### NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 22-7134

JOHN DOES 1-7,

*Plaintiffs-Appellants,*

*v.*

TALIBAN; AL-QAEDA; HAQQANI NETWORK,

*Defendants,*

INTERNATIONAL MONETARY FUND; INTERNATIONAL BANK FOR
RECONSTRUCTION AND DEVELOPMENT,

*Garnishees-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in
Nos. 1:21-MC-00110-DLF, Dabney L. Friedrich, U.S. District Judge*

## BRIEF FOR PLAINTIFFS-APPELLANTS

JOHN THORNTON
DO CAMPO & THORNTON, P.A.
150 S.E. Second Avenue, Suite 602
Miami, Florida 33131
(305) 358-6600
jt@dandtlaw.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES

**(A)     Parties and Amici**

The following individuals and entities were parties before the District Court and are parties in this Court:

1.  John Does 1 through 7, Plaintiffs/Judgment Creditors-Appellants;

2.  International Monetary Fund, Garnishee-Appellee; and

3.  International Bank for Reconstruction and Development, Garnishee-Appellee.

The following entities were parties before the District Court but are not parties in this Court:

1.  The Taliban, Defendant;

2.  Al-Qaeda, Defendant; and

3.  The Haqqani Network, Defendant.

There were no *amici curiae* or intervenors in the District Court proceedings.

**(B)     Rulings Under Review**

The ruling at issue in this appeal is the District Court's Order: 1) granting the International Monetary Fund's ("Fund") Motion to Dismiss (which the Court construed as a Motion to Quash Service of Process); 2) granting the International Bank for Reconstruction and Development's ("World Bank") Motion to Quash

Writ of Attachment; and 3) denying John Does 1 through 7 ("Doe Creditors")

Motion for Entry of Final Judgment. A194.

**(C)    Related Cases**

This case has not previously been before this Court or any other court.

Counsel is not aware of any related cases currently pending in this or any other

court that may be considered related for purposes of this rule.

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES ...............i

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY OF ABBREVIATIONS ......................................................xi

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................1

STATEMENT OF THE CASE.................................................................3

SUMMARY OF THE ARGUMENT ......................................................13

ARGUMENT ........................................................................................16

    I.    Standard of Review ...........................................................16

    II.    Background ........................................................................16

        A.    The Articles of Agreement of the Garnishees are Prospectively Incorporated into U.S. Law................................17

            1.    The Immunity Provisions of the Fund's Articles of Agreement ..................................................17

            2.    The Immunity Provisions of the World Bank's Articles of Agreement ..................................18

        B.    The IOIA ..............................................................19

        C.    28 U.S.C. § 1611 Provides Immunities to International Organizations .........................................19

        D.    The Federal Sanctions Regime Applied to the Taliban and DAB .................................................................20

        E.    TRIA Provides for Execution Against the Blocked Assets of Terrorist Judgment Debtors, or Their Agencies and Instrumentalities, Overriding All Prior Immunities and Thwarting Contrary Executive Action............22

1. Terms and Purpose – to Facilitate Enforcement of Judgments, Provide a Pool of Assets to Satisfy Judgments, and Proscribe Executive Branch Interference ..............................................22

2. Relation to Sovereign Immunities ..................................24

3. Procedure for Enforcement of TRIA Attachment ..........25

F. The Terrorist Attack, Lawsuit, and Judgment ..........................27

G. The Taliban Takes Over Afghanistan and the U.S. Freezes Assets ..............................................................27

1. The Fund Blocked Assets ................................................28

2. The World Bank Blocked Assets ....................................29

H. On September 23, 2021, Doe Creditors Served Writs of Attachment on Garnishees ......................................................30

I. On September 24, 2021, OFAC Issued the World Bank a License to Release Funds to the Taliban................................31

J. The Writs of Attachment Were in Effect From September 23, 2021 Until September 8, 2022 ........................31

III. The District Court Abused its Discretion by Not Entering Judgments Against the Garnishees, as the D.C. Code Mandates ..........................................................................32

IV. The District Court Erred by Not Compelling the Garnishees to Answer the Interrogatories in Attachment ......................................35

V. The District Court Erred in Finding That TRIA Did Not Apply Based on No Supportive Record Evidence ..............................35

A. There Was No Evidence That the Fund Did Not Hold Blocked Assets of an Instrumentality of a Judgment Debtor; In Fact, the Fund Did Not Even Argue That ..............36

B. There Was No Evidence That the World Bank Did Not Hold Blocked Assets of an Instrumentality of a Judgment Debtor; There Was Only Specious Argument of Counsel That Begged Further Discovery ..........................37

iv

VI.    The District Court's Flawed Order Turned on an Incorrect
       Legal Proposition That Assets That Had Not yet Been
       Transferred at the Time of the Service of a Writ Are Not
       Assets of the Transferee ......................................................................38

VII.   The District Court Erred by Ruling in the Alternative That It
       Could Not Find That the Blocked Assets Are "of" a Judgment
       Debtor or an Instrumentality of the Taliban.........................................43

VIII.  There Are No Other Reasons to Affirm ...............................................48

       A.    TRIA Overrides all Immunities, Not Just Those of
             Nations ......................................................................................48

       B.    A License Issued After the Attachment of a Writ Has
             No Effect on a TRIA Collection of the Blocked Assets;
             However Any Transfer Would Indicate That the
             Garnishees in Fact Violated the Writs ......................................48

CONCLUSION .........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bennett v. Islamic Rep*,
  825 F.3d 949 (9th Cir. 2016), *abrogated on other grounds by*
  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)...................................42

*Bennett v. Islamic Repub. of Iran*,
  618 F.3d 19 (D.C. Cir. 2010)................................................................................24

*Biscayne Contractors, Inc. v. Redding*,
  219 F. Supp. 3d 41 (D.D.C. 2016).......................................................................33

*Boyle v. United Techs. Corp.*,
  487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988) ..................................40

*Burks v. Lasker*,
  441 U.S. 471, 99 S. Ct. 1831, 60 L. Ed. 2d 404 (1979) ......................................40

*Est. of Levin v. Wells Fargo Bank*,
  45 F.4th 416 (D.C. Cir. Aug. 16, 2022) ........................................... 14, 39, 40, 41

*Guar. Tr. Co. of New York v. United States*,
  304 U.S. 126 (1938) ..................................................................................... 12, 46

*Heiser v. Islamic Republic of Iran*,
  735 F.3d 934 (D.C. Cir. 2013).................................... 2, 12, 14, 15, 39, 40, 42, 51

*Kirschenbaum v. 650 Fifth Ave.*,
  830 F.3d 107 (2d Cir. 2016) ................................................................................48

*North Dakota v. United States*,
  460 U.S. 300 (1983) ............................................................................................48

*Novak v. World Bank*,
  227 U.S. App. D.C. 83, 703 F.2d 1305 (1983) ........................................... 13, 32

*Owens v. Republic of Sudan*,
  864 F.3d 751 (D.C. Cir. 2017).............................................................................16

*Republic of Arg. v. NML Cap., Ltd.*,
  573 U.S. 134 (2014) ............................................................................................35

*Salimoff & Co. v. Standard Oil Co. of New York*,
  262 N.Y. 220 (1933)............................................................................................44

*Stansell v. Revolutionary Armed Forces of Colom.*
  (FARC), No. 10-471 (TJK), 2020 U.S. Dist. LEXIS 121498
  (D.D.C. July 10, 2020) ...........................................................50

*Sutherlin v. Wells Fargo Bank N.A.*,
  767 F. App'x 812 (11th Cir. 2019)........................................49

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
  772 F. Supp. 2d 191 (D.D.C. 2011) ......................................50

*United States v. Holy Land Found. For Relief & Dev.*,
  445 F.3d 771 (5th Cir. 2006).................................................24

*United States v. Welden*,
  377 U.S. 95 (1964) ................................................................48

*Weininger v. Castro*,
  462 F. Supp. 2d 457 (S.D.N.Y. 2006) ...................................24

*Wrecking Corp. of Am., Inc. v. Jersey Welding Supply, Inc.*,
  463 A.2d 678 (D.C. 1983) ........................................ 16, 34, 51

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ..................................... 12, 15, 44, 45, 46

## Statutes & Other Authorities:

22 U.S.C. § 286...................................................... 6, 11, 17

22 U.S.C. § 286h.................................................. 6, 17, 18, 25

22 U.S.C. § 287.................................................................23

22 U.S.C. §§ 288-288i ...................................................... 7, 19

28 U.S.C. § 610.................................................................13

28 U.S.C. § 1291.................................................................1

28 U.S.C. § 1331.................................................................1

28 U.S.C. § 1605A.............................................................22

28 U.S.C. § 1605(a)(7).......................................................22

28 U.S.C. § 1610........................... 1, 4, 5, 11, 19, 22, 23, 30, 48

28 U.S.C. § 1610(g) ...........................................................40

28 U.S.C. § 1611 ................................................................. 10-11, 19, 20, 23, 24, 25

28 U.S.C. § 1611(a) ............................................................................ 19, 25

50 U.S.C. § 1701 .................................................................................. 20, 23

50 U.S.C. § 1702 .........................................................................................23

50 U.S.C. § 4305(b) ....................................................................................23

50 U.S.C. App. 5(b) .....................................................................................23

31 C.F.R. § 594 ..................................................................................... 9-10

31 C.F.R. § 594.201(a) ................................................................................22

31 C.F.R. § 594.310 ....................................................................................22

31 C.F.R. § 597 ...........................................................................................10

*3 Bevans 1351*,
    1945 U.S.T. LEXIS 218 Bevans 135 ...................................................17

*3 Bevans 1390*,
    1945 U.S.T. LEXIS 219 Bevans 1390 .................................................17

64 Fed. Reg. 36,759 (July 7, 1999) .............................................................21

66 Fed. Reg. 49,079 ....................................................................................21

66 Fed. Reg. 44,751 (July 2, 2002) .............................................................22

148 Cong. Rec. S11524 ...............................................................................23

Articles of Agreement, Art. IX, § 3,
    https://www.imf.org/external/pubs/ft/aa/ ......................................17, 18

Articles of Agreement, Art. VII, §§ 3 and 4,
    https://www.worldbank.org/en/about/articles-of-agreement/ibrd-articles-
    of-agreement ....................................................................................18, 19

Caleb Nelson, *The Persistence of General Law*,
    106 COLUM. L. REV. 503 (2006) .......................................................40

D.C. Code § 16-521 ......................................................................................4

D.C. Code § 16-521(a) ................................................................................26

D.C. Code § 16-526(b) ............................................... 1, 5, 13, 27, 30, 32, 33

D.C. Code § 16-547 .....................................................................................49

D.C. Code § 16-556 ...................................................................................27

Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief
as Crisis Looms*, BLOOMBERG, August 23, 2021,
https://www.bnnbloomberg.ca/taliban-name-obscure-official-central-
bank-chief-as-crisis-looms-1.1643238 ............................................ 27-28

Executive Order 9751 ...............................................................................19

Executive Order 13129 .............................................................................21

Executive Order 13224 ........................................................................ 10, 21

Executive Order 13268 .............................................................................22

Fed. R. App. P. 4 .........................................................................................1

Fed. R. Civ. P. 69 ................................................................................. 25, 26

Final Default Judgment, *John Does 1 through 7 v. the Taliban, et al.*,
No. 20-00605 (N.D. Texas Nov. 5, 2020)...........................................27

General License No. 14, *Department of the Treasury, Office of Foreign Assets
Control: Authorizing Humanitarian Activities in Afghanistan* (September 24,
2021), https://home.treasury.gov/system/files/126/ct_gl14.pdf. ............... 9, 10, 31

H. Rep. No. 107-779 (2002) .....................................................................24

*House Foreign Affairs Committee Holds Hearing on Afghanistan*,
CQ Congressional Transcripts (Sept. 13, 2021)...................................47

Jeff Stein, *Biden administration freezes billions of dollars in
Afghan reserves, depriving Taliban of cash*, THE WASHINGTON POST,
August 17, 2021, https://www.washingtonpost.com/us-
policy/2021/08/17/treasury-taliban-money-afghanistan/ .....................................28

Lipsky, Josh and Wechsler, William F., WALL STREET JOURNAL,
August 18. 2021, *The IMF Acts Against the Taliban--Afghanistan was
in line to receive more than $400 million in Special Drawing Rights next* week,
https://www.wsj.com/articles/biden-imf-taliban-funding-afghanistan-central-
bank-withdrawal-terrorist-financing-islamist-11629320770 ..............................29

News Desk, *A Historical Timeline of Afghanistan*, PBS NEWS HOUR,
https://www.pbs.org/newshour/politics/asia-jan-june11-
timeline-afghanistan ...............................................................................27

Paul J. Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U. PA. L. REV. 797 (1957) ...........................................................................40

Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://home.treasury.gov/news/press-releases/po943 ........................................................................................21

Pub. L. No. 95-223, 91 Stat. 1625 ..........................................................................20

Rappeport, Alan, THE NEW YORK TIMES, *The World Bank is freezing aid disbursements to Afghanistan*, August 24, 2021, https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html................................................................ 29, 30, 38

Remarks on the End of United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 693 (Aug. 31, 2021).....................................47

*Restatement (Second) of Foreign Relations Law* § 106 (1965)....................... 43, 44

*Restatement (Third) of Foreign Relations Law* § 203 (1987)..................................44

*Restatement (Third) of Foreign Relations Law* § 204 ............................................45

State Dep't, *U.S. Relations With Afghanistan* (Aug. 15, 2022), https://www.state.gov/u-s-relations-with-afghanistan/ ........................................47

Terrorism Risk Insurance Action of 2002 § 201 .........................................23, 24, 40

Terrorism Risk Insurance Action of 2002 § 201(a).......................4, 5, 13, 24, 30, 36

U.S. Department of Treasury, Office of Foreign Assets Control, Sanctions Programs and Information, *Frequently Asked Questions No. 928*, Released on September 24, 2021, https://home.treasury.gov/policy-issues/financial-sanctions/faqs/topic/2396 ...........................................................................9

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| DAB | Da Afghanistan Bank |
| FUND | International Monetary Fund |
| IOIA | International Organizations Immunities Act |
| TRIA | Terrorism Risk Insurance Act of 2002 |
| WORLD BANK | International Bank for Reconstruction and Development |
| WRIT OF ATTACHMENT | Writ of Attachment on Judgment Other than Wages, Salary and Commission |

## JURISDICTIONAL STATEMENT

The district court possessed jurisdiction pursuant to 28 U.S.C. § 1331 because Doe Creditors sought enforcement of their Judgment via a Writ of Attachment pursuant to a federal statute, the Terrorism Risk Insurance Act of 2002 ("TRIA"), 28 U.S.C. § 1610, note. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the Order granting the Fund's Motion to Dismiss; granting the World Bank's Motion to Quash Writ of Attachment; and denying the Doe Creditor's Motion for Entry of Final Judgment on September 8, 2022, was a final decision of the District Court, which Doe Creditors timely appealed on October 6, 2022, pursuant to Fed. R. App. P. 4.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)     Whether the District Court erred by not entering judgments against the Appellees, as is mandated by DC code § 16-526(b), after they failed to timely serve answers to the Interrogatories in Attachment, or to appear and show cause why a judgment should not be entered.

(2)     Whether the District Court erred by not compelling the Appellees to answer the Interrogatories in Attachment, when they had no immunities from doing so when those Interrogatories in Attachment were issued pursuant to TRIA.

(3)     Whether the District Court erred by making ultimate findings of fact that neither Appellee held blocked assets of an agency or instrumentality of the

Taliban (as those terms are defined by TRIA), based upon a misapplication of

*Heiser v Islamic Republic of Iran*, 735 F. 3d 934 (D.C. Cir. 2013), despite the

facts:

a)    that because neither Appellee answered the Interrogatories in

Attachment asking whether, in fact, it was indebted to, or had in its

possession or charge any goods, chattels or credits of an agency or

instrumentality of a debtor, including but not limited to Da

Afghanistan Bank ("DAB"), there was no evidence in support in the

record and no factual discovery concerning the questions before the

Court;

b)    that it is not disputed that the Appellant Fund in fact froze credits due

to be withdrawn by DAB, a known agency or instrumentality of a

debtor, the Taliban; and the Fund did not address, with argument or

evidence, whether these frozen assets it indisputably held qualified as

blocked assets of an agency or instrumentality of the Taliban;

c)    that it is not disputed that the Appellant World Bank in fact froze

funds due to be withdrawn by DAB, a known agency or

instrumentality of a debtor, the Taliban; and the World Bank did not

address, with evidence, whether these frozen assets it indisputably

held qualified as blocked assets of an agency or instrumentality of the Taliban; and

d)    that the fact that these frozen assets were in fact blocked assets of an agency or instrumentality of the Taliban was confirmed by the later issuance of a license directed at the Appellees and permitting "transactions involving the Taliban", so that Appellees could transfer these very assets to DAB;

(4)    Whether the District Court erred by ruling in the alternative that it is forbidden from exercising jurisdiction over the blocked assets of DAB, an entity the Taliban controls (as it is mandated by TRIA), because to do so would constitute an impermissible formal recognition by the courts that the Taliban does not just control DAB, but somehow that the Taliban is the legitimate government of all of Afghanistan – even where the Executive Branch has itself recognized that the Taliban controls DAB (and so there would be no conflict with the Executive), and even where finding that the Taliban controls DAB in no way implies that the Taliban is the legitimate government of all of Afghanistan.

## STATEMENT OF THE CASE

Appellants Doe Creditors were working as civilian contractors for the U.S. Government in Afghanistan in 2016 when they were attacked. The terrorist groups the Taliban, Haqqani Network and Al-Qaeda drove a truck bomb into their camp.

3

Appellants sued for compensation for their injuries, and now hold terrorism judgments against the terrorist groups. They seek to satisfy their terrorism judgments by executing against blocked assets pursuant to TRIA.

On September 23, 2021, Doe Creditors served on each Garnishee a Writ of Attachment on Judgment Other than Wages, Salary and Commissions ("Writ of Attachment"), issued by the Clerk, notifying each Garnishee that "any money, property or credits other than wages, salary and commissions of the above-named defendant(s)* are seized by Writ of Attachment …". (A11, A14, A80, A117, A139). The asterisk provided, in a section outlined in red, bold, and underlined, that the money, property or credits included that of defendants "***Or the agency or instrumentality of the Defendant as defined by Section 201(a) of the Terrorism Risk Insurance Action of 2002, 28 U.S.C. § 1610 note, including but not limited to Da Afghanistan Bank**" (emphasis in original). A80, A139.

The Writs of Attachment attached Interrogatories in Attachment which, consistent with D.C. Code § 16-521 and TRIA, required the Garnishees to file answers "within ten (10) days after service of the writ upon you", stating whether the Garnishee "at the time of the service of the writ of attachment", "or between the time of such service and the filing of your answers", was "indebted to" or "had … any goods, chattels or credits of the defendant(s)* …". The asterisk provided, in a section outlined in red, bold, and underlined, that the money, property or credits

4

included that of defendants "*__Or the agency or instrumentality of the__

__Defendant as defined by Section 201(a) of the Terrorism Risk Insurance__

__Action of 2002, 28 U.S.C. § 1610 note, including but not limited to Da__

__Afghanistan Bank__" (emphasis in original). A81, A140.

Both the Writs of Attachment and Interrogatories of Attachment warned of

the consequences of failing to respond: "If you fail to do so, judgment may be

entered against you for the <u>entire amount of the plaintiff's claims with interest and</u>

<u>costs.</u>" A80, A139, Writs of Attachment (emphasis in original); "If you fail to

answer the Interrogatories, judgment may be entered against you for the entire

amount of the plaintiff's claim and costs [Title 16, <u>Section 526(b). D.C. Code 1981</u>

<u>ed.].</u>" A81, A140, Interrogatories in Attachment.

Garnishees failed to answer the Interrogatories in Attachment or appear and

show cause why a judgment should not be entered against them within the

response time period. They have never answered the Writs of Attachment or the

Interrogatories in Attachment.

On October 12, 2022, Doe Creditors filed a motion for entry of judgment

against each of the Garnishees (A15), calling for application of D.C. Code § 16-

526(b)'s statutory penalty against garnishees who fail to either answer or show

cause: that "judgment shall be entered against him for the whole amount of

plaintiff's claim, and costs, and execution may be had thereon."

On October 15, 2021, the Fund belatedly filed a Praecipe arguing that it was immune from process pursuant to its Articles, which were given effect in the United States by the Bretton Woods Agreement Act, 22 U.S.C. § 286 *et seq.* A24. The Fund attached a letter to counsel for Doe Creditors of even date making the same singular argument – of immunity based on its Articles and their incorporation into U.S. law – and making no mention of the blocked assets at issue, and not addressing the fact that the Writ of Attachment and Interrogatories had been issued pursuant to TRIA, as the Writs of Attachment and Interrogatories clearly indicated. A27.

On October 19, 2021, Doe Creditors filed a Response to Praecipe, explaining that TRIA allowed for execution against blocked assets notwithstanding the immunities provided for by the prior-enacted Bretton Woods Agreement Act. A29.

On October 22, 2022, documents that the World Bank had hand-filed with the clerk on October 4, 2022, appeared on the docket. A35-38. These documents were merely a copy of the Writ of Attachment (A35) and the unanswered Interrogatories in Attachment that had been served upon the World Bank (A36), along with a letter its counsel had sent on September 27, 2021, to counsel for Doe Creditors. A37. This letter invoked the World Bank's Articles, which had been incorporated into U.S. law by 22 U.S.C. § 286h, as well as the International

6

Organizations Immunities Act ("IOIA"), 22 U.S.C. §§ 288-288i, as support for the proposition that the World Bank is "immune from judicial proceedings". *Id*. Like the Fund's letter, this letter made no mention of the blocked assets at issue, and did not address the fact that the Writ of Attachment and Interrogatories had been issued pursuant to TRIA, as the Writ of Attachment and Interrogatories clearly indicated. On October 29, 2021, Doe Creditors moved to strike this incognizable filing, A39, and the Court properly struck it that same day, because, *inter alia*, it was not a pleading, a motion, or a response to a motion, and as it was unsigned. A45.

In its minute order striking the World Bank's defective filing, the district court ordered Garnishee the World Bank to file a memorandum in opposition to the Doe Creditors' Motion for Entry for Final Judgment by November 5, 2021. *Id*. That same day, the Court made a docket entry setting the deadline "Memorandum in Opposition due by 11/5/2021". A46.

On November 1, 2021, the Fund filed a Motion to Dismiss, despite the fact that no pleading had been filed against it. A47.

On November 8, 2021, Doe Creditors filed a Motion to Strike both the Praecipe and the Motion to Dismiss as improper filings. A70.

Also on November 8, 2021, the World Bank, having missed the November 5, 2021, deadline to respond to the motion for judgment (just as it had missed the

deadline to answer the Interrogatories in Attachment), filed an Unopposed Motion for Extension of Time to Respond to the Motion for Judgment. A83.

On November 10, 2021, the district court issued a minute order in which it ostensibly granted the World Bank's extension to respond to the Motion for Entry of Final Judgment, but in so doing ordered the World Bank, which had already effectively waived its opportunity to file a motion to quash service of process by not filing one, to file a motion to quash rather than a response to the pending Motion for Entry of Final Judgment for which the World Bank had made its belated motion for extension. A87. In that same minute order, the court denied the motion to strike the two filings from the Fund – the Praecipe and the Motion to Dismiss – and announced that it would instead construe the Fund's Motion to Dismiss as a Motion to Quash Service of Process. *Id*.

On November 15, 2021, the World Bank filed its Motion to Quash. A89.

In their respective motions, both Garnishees argued that they were absolutely immune from the Court's jurisdiction, including judicial process. A56, A94. The Fund argued that its immunity was based on its Articles of Agreement. A59. The World Bank argued that its immunity was based both on its Articles of Agreement and the IOIA. A94.

8

The only evidence either of them provided in support of their motions was a

license and a publication by the U.S. Government submitted by the World Bank

that the Court could take judicial notice of, specifically a:

> license by the United States Treasury's Office of Foreign Assets
> Control, General License No. 14, of September 24, 2021. *See* U.S.
> Department of Treasury, Office of Foreign Assets Control, General
> License No. 14, *Authorizing Humanitarian Activities in Afghanistan*
> (Sept. 24, 2021),
> https://home.treasury.gov/system/files/126/ct_gl14.pdf. General
> License 14 specifically authorizes the United Nations and its
> Specialized Agencies, which includes the World Bank,[7] to engage in
> "all transactions involving the Taliban . . . that are ordinarily incident
> and necessary to the provision of humanitarian assistance to
> Afghanistan or other activities that support basic human needs in
> Afghanistan." *Id.* at 1.
>
> [7]*See* U.S. Department of Treasury, Office of Foreign Assets Control,
> Sanctions Programs and Information, *Frequently Asked Questions No.
> 928*, Released on September 24, 2021 (available at
> https://home.treasury.gov/policy-issues/financial-
> sanctions/faqs/topic/2396) "Persons authorized under [General
> License No.] 14 include the following entities and their employees,
> grantees, contractors, or other persons acting on their behalf: (1) the
> United States Government; (2) NGOs; (3) the United Nations,
> including its Programmes, Funds, and Other Entities and Bodies, as
> well as its specialized Agencies and Related Organizations, *which
> includes the World Bank*.") (emphasis added)).

A99-100.[1] The only other items of evidence in the record were the Affidavits of

Service and the Writs of Attachment and Interrogatories in Attachment themselves.

---

[1] The license covered not only the Taliban, but "transactions involving the Taliban
or the Haqqani Network, or any entity in which the Taliban or the Haqqani
Network owns, directly or indirectly, individually or in the aggregate, a 50 percent
or greater interest, prohibited by the Global Terrorism Sanctions Regulations, 31

The Fund was explicit that its motion was not addressed to facts at all, but rather that its argument was limited to one proposition: that TRIA, as a matter of law, does not override its immunities in any instance. A58, n.3.

Thus, the only evidence before the Court was: 1) evidence that, on September 23, 2021, the Garnishees had been served with the Writs of Attachment issued by the Court pursuant to TRIA, but had not timely answered them; and 2) evidence that, on the following day, September 24, 2021, the Executive Branch issued licenses to international organizations such as the Garnishees, and specifically the World Bank, to engage in otherwise prohibited "transactions involving the Taliban" (or the Haqqani Network and the entities they control), *i.e.* the very terrorist judgment debtors in this matter.[2]

Doe Creditors countered the Garnishees' motions, pointing out that TRIA allows for execution of blocked assets notwithstanding all the previously enacted laws that formed the bases for their claimed immunities, including the IOIA, 28

---

CFR part 594 (GTSR), the Foreign Terrorist Organizations Sanctions Regulations, 31 CFR part 597 (FTOSR), or Executive Order (E.O.) 13224 …". *See* U.S. Department of Treasury, Office of Foreign Assets Control, General License No. 14, *Authorizing Humanitarian Activities in Afghanistan* (Sept. 24, 2021), https://home.treasury.gov/system/files/126/ct_gl14.pdf.

[2] The invocation of the license by the World Bank as authority to move assets indicates that the assets it held were to be paid to the Taliban or the Haqqani Network or to an entity they control. If the blocked assets were not "blocked assets" that, absent the block, would be withdrawn by these entities or an entity they control, then the World Bank would not be invoking the license.

U.S.C. § 1611 (which grants immunity to property of international organizations), and the specific laws such as the Bretton Woods Agreement Act, 22 U.S.C. § 286 *et seq.*, that give force in the United States to these organizations' own charter agreements. A112-113, A126-127. Further, Doe Creditors pointed out that the only evidence before the Court, if the evidence showed anything, showed that the Garnishees held assets of the Taliban or its instrumentalities, as the U.S. Government had, only a day after the service of the Writs of Attachment, issued a license that would have authorized them to transfer assets to the Taliban, the Haqqani Network, or their instrumentalities, (had the assets not been subject to the prior writ, of course). A129.

On September 8, 2022, the district court ruled. The district court did not rule on the principal question before it: whether TRIA, as a matter of law, overrides the immunities that these two international organizations would otherwise enjoy. The district court stated it

> need not resolve that dispute, because, even if the TRIA applies to the Fund and the World Bank, it does not cover the assets in dispute here. By its terms, the TRIA only applies to 'assets of [a] terrorist party' or 'any agency or instrumentality of that terrorist party.' 28 U.S.C. § 1610 (note).

A199.

Despite the fact that the Interrogatories in Attachment had not been answered, and the only evidence in the record concerning the assets was that

subsequent to the Writs attaching there had been a license issued that would have allowed the Garnishees to deal with the Taliban, the Haqqani Network and the entities they control, the district court made findings that the blocked assets at issue were not assets of either DAB or the Taliban; that TRIA was therefore not available and could not be used to overcome the Garnishees' claimed immunities; and that the Court therefore lacked jurisdiction. The district court cited a single case in support of this finding, *Heiser v. Islamic Republic of Iran*, 735 F.3d at 938, 940-41, (A200), which found that the U.C.C.'s technical rules governing wire transfers were an appropriate rule of decision in a wire transfer case, and according to them, assets payable to, but not yet paid, were not assets "of" the payee.

The district court ruled, alternatively, and based on no evidence in support of its findings, that it lacked jurisdiction because DAB did not own the assets, and, further, that it could not recognize the Taliban as the owner of the assets out of deference to the political department of the government, citing two cases, *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 137–38 (1938); and *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 18–19 (2015). A200.

Based on its ruling that it lacked jurisdiction, the district court granted the Fund's Motion to Dismiss (which the Court construed as a Motion to Quash Service of Process); granted the World Bank's Motion to Quash Writ of Attachment; and denied Doe Creditors' Motion for Entry of Final Judgment. A194.

The Interrogatories in Attachment asking the Garnishees whether they "had … any goods, chattels or credits of the defendant(s) … **Or the agency or instrumentality of the Defendant as defined by Section 201(a) of the Terrorism Risk Insurance Action of 2002, 28 U.S.C. § 610 note, including but not limited to Da Afghanistan Bank**" (A118, A140), were never answered by the Garnishees, and Doe Creditors never had the opportunity to traverse their answers.

## SUMMARY OF THE ARGUMENT

The Court first erred by ignoring the statutory mandate of DC code § 16-526(b), that "judgment *shall* be entered against [Garnishees]" (emphasis added) for the failure to answer the Interrogatories in Attachment or show cause why judgment should not be entered against them.

If the Garnishees challenged service on the grounds of their purported immunities, the proper course was to file a motion to quash. *See Novak v. World Bank,* 227 U.S. App. D.C. 83, 703 F.2d 1305, 1310 (1983) (reversing district court's dismissal of claim against the World Bank, and stating "the World Bank, if it claimed service was improper, should have contested the validity of service and asserted that it was not amenable to suit in the district court …".).

If these organizations had any other reason why judgment should not have been entered against them, they had one course under the statute: to timely "show cause" why judgment should not be entered. Having failed to timely challenge

13

service or show cause why judgment should not be entered against them, the district court was obligated to issue judgments against them. It erred by not doing so, and by instead providing legal advice to the World Bank by ordering it to file a belated Motion to Quash after it had already waived its right to do so.

The Court then erred by not compelling the Garnishees to answer the Interrogatories in Attachment before ruling.

The Court erred again by making the factual finding that neither Garnishee held blocked assets of DAB. The district court construed the Doe Creditors' description that the assets were "payable" to DAB as proof that DAB did not own the assets. In making this finding, the district court did not rely on any evidence. Instead, the district court relied on a legal proposition – that assets don't belong to a potential transferee who has not yet taken possession of the funds – a proposition that it gleaned from an out of context electric funds transfer case, *Heiser*, 735 F.3d 934 – a case that this Court, in *Est. of Levin v. Wells Fargo Bank*, 45 F.4th 416 (D.C. Cir. Aug. 16, 2022), less than two weeks prior to the district court's order, stressed was limited to its facts and does not provide the rule of decision in a TRIA collection. This was error.

It was error to rule that the assets do not belong to DAB based on the assumption that they were payable to DAB; it was error to make *any* conclusive findings about the assets when the Garnishees had not answered the Interrogatories

14

in Attachment and there was no admissible evidence in the record other than the subsequent license that would allow the Taliban and Haqqani Network to access the very assets at issue through their payment to DAB; and, it was error to apply the inapplicable rule from *Heiser*.

Finally, the district court's alternative rationale for ruling that it lacked jurisdiction – that it was precluded from finding that the assets belong to an instrumentality of the Taliban – is incorrect. The district court misinterpreted both TRIA and the Supreme Court's separation-of-powers precedents in concluding that the assets cannot be considered assets of an instrumentality of the Taliban. To be an agency or instrumentality of the Taliban under TRIA, an entity need only be controlled or used by the Taliban; there is no requirement that such control be legitimate or governmental. And a court's factual finding that the Taliban controls an entity, or even that the Taliban is acting as a *de facto* government, would not bestow the United States's formal recognition on the Taliban regime or even impact the President's position on Afghanistan's government, which is all the Constitution precludes. *See Zivotofsky*, 576 U.S. at 30. There is simply no logic to the notion that recognizing, exactly as the U.S. Government does, that the Taliban control both Afghanistan and DAB *de facto* and *illegitimately*, is somehow an infringement of the Executive Branch's recognition prerogatives.

The district court's errors have paved the way for formerly blocked assets to be released *to the Taliban*, either directly or through the instrumentalities it controls, including DAB. This ruling is anathema to TRIA's mandates that blocked assets of terrorists or their agencies or instrumentalities must be made available to the terrorists' judgment debtors, (and must *not* be delivered to the control of terrorists), even if the Executive Branch desires to do so for political reasons. The district court should be reversed, and it should be mandated to enter judgments against the Garnishees, as the law requires.

## ARGUMENT

### I.    Standard of Review

The District Court's ruling that it lacked jurisdiction is reviewed *de novo. See Owens v. Republic of Sudan,* 864 F.3d 751, 785 (D.C. Cir. 2017). The district court's denial of the motion for judgment against the Garnishees is reviewed for an abuse of discretion. *See Wrecking Corp. of Am., Inc. v. Jersey Welding Supply, Inc*., 463 A.2d 678, 680 (D.C. 1983).

### II.    Background

The following background was supplied in relevant part to the district court and is relevant to this *de novo* review. A104-111, A120-126. This background examined the post-World War II establishment of the Garnishees and their immunities; the terrorist era blocking regime and its application to terrorist groups

16

including the Taliban; TRIA, its provisions overriding prior immunities, and effectuation through state execution procedures; the terrorist attack, lawsuit and judgment in this matter; the Taliban takeover and the blocking of assets by the Garnishees; the writs served on Garnishees in this district; and the subsequent license.

### A.    The Articles of Agreement of the Garnishees are Prospectively Incorporated into U.S. Law

Both the Fund and the World Bank have immunities in their charters that were given effect in U.S. law by an act of Congress. On July 31, 1945, the Bretton Woods Agreement Act, 22 U.S.C. § 286 *et seq*. was passed, authorizing the President to accept membership into the Fund and World Bank according to their respective Articles of Agreement, which had been drafted at that time, but not yet signed by member states.  22 U.S.C. § 286.  The Articles of Agreement of both the Fund and the World Bank were accepted by the United States and other member states on December 27, 1945. *See* 3 Bevans 1351, 1945 U.S.T. LEXIS 218, *1, 3 Bevans 135; *see also* 3 Bevans 1390, 1945 U.S.T. LEXIS 219, *1, 3 Bevans 1390.

### 1.    The Immunity Provisions of the Fund's Articles of Agreement

According to 22 U.S.C. § 286h, the provisions of article IX, sections 2 to 9 of the Fund's Articles of Agreement concerning immunities have full force and effect in the United States.  Article IX, Section 3 provides:

*Immunity from judicial process.* The Fund, its property and its assets, wherever located and by whomsoever held, shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract.

Articles of Agreement, Art. IX, Section 3 available at

https://www.imf.org/external/pubs/ft/aa/.

### 2. The Immunity Provisions of the World Bank's Articles of Agreement

According to 22 U.S.C. § 286h, the provisions of article VII, sections 2 to 9, including sections 3 and 4 of the World Bank's Articles of Agreement concerning immunities have full force and effect in the United States. Notably, the scope of the World Bank's immunities provided for in its Articles do not include immunity from all suits. Further, the immunities provided for in the World Bank's Articles extend only to the assets of the World Bank, not assets of other entities that it might hold. Article VII, sections 3 and 4, the sections concerning immunities, provide:

**SECTION 3. Position of the Bank with Regard to Judicial Process**

*Actions may be brought against the Bank* only in a court of competent jurisdiction *in the territories of a member in which the Bank has an office*, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members. *The property and assets of the Bank shall*, wheresoever located and by whomsoever held, *be immune from* all forms of seizure, *attachment* or execution *before the delivery of final judgment against the Bank*.

18

> **SECTION 4. Immunity of Assets from Seizure**
> *Property and assets of the Bank*, wherever located and by whomsoever held, *shall be immune from search, requisition, confiscation, expropriation or any other form of seizure by executive or legislative action*.

Articles of Agreement, Art. VII, Sections 3 and 4 available at

https://www.worldbank.org/en/about/articles-of-agreement/ibrd-articles-of-agreement. (emphasis added).

## B.    The IOIA

On December 29, 1945, the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288 *et seq*., was signed into law.  It defined the term "international organization", and authorized the President to designate organizations that would be entitled to the immunities contained in the Act.  On July 11, 1946, President Harry S. Truman issued Executive Order 9751, thereby designating the Fund and the World Bank as public international organizations.

## C.    28 U.S.C. § 1611 Provides Immunities to International Organizations

On October 21, 1976, 28 U.S.C. §§ 1610 and 1611 were signed into law.  Section 1610 concerns "Exceptions to the immunity from attachment or execution"; Section 1611 specifies "Certain types of property immune from execution."  Section 1611(a) provides that,

> Notwithstanding the provisions of section 1610 of this chapter [28 USCS § 1610], the property of those organizations designated by the

19

> President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

28 U.S.C. § 1611.

### D.    The Federal Sanctions Regime Applied to the Taliban and DAB

Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95–223, 91 Stat. 1625, 50 U.S.C. § 1701 *et seq.*, at the end of 1977. The law provides that whenever the United States is faced with an "unusual and extraordinary threat … to [its] national security, foreign policy, or economy" which "has its source in whole or substantial part outside the United States," the President may "declare[] a national emergency with respect to such threat" and implement measures to regulate international economic transactions. 50 U.S.C. § 1701.

The Taliban is an Islamic fundamentalist terrorist group that has twice taken control of territory and institutions in Afghanistan, including DAB. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his power under IEEPA to block (1) "all property or interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone

20

found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H. DOC. NO. 106-268, at 4; *see also* H. DOC. NO. 107-16, at 4 (2001) (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id. Notably, the United States did not recognize the Taliban as the government of Afghanistan yet simultaneously recognized and asserted that the Taliban controlled DAB and had an interest in it (and did so even though DAB was Afghanistan's central bank).*[3]

After the September 11 attacks, President George W. Bush took immediate action pursuant to IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked. Executive Order 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, he added the Taliban to

---

[3] *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://home.treasury.gov/news/press-releases/po943. After the fall of the Taliban at the end of 2001, the Treasury Department issued a license authorizing the new Afghan government to access the DAB's assets. *Id.*

the list of blocked persons, thereby deeming the Taliban a "Specially Designated Global Terrorist" or "SDGT." Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban's designations remains in effect.

### E. TRIA Provides for Execution Against the Blocked Assets of Terrorist Judgment Debtors, or Their Agencies and Instrumentalities, Overriding All Prior Immunities and Thwarting Contrary Executive Action

#### 1. Terms and Purpose – to Facilitate Enforcement of Judgments, Provide a Pool of Assets to Satisfy Judgments, and Proscribe Executive Branch Interference

On July 26, 2002, TRIA (28 U.S.C. § 1610, note), was signed into law to address the difficulty of collecting judgments against terrorists by removing immunities, and by providing a source of collection: the pool of assets blocked pursuant to IEEPA and the Trading with the Enemies Act. It provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610, note. TRIA defined "blocked assets" as follows:

(2) Blocked asset. The term 'blocked asset' means—

(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b) [50 USCS § 4305(b)]) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and
(B) does not include property that—
(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) or the United Nations Participation Act of 1945 (22 U.S.C. 287 *et seq.*); or
(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

*Id*.

As Senator Tom Harkin, one of the primary sponsors of TRIA, explained: "[t]he purpose of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties … [TRIA] establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.*" 148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)) (emphasis added). The conference committee's report echoed this theme: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on

behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.).

## 2.    Relation to Sovereign Immunities

It is settled law that TRIA preempts other statutes that provide for immunities. *See Bennett v. Islamic Repub. of Iran,* 618 F.3d 19, 21 (D.C. Cir. 2010); *see also Weininger v. Castro*, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) ("TRIA, which was enacted later in time than [28 U.S.C.] § 1611, overrides the immunity conferred in § 1611").  TRIA clearly provides for execution or attachment "notwithstanding *any* other provision of law", including immunities. TRIA, Section 201(a) (emphasis added).  TRIA leaves no doubt that Congress intended to, and did, override all prior grants of immunity so that collection can be had against those holding assets of terrorist judgment debtors when it authorized those collections "notwithstanding any other provision of law". Indeed, the intent of the "notwithstanding" language in TRIA is "to target statutory exceptions to immunity". *Id. at* 498 quoting *United States v. Holy Land Found. For Relief & Dev.*, 445 F.3d 771, 787 (5th Cir. 2006).

24

All three of the claimed sources of immunity for these organizations – their Articles, the IOIA and 28 U.S.C. § 1611[4] – predate TRIA, and so were overridden by it.

On December 27, 1945, the day the Garnishees' respective Articles of Agreement Articles were signed by the United States, the immunities provided for in them became effective in U.S. law pursuant to the prior-enacted statutory section, 22 U.S.C. § 286h.

The IOIA was passed on December 29, 1945, and the Garnishees were designated as public international organizations entitled to enjoy the IOIA's immunities on July 1, 1946.

Section 1611(a) of Title 28 became law on October 21, 1976.

TRIA was signed into law after all of these, on November 26, 2002.

Because all the possible sources of their immunities were subsequently overridden by TRIA, the Garnishees are not immune from this TRIA collection effort.

### 3.    Procedure for Enforcement of TRIA Attachment

Federal Rules of Civil Procedure 69 provides as follows:

(a) In General.

---

[4] The World Bank argued that all three of these sources of immunity protected it. The Fund argued that only its Articles did.

(1) *Money Judgment; Applicable Procedure.* A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

(2) *Obtaining Discovery.* In aid of the judgment or execution, the judgment creditor or a successor in interest whose interest appears of record may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located.

Fed. R. Civ. P. 69. Thus, the federal rules mandate that state court procedures govern the execution process, and that the judgment creditor is entitled to discovery.

The D.C. Code establishes a process by which the garnishee is served with a writ of attachment, along with interrogatories, as follows:

In any case in which a writ of attachment is issued, the plaintiff may submit interrogatories in writing, in such form as may be allowed by the rules or special order of the court, to be served on any garnishee, asking about any property of the defendant in his possession or charge, or indebtedness of his to the defendant at the time of the service of the attachment, or between the time of service and the filing of his answers to the interrogatories. The garnishee shall file his answers under oath to the interrogatories within ten days after service upon him.

D.C. Code § 16-521(a).

The D.C. Code further provides:

When the garnishee has failed to answer the interrogatories served on him, or to appear and show cause why a judgment of condemnation should not be entered, judgment shall be entered against him for the

> whole amount of the plaintiff's claim, and costs, and execution may
> be had thereon.

D.C. Code § 16-526(b).[5]

### F.    The Terrorist Attack, Lawsuit, and Judgment

On January 4, 2016, the Taliban, Al-Qaeda, and the Haqqani Network, acting in conspiracy, executed a massive bomb attack in Kabul, Afghanistan injuring Doe Creditors, who were in Afghanistan working for a U.S. Government contractor. Plaintiffs brought suit against the terrorists, and on November 5, 2020, were awarded approximately $138 million for their injuries. *See* Final Default Judgment, *John Does 1 through 7 v. the Taliban, et al.,* No. 20-00605 (N.D. Texas Nov. 5, 2020) (ECF No. 22).

### G.    The Taliban Takes Over Afghanistan and the U.S. Freezes Assets

On or around August 15, 2021, the Taliban, with the aid of the Haqqani Network, took control of and established itself as the government of Afghanistan. News Desk, *A Historical Timeline of Afghanistan*, PBS NEWS HOUR, https://www.pbs.org/newshour/politics/asia-jan-june11-timeline-afghanistan.

Soon thereafter, the Taliban took control of DAB, installing a new governor. Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief as Crisis*

---

[5] D.C. Code § 16-556, which is contained in the statutory subsection concerning attachment and garnishment after judgment in aid of execution, has the identical punishment for failure to answer attachment interrogatories or to appear and show cause.

*Looms*, BLOOMBERG, August 23, 2021, https://www.bnnbloomberg.ca/taliban-name-obscure-official-central-bank-chief-as-crisis-looms-1.1643238.

On August 15, the United States Government moved to freeze assets destined for DAB. The Washington Post reported:

> The Biden administration on Sunday froze Afghan government reserves held in U.S. bank accounts, blocking the Taliban from accessing billions of dollars held in U.S. institutions, according to two people familiar with the matter.
>
> \*\*\*
> An administration official said in a statement, "Any central-bank assets the Afghan government have in the United States will not be made available to the Taliban."

*See* Jeff Stein, *Biden administration freezes billions of dollars in Afghan reserves, depriving Taliban of cash*, THE WASHINGTON POST, August 17, 2021, https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

### 1.     The Fund Blocked Assets

At the time of the Taliban takeover of Afghanistan, the Fund was set to distribute to DAB assets worth $400,000,000 the following week, that is, on August 23, 2021. According to an article in the Wall Street Journal:

> In addition to the funding from the opium trade and extortion schemes that fuel Taliban operations, the group thought it was positioned to inherit a large amount of cash from the International Monetary Fund next week. . . .

. . . Over the past six months, the fund has gone through a complicated process to approve an allocation of SDRs worth roughly $650 billion to its 190 member countries.

Per the agreement, the Taliban would have received the equivalent of over $400 million from the IMF.

It was possible, though difficult due to sanctions, that the Taliban could have found eager partners in Russia and China to help them convert the claims to cash after they are allocated on Aug. 23.

Lipsky, Josh and Wechsler, William F., WALL STREET JOURNAL, August 18.

2021, *The IMF Acts Against the Taliban --Afghanistan was in line to receive more than $400 million in Special Drawing Rights next week*,

https://www.wsj.com/articles/biden-imf-taliban-funding-afghanistan-central-bank-withdrawal-terrorist-financing-islamist-11629320770, *see also* Rappeport, Alan,

THE NEW YORK TIMES, *The World Bank is freezing aid disbursements to Afghanistan*, August 24, 2021,

https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html

("The decision follows a move by the International Monetary Fund last week to freeze the distribution of more than $400 million in emergency currency reserves that were allocated to Afghanistan . . . ".).

### 2.    The World Bank Blocked Assets

As the World Bank admitted in its Motion to Quash (A97), on August 24, 2021, the World Bank announced that it had frozen aid disbursement from a "Trust Fund" for Afghanistan that it administers. Rappeport, Alan, *The World Bank is*

*freezing aid disbursements to Afghanistan*, THE NEW YORK TIMES (Aug. 24, 2021), https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html. (It is worth reminding that the World Bank's Charter, Article VII, section 4, immunized "Property and assets of the Bank" from executive action. *See infra* section II.A.2. Thus, the World Bank must have realized that the assets it froze were not its own assets, which would not have been subject to executive action.)

### H.    On September 23, 2021, Doe Creditors Served Writs of Attachment on Garnishees

On September 17, 2020, the Clerk of this Court issued the Writs of Attachment requiring each of the Garnishees "to hold and not to pay or surrender" the assets it held of any defendant, that is the Taliban, Al-Qaeda, or the Haqqani Network, "or the agency or instrumentality of the Defendant as defined by Section 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note, including but not limited to Da Afghanistan Bank." A117, A139. The Writs of Attachment further contained the standard "INTEROGATORIES IN ATTACHMENT". A118, A140. The Writs of Attachment announced that the attachment was made pursuant to TRIA, and further announced that "[i]f you fail to answer the Interrogatories, judgment may be entered against you for the entire amount of the plaintiff's claim and costs [Title 16, Section 526(b). D.C. Code 1981 ed.]."

On September 23, 2021, Plaintiffs served the Writs of Attachment on the
Fund and the World Bank (*see* A11, A14), thereby establishing a lien over any
assets of the Taliban, Al-Qaeda, the Haqqani Network, or any of their agencies or
instrumentalities, including but not limited to DAB, as the Writs of Attachment
specifically stated.

## I.      On September 24, 2021, OFAC Issued the World Bank a License to Release Funds to the Taliban

On September 24, 2021, the U.S. Department of Treasury, Office of Foreign
Assets Control ("OFAC") issued General License No. 14 authorizing the World
Bank to engage in "all transactions involving the Taliban . . . that are ordinarily
incident and necessary to the provision of humanitarian assistance to Afghanistan
or other activities that support basic human needs in Afghanistan." General
License No. 14, Department of the Treasury, Office of Foreign Assets Control:
*Authorizing Humanitarian Activities in Afghanistan* (September 24, 2021),
https://home.treasury.gov/system/files/126/ct_gl14.pdf. The World Bank cited this
license to the district court in its Motion to Quash. A99-100.

## J.      The Writs of Attachment Were in Effect From September 23, 2021 Until September 8, 2022

The Interrogatories in Attachment make clear that the relevant time period is
a time range, not a snapshot. It states, "Had you at the time of the service of the
writ of attachment, *or have you had between the time of such service and the filing*

31

*of your answer to this interrogatory*, any goods, chattels, or credits of the defendant(s)* in you possession or charge, and, if so, what?" A80, A140. Since there was no answer to the Writ of Attachment, the Writ stayed in effect the entire time that the district court had the matter under advisement – until the district court issued its order on September 8, 2022. A194. This was well after the IMF's $400,000,000 payment, and the World Bank's planned disbursals (A97), were due to be made.

## III.    The District Court Abused its Discretion by Not Entering Judgments Against the Garnishees, as the D.C. Code Mandates

Both Garnishees were instructed by their respective Writs of Attachment that they "[were] required by law to file answers to the [ ] interrogatories within ten (10) days after service of the writ...". D.C. Code § 16-526(b) requires that when "the garnishee has failed to answer the interrogatories … *judgment shall be entered* … for the whole amount of plaintiff's claim, and costs…". (Emphasis added). Since the Garnishees failed to make any filing, the district court was obligated to issue judgments against the Garnishees.

This Court has made clear that international organizations such as these Garnishees may have immunity even from process in some situations, but they must assert it by timely filing a motion to quash. *See Novak*, 703 F.2d at 1310 (reversing district court's dismissal of claim against World Bank, and stating "the World Bank, if it claimed service was improper, should have contested the validity

of service and asserted that it was not amenable to suit in the district court …".). In the instant case, in which the Writ of Attachment and Interrogatories in Attachment were explicitly issued pursuant to TRIA, which explicitly overrides the immunities they claim (*see infra* section II.E.), the Garnishees had even more reason to not be excused from their failure to file a motion to quash or answer the Interrogatories in Attachment.

Both Garnishees failed to properly respond to the Writs of Attachment. The statutory remedy for failing to comply with a Writ of Attachment is not discretionary: to punish the Garnishee for failure to respond, "Judgment shall be entered" and the creditor may execute on the judgment. D.C. Code § 16-526(b).

The Garnishees made no subsequent excuse for their flouting the law, and the district court did not explicitly excuse their defaults, reopen the matter after judgment, or provide any rationale as to why it should have relieved the Garnishees from default. What should have happened is that the district court enter the judgment, and the defaulting party move for relief from the judgment against it pursuant to the Federal Rules of Civil Procedure. *See Biscayne Contractors, Inc. v. Redding*, 219 F. Supp. 3d 41 (D.D.C. 2016). Had the district court done so, the test it would have applied is: "(1) whether the alleged defense is meritorious, (2) whether the default was willful, and (3) whether a set-aside would prejudice the plaintiff." *Id*. at 45.  Here, the first two factors augur in favor of no relief from the

judgment that should have issued. The Garnishees have no meritorious defense, as their immunities were clearly overridden by TRIA. Their defaults were willful, as TRIA was clearly invoked on the Writs of Attachment themselves; as the IMF filed nothing in response to the Writ of Attachment served upon it; and, as counsel for garnishees had explained to the World Bank, TRIA had overridden its immunities. The only question is whether they in fact held blocked assets due to be paid to an instrumentality of the Taliban during the pendency of the writ. If so, then relieving judgment would clearly prejudice the plaintiffs. As such, failure to impose the sanction of condemnation would be an abuse of discretion. *See Wrecking Corp. of Am., Inc. v. Jersey Welding Supply, Inc*., 463 A.2d 678, 680 (D.C. 1983) (judgment of condemnation against garnishee reviewed for abuse of discretion).

The district court simply ignored the laws of the District of Columbia. This was error. The matter should be remanded, with an order that the district court enter judgment for the Doe Creditors, and should the Garnishees move for relief from judgment, the district court should determine only whether the Garnishees held blocked assets due to be paid to an instrumentality of the Taliban during the pendency of the writ. If so, then execution should issue against Garnishees for the amounts they held, up to the amount of the judgment.

**IV.    The District Court Erred by Not Compelling the Garnishees to Answer the Interrogatories in Attachment**

Although the district court should have issued judgment and let execution issue, as the statute mandates, it instead heard belated motions by the Garnishees. It did so from a position of no evidence in support of the Garnishees' positions. At a minimum, the Court should have compelled the Garnishees to answer the Interrogatories in Attachment which had been served pursuant to TRIA. As has been shown, TRIA, which was passed after the statutes that establish the Garnishees' immunities, and by its terms applies "notwithstanding" them, overrides the statutory immunities these entities would otherwise enjoy. Sovereigns enjoy no inherent immunities outside of those provided by statute, including immunity from discovery in aid of execution. *Republic of Arg. v. NML Cap., Ltd.*, 573 U.S. 134 (2014). Thus, Garnishees should have been made to answer the Interrogatories in Attachment.

**V.    The District Court Erred in Finding That TRIA Did Not Apply Based on No Supportive Record Evidence**

The court recognized that what was at issue are "funds that the Fund and World Bank would have disbursed to Afghanistan but froze after the Taliban takeover of the country." A199. The district court stated that there is "reason to doubt that the funds belong to Afghanistan". A200. Of course, whether Afghanistan owned the assets is not the test (it is whether the Taliban or any one of

35

its agencies or instrumentalities has the requisite ownership interest in the blocked assets). But in the face of doubt, the proper course would have been to allow discovery on the blocked assets' status, starting with the answer to the Interrogatories in Attachment, so that the question of whether they were attachable pursuant to TRIA could be determined.

Instead, the district court relied on statements of lawyers that "their organizations do not 'hold assets of' any member country or private entity." *Id*. Again, that is not the question, but rather whether, at any time between the service of the Writ of Attachment and the answer, they came to hold blocked assets of an instrumentality of a terrorist judgment debtor in this case.

### A.    There Was No Evidence That the Fund Did Not Hold Blocked Assets of an Instrumentality of a Judgment Debtor; In Fact, the Fund Did Not Even Argue That

In support of the contention that the Fund "do[es] not 'hold assets of' any member country or private entity[]", the district court cites to one record entry: "Fund's Mem. at 4, n.3". *Id*. But as a review of that supposed authority shows, the Fund did not even *argue* that it did not hold blocked assets that would be subject to attachment but for its immunities. Footnote 3 reads:

> The merits of Plaintiffs' legal arguments—including whether a member country's Special Drawing Rights ("SDRs") are an asset held by the Fund at all, much less the sort of "blocked assets" Plaintiffs can attach under TRIA § 201(a)—are beyond the scope of this motion. The Fund's request for dismissal is based solely on the Fund's immunity from suit, and the Fund reserves all other defenses.

Nevertheless, it is important to note that SDRs cannot be held by private entities or individuals such as the plaintiffs. SDRs are an international reserve asset created by the Fund to supplement the reserves of its member countries, in accordance with its Articles of Agreement.

A58. Concerning ownership, the Fund did not argue that DAB had no interest in the frozen funds; all the Fund argued was that by its rules, the *Doe Creditors* could not assume such interest.[6] The district court's findings were erroneous.

### B.    There Was No Evidence That the World Bank Did Not Hold Blocked Assets of an Instrumentality of a Judgment Debtor; There Was Only Specious Argument of Counsel That Begged Further Discovery

In support of the contention that the World Bank "do[es] not 'hold assets of' any member country or private entity[]", the district court cites to two record entries. First, it cites to "World Bank's Motion at 10". A200. There is no evidence cited in the motion the court cites to, however. Instead, that section of the Motion provides news stories and quotes from its website that confirm that it administers a

---

[6] It is akin to a male who has a membership interest at Augusta National Golf Club arguing that a female creditor couldn't garnish that interest because the Club's rules prohibit female members. The easy riposte, which these Creditors have as well, is that the creditor will sell the asset to an entity or person that can use it. How the Doe Creditors will liquidate the credits, of course, is a question for another day; the point is that the Fund's lawyers did not even argue that they did not hold blocked assets of an instrumentality of the Taliban, but rather expressly limited their argument to the incorrect legal proposition that TRIA cannot, ever, override the Fund's immunities.

"Trust Fund", and that this fund and aid disbursements were frozen when the Taliban took over Afghanistan. A97 (quoting its own website and Rappeport, Alan, *The World Bank is freezing aid disbursements to Afghanistan*, THE NEW YORK TIMES (Aug. 24, 2021), https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html.

Second, the district court cites the statement from lawyers in the World Bank's reply brief (which itself is based not on testimony, but a press release) (*see* A146, n.5), that the trust fund is comprised of "member donor money administered by the Bank . . .". A200. The idea that the parties that have already donated money still own the money they donated, is, of course specious. Had the World Bank provided testimony so stating, it would raise questions for further discovery, questions such as: "Do the donors have the right to withdraw the 'donor money'?" and "Can the World Bank administer the money however it wishes?" Finding that the money was member 'donor money' and thus that an instrumentality of the Taliban had no interest in it, based on bare argument by lawyers, and no evidence whatsoever in support of their positions, was error.

## VI. The District Court's Flawed Order Turned on an Incorrect Legal Proposition That Assets That Had Not yet Been Transferred at the Time of the Service of a Writ Are Not Assets of the Transferee

The district court addressed the fact that these monies in fact were allocated to Taliban-controlled Afghanistan: "[A]nd even if the funds were destined for

38

Afghanistan, the D.C. Circuit has held that funds payable, but not yet transferred, to a terrorist organization are not assets "*of*" the organization. *Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 938, 940-41 (D.C. Cir. 2013) …". A200. The district court's reliance on *Heiser* was mistaken for several reasons.

First, to remind, it was error for the court to make *any* findings about the nature of the relationship between the alleged instrumentality of the Taliban, on the one hand, and the blocked funds, on the other, absent any evidence and absent answers to the Writs of Attachment.

Second, even if this Court had not addressed *Heiser*, there would be little reason to import the strict, mechanistic property definitions that allow for the unwinding of misfired transfers into this case. This is not a wire transfer case. There is no evidence that either of the garnishees was acting anything like a wire transfer agent, as opposed to a depository institution. The World Bank admits that what it holds is a "trust fund", and that this fund and scheduled aid disbursements were frozen. A97. The Fund calls what it holds "Special Drawing Rights". A58, n.3. This is simply a much different case than a wire transfer.

Third, this Court *did* address *Heiser*, and in doing so, disapproved of the mechanistic application of the U.C.C.'s technical ownership rules for unwinding misfired wire transfers into a TRIA case, even in the wire transfer context. In *Est. of Levin*, the plaintiff had served a writ of attachment on Wells Fargo Bank

concerning blocked assets from an intercepted wire transfer that it contended

belonged to the judgment debtor Iran. 45 F.4th at 416. The district court, like the

district court here, quashed the plaintiff's writ of attachment on the basis of *Heiser*,

mechanistically applying the U.C.C.'s technical provisions concerning ownership

during wire transfers. *Id*. at 419.

This Court reversed. *Id*. at 424.  It specifically disapproved of the

mechanistic application of the U.C.C. rule that transferees do not own the assets

being transferred to the question of ownership in a TRIA case. *Id*. at 422. Rather, it

noted that whether to apply the U.C.C., or any state court law, to a federal question

depended on whether it furthered the federal statute being applied:

> when federal courts incorporate state law as federal common law,
> such incorporation must be done "as to a single issue at a time" and
> the court must consider whether the "issue's outcome" is consistent
> with the "federal program." Paul J. Mishkin, *The Variousness of
> "Federal Law": Competence and Discretion in the Choice of
> National and State Rules for Decision*, 105 U. PA. L. REV. 797, 804-
> 06 (1957); *see* Caleb Nelson, *The Persistence of General Law*, 106
> COLUM. L. REV. 503, 510-11 & n.33 (2006). It follows that we may
> use Article 4A if and only if, on the issue presented, doing so would
> be consistent with TRIA § 201 and FSIA § 1610(g). *Boyle v. United
> Techs. Corp.*, 487 U.S. 500, 507-13, 108 S. Ct. 2510, 101 L. Ed. 2d
> 442 (1988); *Burks v. Lasker*, 441 U.S. 471, 479-80, 99 S. Ct. 1831, 60
> L. Ed. 2d 404 (1979). As we held in *Heiser*, "Article 4A does not
> apply of its own force. . . . Federal law, specifically § 201 and §
> 1610(g), is controlling." 735 F.3d at 940.

*Est. of Levin*, 45 F.4th at 421. The D.C. Circuit went on to consider who was "out

of pocket" as the result of the OFAC blocking of the assets. *Id*. at 423. Clearly, as

the funds were about to be delivered to, accessed, or withdrawn by an instrumentality of the Taliban such as DAB in due course, but for the block, it was the Taliban or one of its instrumentalities that was out of pocket here. As in *Est. of Levin*, these blocked assets thus "represent[] 'blocked assets of [a] terrorist party.' *Id*. at 421.

Considering whether it is consistent with TRIA to apply the rule that the district court did here, one only need consider the outcome of the district court's ruling: the very blocked assets that the terrorist judgment creditors restrained are being delivered, directly, into the hands of the Taliban and its instrumentalities. This result is anathema to TRIA's mandates that blocked assets of terrorists, or their agencies or instrumentalities must be made available to the terrorists' judgment debtors, (and must *not* be delivered to the control of terrorists), even if the Executive Branch desires to do so for political reasons. This Court rightly recognized that a mechanistic rule that a payee who has not yet received the assets cannot be the owner for garnishment purposes runs counter to TRIA, even in the wire transfer context where state law supplies a strict rule.

Applying a rule that assets not yet sent to a payee cannot be garnished is particularly wrong outside of the U.C.C. wire transfer context. The U.C.C.-based rule in fact runs completely counter to the typical operation of a garnishment and the effective application of TRIA. Typically, a garnishee that is holding assets that

41

it intends to pay to a party who is subject to a judgment is subject to garnishment to pay the judgment against that party. Even though a payor has not segregated assets that it intends to transfer to a payee, those assets are subject to garnishment. This is true both within and outside the TRIA context. For example, in the Southern District of Florida, a district court specifically considered a government Statement of Interest that invoked *Heiser* to question whether funds not yet paid to an alleged instrumentality of terrorist judgment debtor were assets "of" that debtor under TRIA. *See* ECF No. 272, Statement of Interest of the United States, dated Nov. 25, 2019, in *Doe v. ELN, et al.*, Case No. 10-cv-21517 in the United States District Court for the Southern District of Florida. The magistrate issued an order, later adopted by the district court, clarifying that assets owed but not yet paid were "of" the payee for TRIA purposes, whether the question was determined by state or federal law. *Id.* at ECF Nos. 277, 288. The Ninth Circuit, applying California law, but noting that the result would be the same under a federal rule of decision, reached the same conclusion. *See Bennett v. Islamic Rep (In re Estate of Bennett)*, 825 F.3d 949, 964 (9th Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

Indeed, it is almost always the case that the assets at issue in a garnishment are assets that will, but have not yet been, delivered to the judgment debtor. In fact, it *must* be the case for the garnishment to be effective. The district court's

mechanistic application of a rule that assets destined for but not yet paid to a payee are not assets of the payee and so cannot be garnished, if not overturned, would turn the entire system of collecting judgments through garnishment on its head.

Finally, for the Court to determine whether the "Special Drawing Rights" in the Fund's possession or the "trust fund" in the World Bank's possession – both of which were payable to DAB during the pendency of the Writs of Attachment and likely were even delivered to it – qualified as assets subject to TRIA execution, it should have at least required the Garnishees to answer the Interrogatories and respond to appropriate discovery on the question.

## VII.  The District Court Erred by Ruling in the Alternative That It Could Not Find That the Blocked Assets Are "of" a Judgment Debtor or an Instrumentality of the Taliban

The Court ruled in the alternative that it is forbidden from exercising jurisdiction over the blocked assets of DAB, an entity the Taliban controls (as it is mandated to by TRIA), because to do so would constitute an impermissible formal recognition by the courts that the Taliban does not just control DAB, but somehow that the Taliban is the legitimate government of all of Afghanistan. This was error.

It has long been understood that "[d]ecisions by courts in the United States to the effect that unrecognized regimes have certain powers to act within the territory controlled by them . . . do not constitute recognition of such regimes." *Restatement (Second) of Foreign Relations Law* § 106, cmt. b (1965). There is thus a crucial

distinction between acknowledging that as a factual matter the Taliban *acts as* a government, and formally bestowing upon the Taliban official legal status as the recognized government of Afghanistan in the eyes of the United States. *See Salimoff & Co. v. Standard Oil Co. of New York*, 262 N.Y. 220, 227 (1933) ("The courts may not recognize the Soviet government as the *de jure* government until the State Department gives the word. They may, however, say that it is a government").

Even if the district court had found that the Taliban is acting as the *de facto* government of Afghanistan, such a finding would not "bestow[] [the United States'] governmental recognition" on the Taliban. Under international law, "[r]ecognition of a government is *formal* acknowledgment that a particular regime is the effective government of a state," *Restatement (Third) of Foreign Relations Law* § 203, cmt. a (1987) (emphasis added). In the United States, "recognition may be effected by different means, but each means is dependent upon Presidential power." *Zivotofsky*, 576 U.S. at 13. Most commonly, a state recognizes a foreign government via an express, unambiguous, written or oral declaration by the organ of the recognizing state that wields the executive power. *See Restatement (Second) of Foreign Relations Law* § 106, cmt. a.

It is only "formal" acts of recognition, whether express or implied, that implicate the Constitutional separation of powers. Judicial or legislative acts short

44

of the formal act of recognition are not constitutionally problematic. As the Supreme Court made clear in *Zivotofsky*, the President's "exclusive power extends no further than his *formal* recognition determination." 576 U.S. at 30 (emphasis added). Congress can, for example, decline to pay for an embassy or refuse to confirm an ambassador to a foreign government it finds to be illegitimate. It could even declare war on a state whose government the President has recognized to express its view that the government is not legitimate. *See id*. These acts are constitutionally permissible because they do not "alter the President's recognition decision." *Id*. There is thus nothing constitutionally problematic about a judicial finding that the Taliban controls DAB. Such a judicial determination would not touch any of the attributes of either an explicit or an implied act of recognition and would not impact the President's own determinations regarding recognition.

For, "[i]n the absence of a Presidential decision" as to the legitimate government of Afghanistan, the courts are not required to be blind to the realities on the ground in Afghanistan—and they may even "decide whether to treat . . . a foreign regime as a government, where such a determination is necessary for the purposes of a case before the court." *Restatement (Third) of Foreign Relations Law* § 204, cmt. a. In short, a judicial finding that DAB is a Taliban instrumentality would not be constitutionally problematic under *Zivotofsky*, because it would not impact the United States' position on the status of Afghanistan's government.

45

The district court misreads *Zivotofsky*.[7] The *Zivotofsky* litigation centered on a dispute about whether Congress could command the President to print "Jerusalem, Israel" in the passports of Jerusalem-born U.S. citizens, notwithstanding the President's refusal to recognize Israel's claim of sovereignty over Jerusalem. The Supreme Court saw the statute at issue as a Congressional mandate that the Secretary of State issue a formal document amounting to an "official executive statement implicating recognition." *Zivotofsky*, 576 U.S. at 30. The problem, in other words, was not that the statute expressed Congress's own view that Israel exercised sovereignty over Jerusalem; it was that Congress required *the President himself*, via his agent the Secretary of State, to contradict the executive branch's longstanding policy on Jerusalem's status in a formal U.S. document issued by the executive branch. *See id.* at 21.

Here, by contrast, none of the *Zivotofsky* concerns are present. A judicial finding that the Taliban controls DAB would not put any words in the President's mouth and would not require the executive branch to say or do anything that would amount to recognizing the Taliban.

---

[7] The district court also cited *Guar. Tr. Co. v. United States*, 304 U.S. 126 (1938) in support of its separation of powers ruling. That case obliquely concerned who could speak for a foreign nation in U.S. Courts. It has little bearing on the analysis in this case.

Finally, a judicial finding that the Taliban controls DAB would be fully aligned with the executive branch's positions, which have consistently acknowledged the fact of the Taliban's control over Afghanistan while refraining from recognizing the Taliban or any other entity as the government of Afghanistan.[8] As noted (*see supra* Section II.D.), as far back as the Clinton Administration, during the first Taliban regime, the United States blocked DAB based on its findings that the Taliban controlled DAB and had an interest in it, while simultaneously refusing to recognize the Taliban as the government of Afghanistan. Giving effect to TRIA and ordering turnover of funds owed to DAB would no more recognize the Taliban as the legitimate Afghan government than the United States did when it blocked the funds of that entity. There are no separation of powers concerns that would preclude a court from administering a TRIA execution that arises from the fact that DAB is an instrumentality of the Taliban.

---

[8] According to the State Department, "[t]he United States has not yet made a decision as to whether to recognize the Taliban or any other entity as the Government of Afghanistan." *See* State Dep't, *U.S. Relations With Afghanistan* (Aug. 15, 2022), https://www.state.gov/u-s-relations-with-afghanistan/. At the same time, President Biden has explained that the "Taliban seized power" in Afghanistan, *see* Remarks on the End of United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 693 (Aug. 31, 2021), and Secretary Blinken has called the Taliban the "de facto government of Afghanistan," *see House Foreign Affairs Committee Holds Hearing on Afghanistan*, CQ Congressional Transcripts (Sept. 13, 2021).

## VIII. There Are No Other Reasons to Affirm

Out of an abundance of caution that this Court find that the district court did not err for another reason, or that the error was harmless, Doe Creditors address other arguments made to the district court by the Garnishees.

### A.    TRIA Overrides all Immunities, Not Just Those of Nations

The World Bank argued that the placement of TRIA within the notes to Section 1610 indicates that it only overrides sovereign immunities contained in the Foreign Sovereign Immunities Act. *See* A96. This contention is wrong. TRIA is not part of Section 1610, and nothing can be inferred from where it is placed in the United States Code. *See Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 132-33 (2d Cir. 2016). TRIA's placement in the notes of Section 1610 was a choice made by the Office of Law Revision Counsel rather than by Congress. Such a decision, "made by a codifier without the approval of Congress . . . should be given no weight." *North Dakota v. United States*, 460 U.S. 300, 311 n.13 (1983) (quoting *United States v. Welden,* 377 U.S. 95, 99 n.4 (1964)).

### B.    A License Issued After the Attachment of a Writ Has No Effect on a TRIA Collection of the Blocked Assets; However Any Transfer Would Indicate That the Garnishees in Fact Violated the Writs

The World Bank argued that the issuance of a license subsequent to the service of a writ undoes the writ by changing the status of the assets from blocked to unblocked. *See* A99-100. Such an interpretation flies in the face of the operation of writs, the jurisprudence concerning OFAC actions in TRIA cases, and the entire

48

purpose of TRIA, which was to remove the Executive Branch's ability to thwart collection of blocked assets. *See supra* p. 23, statement of Sen. Harkin.

The jurisprudence concerning OFAC actions in TRIA cases overwhelmingly reflects that the relevant time for evaluating whether an asset is a "blocked asset" for TRIA purposes is when the writ is served. The Eleventh Circuit confirmed this in a case involving a blocked individual who was later unblocked. The Eleventh Circuit held that because "the writ of garnishment had been served on [the bank] before the delisting, the assets were still considered "blocked" for purposes of the… plaintiffs' turnover claim, notwithstanding the delisting decision." *Sutherlin v. Wells Fargo Bank N.A.*, 767 F. App'x 812, 821 (11th Cir. 2019). That the assets were not "blocked assets" at some time later makes not a whit of difference. Even the complete delisting of the blocked entity, as in *Sutherlin*, would not serve to undo the writ.

This reasoning comports with the longstanding operation of writs of attachment and garnishment, which freeze the status of property, prevent its transfer or change of status, and establish priority amongst creditors. A writ acts as a lien. D.C. Code § 16-547, Retention of Property or Credits by garnishee, states:

> Where property or credits attached or sought to be attached are held by the garnishee in the name of or for the account of a person other than the defendant, the garnishee *shall retain* the property or credits during the period *pending determination by the Court* of the propriety of the attachment or the rightful owner of the property or credits.

49

(emphasis added). Once it has attached, the judgment creditor has a valid lien on the debtor's property held by a garnishee. *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 191, 203 (D.D.C. 2011). This district applies this non-controversial proposition in TRIA executions. *See Stansell v. Revolutionary Armed Forces of Colom.* (FARC), No. 10-471 (TJK), 2020 U.S. Dist. LEXIS 121498, at *5 (D.D.C. July 10, 2020).

Finally, a subsequent transfer pursuant to a license would be strong indication that the Garnishees are liable to Doe Creditors. To remind, the question of whether the assets in the Afghanistan Trust Fund or the Special Drawing Rights are "of" an instrumentality of a terrorist judgment debtor was not limited to the day of the service of the writ. *See supra* Section II J.

It is clear from the Garnishees' responses that, had the assets of these entities not been frozen, they would have been transferred to instrumentalities of the Taliban in due course during the pendency of the Writs of Attachment, even if they were not immediately due on the date of service. A58, A97. Thus Garnishees held blocked assets of an instrumentality of the Taliban during the pendency of the Writs of Attachment. If any transfer occurred *after* the district court's order granting the motions to quash, it is strong indication that the Garnishees had, in fact, at the time of the service of the Writs of Attachment, held assets of an instrumentality of the Taliban. We know that they held assets of an instrumentality

50

of the Taliban, because once they thought themselves in the clear, they transferred those assets. Their failure to timely answer the Writs of Attachment should subject them to entry of judgment.

At a minimum, this Court should order the district court to try the issue of whether, during the pendency of the writ, any assets were due to be paid, or were paid, to an instrumentality of the Taliban, and if so, to order judgment. *See Wrecking Corp. of Am., Inc.*, 463 A.2d 678 at 680 (a critical factor for this court to consider in reviewing the trial court's exercise of discretion [of whether to award condemnation judgment against the garnishee] is whether the garnishee was in fact indebted to the judgment debtor or possessed any property belonging to the debtor.)

## **CONCLUSION**

The Doe Creditors served valid Writs of Attachment. Garnishees acted at their own peril when they violated the law by not timely responding.

The district court erred by not entering judgment for Doe Creditors, erred by failing to compel Garnishees to answer the Interrogatories in Attachment, erred by making findings based on no evidence that supported them, and erred by making incorrect rulings that the assets are not assets of an instrumentality of a judgment debtor based on inapplicable precedent. The district court was wrong to apply the U.C.C. rule from *Heiser*, and it was wrong to find that by recognizing that the

51

Taliban control DAB it would be bestowing the United States's formal recognition on the Taliban regime in a way that offended separation of powers principles.

The district court should be reversed, and it should be mandated to enter Judgment for Doe Creditors against Garnishees. It should further be mandated that, if the Garnishees move for relief from judgment, that they should be made to answer the Interrogatories in Attachment, and the Court should determine whether, during the pendency of the Writs of Attachment, they held funds of or owed funds to an instrumentality of a judgment debtor in this matter, and apply the law accordingly.

Dated:  January 17, 2023.

> Respectfully submitted,
>
> **do Campo & Thornton, P.A.**
> Chase Bank Building
> 150 S.E. 2nd Avenue, Ste. 602
> Miami, Florida 33131
> Telephone: (305) 358-6600
> Facsimile: (305) 358-6601
> *Counsel for Appellants*
>
> By:    s/ *John Thornton*
>        John Thornton
>        DC Bar No. 980680
>        jt@dandtlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with the word limit of Fed. R. App.

32(a)(2)(7)(B)(i) because, excluding the parts of the document exempted by Fed.

R. App. P. 32(f), this document contains 12,800 words.

2.    This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word in 14 point Times New Roman style.

s/ <u>*John Thornton*</u>
John Thornton

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 17, 2023 I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF.


<u>s/ *John Thornton*</u>
John Thornton

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page**

D.C. Code § 16-521(a)........................................................................ ADD1

D.C. Code § 16-526(b)........................................................................ ADD1

D.C. Code § 16-547 ............................................................................ ADD1

D.C. Code § 16-556 ............................................................................ ADD1

22 U.S.C. § 286 .................................................................................. ADD2

28 U.S.C. § 1610 ................................................................................ ADD2

28 U.S.C. § 1611 ................................................................................ ADD3

50 U.S.C. § 1701 ................................................................................ ADD3

## STATUTES

D.C. Code § 16-521(a).

> In any case in which a writ of attachment is issued, the plaintiff may submit interrogatories in writing, in such form as may be allowed by the rules or special order of the court, to be served on any garnishee, asking about any property of the defendant in his possession or charge, or indebtedness of his to the defendant at the time of the service of the attachment, or between the time of service and the filing of his answers to the interrogatories. The garnishee shall file his answers under oath to the interrogatories within ten days after service upon him.

D.C. Code § 16-526(b).

> When the garnishee has failed to answer the interrogatories served on him, or to appear and show cause why a judgment of condemnation should not be entered, judgment shall be entered against him for the whole amount of the plaintiff's claim, and costs, and execution may be had thereon.

D.C. Code § 16-547

> Where property or credits attached or sought to be attached are held by the garnishee in the name of or for the account of a person other than the defendant, the garnishee shall retain the property or credits during the period pending determination by the Court of the propriety of the attachment or the rightful owner of the property or credits.

D.C. Code § 16-556

> When the garnishee has failed to answer the interrogatories served on him, or to appear and show cause why a judgment of condemnation should not be entered, judgment shall be entered against him for the whole amount of the plaintiff's judgment and costs, and execution may be had thereon.

22 U.S.C. § 286

The President is hereby authorized to accept membership for the United States in the International Monetary Fund (hereinafter referred to as the "Fund"), and in the International Bank for Reconstruction and Development (hereinafter referred to as the "Bank"), provided for by the Articles of Agreement of the Fund and the Articles of Agreement of the Bank as set forth in the Final Act of the United Nations Monetary and Financial Conference dated July 22, 1944, and deposited in the archives of the Department of State.

28 U.S.C. § 1610, note

Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

(2) Blocked asset. The term 'blocked asset' means—
(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b) [50 USCS § 4305(b)]) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and
(B) does not include property that—
(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) or the United Nations Participation Act of 1945 (22 U.S.C. 287 *et seq.*); or
(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular

Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

28 U.S.C. § 1611

Notwithstanding the provisions of section 1610 of this chapter [28 USCS § 1610], the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

50 U.S.C. § 1701

(a)Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b)The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.