**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 22-7134**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JOHN DOES 1-7,
Plaintiffs-Appellants,

v.

TALIBAN; AL-QAEDA; HAQQANI NETWORK,
Defendants,

INTERNATIONAL MONETARY FUND; INTERNATIONAL BANK FOR
RECONSTRUCTION AND DEVELOPMENT,
Garnishees-Appellees.

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-MC-00110-DLF
Dabney L. Friedrich, U.S. District Judge

**BRIEF OF GARNISHEE-APPELLEE INTERNATIONAL BANK FOR
RECONSTRUCTION AND DEVELOPMENT**

Ginger D. Anders
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
 Suite 500E
Washington, DC 20001-5369
(202) 220-1100
Ginger.Anders@mto.com

*Counsel for Appellee International
Bank For Reconstruction and Development*

March 20, 2023

**ORAL ARGUMENT NOT YET SCHEDULED**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellants.

### B.    Rulings under review

References to the rulings at issue appear in the Brief for Plaintiffs-Appellants.

### C.    Related cases

This case has not previously been before this or any other Court.  A related case, *John Does 1 Through 7 v. The Taliban*, No. 23-263 (2d Cir.), is currently pending before the U.S. Court of Appeals for the Second Circuit.  Counsel for Garnishee-Appellee International Bank For Reconstruction and Development are unaware of any other related cases pending before this Court or any other court.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Garnishee-Appellee International Bank For Reconstruction and Development (the "World Bank" or "Bank") states as follows:

The Bank is a public international organization owned by its sovereign member countries, which currently total 189. Its purposes are, *inter alia*, to further the development of its member countries by providing technical and financial assistance. The Bank has no parent company, and no publicly held company has a 10% or greater ownership interest in the Bank.

Dated: March 20, 2023                    */s/ Ginger D. Anders*
                                         Ginger D. Anders

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ......................................... ii

GLOSSARY OF ABBREVIATIONS ..................................................xiv

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF THE ISSUE.............................................................3

STATUTES AND REGULATIONS.......................................................4

STATEMENT OF THE CASE...............................................................4

    A.    The World Bank's immunity as an international organization ............4

    B.    Plaintiffs' judgment against the Taliban, and the statutes
         relevant to enforcement of that judgment ............................9

    C.    The Bank's Afghanistan Reconstruction Trust Fund.........................11

    D.    Procedural history.................................................................15

STANDARD OF REVIEW ..................................................................19

SUMMARY OF ARGUMENT ............................................................19

ARGUMENT ........................................................................................22

I.    THE DISTRICT COURT LACKED SUBJECT MATTER
      JURISDICTION OVER THE BANK BECAUSE TRIA DOES NOT
      PROVIDE AN EXCEPTION TO JURISDICTIONAL IMMUNITY.........22

    A.    Under the IOIA and the FSIA, the Bank is immune from all
         forms of judicial process, and Plaintiffs therefore must establish
         an exception to jurisdictional immunity............................................23

    B.    TRIA does not abrogate the Bank's jurisdictional immunity
         from suit. ............................................................................25

II.   TRIA'S REQUIREMENTS ARE NOT SATISFIED BECAUSE THE
      ASSETS PLAINTIFFS SEEK TO ATTACH ARE NOT "OF ANY
      AGENCY OR INSTRUMENTALITY OF" THE TALIBAN.....................34

    A.    DAB is an organ of the State of Afghanistan.....................................35

**TABLE OF CONTENTS**
**(continued)**

Page

B.    DAB is not an "agency or instrumentality of a terrorist party" under TRIA, and therefore its alleged assets are not subject to TRIA.................................................................37

C.    The Court need not address whether ARTF funds are owned by DAB and are "blocked assets," but in any event, Plaintiffs have failed to satisfy their burden on those issues.......................48

III.    THE DISTRICT COURT CORRECTLY DENIED PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT. ...................................53

CONCLUSION ................................................................................56

CERTIFICATE OF COMPLIANCE......................................................57

CERTIFICATE OF SERVICE ............................................................58

iv

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran,*
    734 F.3d 1175 (D.C. Cir. 2013)....................................................23

*Bennett v. Islamic Republic of Iran,*
    618 F.3d 19 (D.C. Cir. 2010)........................................................31

*Bennett v. Islamic Republic of Iran,*
    825 F.3d 949 (9th Cir. 2016) .......................................................27

*Calderon-Cardona v. Bank of New York Mellon,*
    770 F.3d 993 (2d Cir. 2014) ........................................................31

*Cheyenne Arapaho Tribes of Oklahoma v. United States,*
    558 F.3d 592 (D.C. Cir. 2009)......................................................49

*Crystallex International Corp. v. Bolivarian Rep. of Venezuela,*
    932 F.3d 126 (3d Cir. 2019) .........................................................28

*Delta Foods Inc. v. Republic of Ghana,*
    265 F.3d 1068 (D.C. Cir. 2001)...............................................25, 55

*EM Ltd. v. Banco Cent. de la Republica Argentina,*
    800 F.3d 78 (2d Cir. 2015) ..........................................................36

*First City, Texas Houston, N.A. v. Rafidain Bank,*
    281 F.3d 48 (2d Cir. 2002) ..........................................................25

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
    462 U.S. 611 (1983).....................................................................28

*\*Guar. Tr. Co. of New York v. United States,*
    304 U.S. 126 (1938).................................................................42, 45

*\*Heiser v. Islamic Republic of Iran,*
    735 F.3d 934 (D.C. Cir. 2013).....................................10, 18, 35, 48

*Inversora Murten, S.A. v. Energoprojekt-Niskogradnja Co.,*
    264 F. App'x 13 (D.C. Cir. 2008) (per curiam)...............................54

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Jam v. Int'l Fin. Corp.*,
  139 S. Ct. 759 (2019)................................................................4, 6, 7

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*,
  830 F.3d 107 (2d Cir. 2016) .......................................................27, 40

*Kirschenbaum v. Assa Corp.*,
  934 F.3d 191 (2d Cir. 2019) ............................................................40

*Kucana v. Holder*,
  558 U.S. 233 (2010)........................................................................29

*Estate of Levin v. Wells Fargo Bank, N.A.*,
  45 F.4th 416 (D.C. Cir. 2022)....................................................50, 51

*Mendaro v. World Bank*,
  717 F.2d 610 (D.C. Cir. 1983)........................................................5, 9

*Ministry of Def. & Support for the Armed Forces of the Islamic
  Republic of Iran v. Elahi*,
  556 U.S. 366 (2009).........................................................................31

*Nat'l City Bank of New York v. Republic of China*,
  348 U.S. 356 (1955)....................................................................42, 43

*NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*,
  652 F.3d 172 (2d Cir. 2011) ........................................................36, 44

*Novak v. World Bank*,
  703 F.2d 1305 (D.C. Cir. 1983)........................................................55

*\*Nyambal v. Int'l Monetary Fund*,
  772 F.3d 277 (D.C. Cir. 2014)....................................................33, 49

*Radmanesh v. Islamic Republic of Iran*,
  6 F.4th 1338 (D.C. Cir. 2021)..........................................................19

*Rosenkrantz v. Inter-Am. Dev. Bank*,
  35 F.4th 854 (D.C. Cir. 2022).............................................................7

## TABLE OF AUTHORITIES
## (continued)

Page(s)

*Rubin v. Islamic Republic of Iran*,
　138 S. Ct. 816 (2018)...........................................................29

*Rubin v. Islamic Republic of Iran*,
　830 F.3d 470 (7th Cir. 2016) ...........................................7, 39

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
　549 U.S. 422 (2007)...........................................................54

*Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*,
　346 F.3d 264 (2d Cir. 2003) .........................................29, 32

*Stansell v. Revolutionary Armed Forces of Colombia*,
　45 F.4th 1340 (11th Cir. 2022) ...........................................48

*Stansell v. Revolutionary Armed Forces of Colombia*,
　771 F.3d 713 (11th Cir. 2014) ...........................................35

*SW Gen., Inc. v. N.L.R.B.*,
　796 F.3d 67 (D.C. Cir. 2015) ..............................................29

*\*In re: Terrorist Attacks on September 11, 2011*,
　No. 03-MDL-1570, 2023 WL 2138691 (S.D.N.Y. Feb. 21, 2023)........24, 25, 46

*\*TIG Ins. Co. v. Republic of Argentina*,
　967 F.3d 778 (D.C. Cir. 2020).......................................7, 24, 25

*United States v. Holy Land Found. for Relief & Dev.*,
　722 F.3d 677 (5th Cir. 2013) ..............................................32

*United States v. Hutchings*,
　26 F. Cas. 440 (C.C.D. Va. 1817)........................................45

*United States v. Palmer*,
　16 U.S. 610 (1818).............................................................46

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
　946 F.3d 120 (2d Cir. 2019) .........................................27, 49

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983) ................................................54

*Walters v. Indus. & Com. Bank of China, Ltd.*,
651 F.3d 280 (2d Cir. 2011) ................................30

*Weininger v. Castro*,
462 F. Supp. 2d 457 (S.D.N.Y. 2006) ...................26, 31, 38

*Weinstein v. Islamic Republic of Iran*,
609 F.3d 43 (2d Cir. 2010) .......................27, 28

*Weinstein v. Islamic Republic of Iran*,
831 F.3d 470 (D.C. Cir. 2016) .......................24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ...............................42, 45, 46

*Zuza v. Off. of the High Representative*,
857 F.3d 935 (D.C. Cir. 2017) .......................54

STATE CASES

*M. Salimoff & Co. v. Standard Oil Co. of New York*,
262 N.Y. 220 (1933) ...............................46, 47

FEDERAL STATUTES

12 U.S.C. § 632 ................................52

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*:

28 U.S.C. § 1602 ................................6

28 U.S.C. § 1603(a) ................................35

28 U.S.C. § 1603(b) ...............................35, 36, 40

28 U.S.C. § 1604 ...............................7, 23, 24, 30

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

28 U.S.C. § 1605.........................................................................23, 26, 30

28 U.S.C. § 1605A............................................... 10, 26, 27, 31, 38, 39

28 U.S.C. § 1609.....................................................................7, 8, 31, 48

28 U.S.C. § 1610.........................................................................8, 30, 31

28 U.S.C. § 1610(f)...............................................................................31

28 U.S.C. § 1610(f)(1)..........................................................................30

28 U.S.C. § 1610(f)(3)..........................................................................31

28 U.S.C. § 1610(g).............................................................................29

28 U.S.C. § 1611...........................................................8, 23, 32, 48

28 U.S.C. § 1611(a) ...............................................................................8

28 U.S.C. § 1611(b)(1) ........................................................................36

International Emergency Economic Powers Act, Pub. L. No. 95-223,
    tit. II, 91 Stat. 1625 (1977) (50 U.S.C. § 1701 *et seq*.)........................9

    IEEPA § 201(d)(2)...........................................................................11

International Organizations Immunities Act of 1945, Pub. L. No. 79-
    291, 59 Stat. 669 (22 U.S.C. § 288 *et seq*.) ..........................................6

    22 U.S.C. § 288a(b) .....................................................................23, 6

Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L.
    No. 112-158, § 502(e)(2), 126 Stat. 1214, 1260................................10

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat.
    2322.................................................................................................10

    TRIA § 201(a)....................................... 10, 20, 25, 26, 31, 34, 37, 38

    TRIA § 201(d)(2)..............................................................................34

ix

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

TRIA § 201(d)(4) ................................................................10, 11, 37

**STATE STATUTES**

D.C. Code § 16-526(b) ..................................................................53

**FEDERAL RULES**

Fed. R. Civ. P. 69(a)(1) ................................................................54

**FEDERAL REGULATIONS**

31 C.F.R. § 501.801 .....................................................................10

Exec. Order No. 9751, 11 Fed. Reg. 7713, 7713 (1946) .........................................8

Exec. Order No. 13129, 64 Fed. Reg. 36,759 (1999) ..............................................10

Exec. Order No. 13224, 66 Fed. Reg. 49,079 (2001) ..............................................10

Exec. Order No. 13268, 67 Fed. Reg. 44,751 (2002) ..............................................10

**LEGISLATIVE MATERIALS**

148 Cong. Rec. S11,524 (daily ed. Nov. 19, 2002) ...............................................28

H.R. Rep. 94-1487 (1976) ........................................................8, 24, 34

H.R. Rep. No. 107-779 (2002) .....................................................31

S. Rep. No. 79-861 (1945) ..................................................................34

**INTERNATIONAL INSTRUMENTS**

Articles of Agreement of the International Bank for Reconstruction
and Development, Dec. 27, 1945, 60 Stat. 1440, T.I.A.S. No. 1502,
2 U.N.T.S. 134 .........................................................................4

Article I(i) ........................................................................5

Article II ..........................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Article III .......................................................................................52

Article III § 1 ................................................................................51

Article IV .......................................................................................52

Article IV § 1 ................................................................................51

Article VII § 3 ...........................................................................9, 52

Article VII § 4 ...........................................................................9, 52

**TREATISES**

Restatement (Third) of Foreign Relations Law of the United States
    (1987)................................................................................30, 44, 47

Scalia & Garner, Reading Law (2012) ........................................29

**OTHER AUTHORITIES**

Afghanistan Reconstruction Trust Fund Grant Agreement (Feb. 15,
    2012), https://documents1.worldbank.org/curated/en/
    976661516114752161/pdf/ARTF-Grant-Agreement-TF011825.pdf ...............14

ARTF Administration Agreement: Standard Terms and Conditions
    Governing Contributions to the Afghanistan Reconstruction Trust
    Fund, https://documents1.worldbank.org/curated/
    en/320361601479783918/pdf/Official-Documents-Administration-
    Agreement-with-the-United-States-Agency-for-International-
    Development-for-TF050576.pdf ........................................................14

ARTF Administrator, *ARTF Scorecard 2020*, https://www.wb-
    artf.org/sites/default/files/ARTF/ARTF%20Scorecard%202020%
    20s_Redacted1_Redacted2.pdf.........................................................13

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Press Release, *World Bank Announces Expanded Approach to Supporting the People of Afghanistan* (Mar. 1, 2022), https://www.worldbank.org/en/news/press-release/2022/03/01/world-bank-announces-expanded-approach-to-supporting-the-people-of-afghanistan ................................................................................16

Standard Conditions for Grants Made by the World Bank Out of Various Funds (Feb. 15, 2012), http://web.worldbank.org/archive/website01535/WEB/IMAGES/STDGC_EN.PDF...............................................13

Statement of Interest of the United States of America, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-mc-40 (W.D.N.Y. Sept. 20, 2022)............... 22, 26, 30, 34, 36, 39, 40, 41

Statement of Interest of the United States of America, *John Does 1 Through 7 v. The Taliban*, No. 20-mc-740 (S.D.N.Y. Feb. 11, 2022) ....................................................................................42, 44, 47

U.S. Dep't of State, *Charter of the United Nations: Report to the President on the Results of the San Francisco Conference by the Chairman of the United States Delegation, The Secretary of State* 136, Pub. 2349, Conference Series 71 (June 26, 1945)........................................5

U.S. Dep't of Treasury, OFAC, General License No. 14, Authorizing Humanitarian Activities in Afghanistan (Sept. 24, 2021), https://home.treasury.gov/system/files/126/ct_gl14.pdf ....................................53

World Bank, *Annual Report 2022*, https://www.worldbank.org/en/about/annual-report#anchor-annual ....................................................5

World Bank, *Emergency Support for the People of Afghanistan* (Sept. 9, 2022), https://www.worldbank.org/en/country/afghanistan/brief/afghanistan-emergency-support...........................................................15

World Bank, *Getting to Know the World Bank*, https://www.worldbank.org/en/news/feature/2012/07/26/getting_to_know_theworldbank.......................................................6

## TABLE OF AUTHORITIES
### (continued)

Page(s)

World Bank, *'Through the Looking Glass': Lessons from the World Bank Afghanistan Portfolio for FCV Engagement* (2022), https://documents1.worldbank.org/curated/en/09991510103232143 6/pdf/P17861103275970d50957302bfb0c71a607.pdf .......................................14

World Bank, *Trust Funds and Programs: About*, https://www.worldbank.org/en/programs/trust-funds-and-programs.................11

World Bank Group, *2006 Trust Funds Annual Report*, https://documents1.worldbank.org/curated/fr/ 115331468161643763/pdf/38883.pdf ..............................................................12

World Bank Group, *2021 Trust Fund Annual Report: Toward Greater Resilience* (Nov. 30, 2021), https://thedocs.worldbank.org/en/doc/ 44c24bb3d216f1efb43801d870aa0eb4-0060072021/trust-fund-annual-report-2021...............................................................................................12

World Bank Group, *A Guide for Development Partners* (Oct. 2022), https://thedocs.worldbank.org/en/doc/691a0080958ba14595adce 208d27a19c-0060072022/related/Donor-Guide-Main-text.pdf ...................11, 13

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ARTF | Afghanistan Reconstruction Trust Fund |
| Articles | Articles of Agreement of the International Bank for Reconstruction and Development |
| Bank | International Bank for Reconstruction and Development |
| Caballero SOI | Statement of Interest of the United States of America, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-mc-40 (W.D.N.Y. Sept. 20, 2022) |
| DAB | Da Afghanistan Bank |
| Defendants | Taliban, al-Qaeda, and the Haqqani Network |
| Does SOI | Statement of Interest of the United States of America, *John Does 1 Through 7 v. The Taliban*, No. 20-mc-740 (S.D.N.Y. Feb. 11, 2022) |
| Donor Guide | World Bank Group, *A Guide for Development Partners* (Oct. 2022) |
| FSIA | Foreign Sovereign Immunities Act of 1976 |
| IBRD | International Bank for Reconstruction and Development |
| IDA | International Development Association |
| IEEPA | International Emergency Economic Powers Act |
| IMF | International Monetary Fund |
| IOIA | International Organizations Immunities Act of 1945 |
| NGOs | Nongovernmental organizations |
| OFAC | Office of Foreign Assets Control |
| Plaintiffs | John Doe plaintiffs |
| TRIA | Terrorism Risk Insurance Act of 2002 |
| World Bank | International Bank for Reconstruction and Development |

**INTRODUCTION**

In this action, seven John Doe plaintiffs seek to satisfy a judgment against the Taliban by attaching funds that were never intended for the Taliban, but instead were contributed to the World Bank by its sovereign member countries for use as development assistance in Afghanistan. The Bank, however, enjoys statutory immunity from the jurisdiction of U.S. courts, as well as immunity from execution, pursuant to the International Organizations Immunities Act of 1945 (IOIA). The IOIA exists precisely to protect the Bank and other international organizations from suits like Plaintiffs'. Congress anticipated that organizations like the Bank would be headquartered and maintain substantial assets in the United States, and it understood that attachment actions by private claimants could chill donor contributions and undermine organizations' ability to fulfill their international-development mandates. The district court here correctly held that the Bank is immune from this suit and dismissed for lack of jurisdiction. This Court should affirm.

Plaintiffs acknowledge that the Bank would ordinarily be immune from suit under the IOIA, but they assert that the Bank's jurisdictional immunity is abrogated by the Terrorism Risk Insurance Act of 2002 (TRIA). Plaintiffs are incorrect. TRIA was enacted to facilitate execution against blocked assets belonging to terrorist parties and their agencies and instrumentalities. The statute accordingly does not supersede jurisdictional immunity, but instead abrogates only the *execution*

1

immunity of certain terrorist assets. It is inconceivable that in providing for execution against terrorist assets in carefully defined circumstances, Congress would have silently abrogated the immunity from suit of international organizations that have no relationship to terrorist parties or involvement in their activities, thereby subjecting those organizations to burdensome execution actions.

In addition, even if TRIA could in theory abrogate jurisdictional immunity, its requirements are not satisfied here. In seeking to establish that the Bank's funds are terrorist assets belonging to the Taliban or its agencies, as TRIA requires, Plaintiffs are forced to rely on the convoluted theory that the Bank's Afghanistan-related funds are actually owned by Afghanistan's central bank, and that the central bank is, in turn, an agency of the Taliban. That theory is legally meritless and factually unsupported. TRIA makes clear that as a matter of law, the central bank, as an organ of the State of Afghanistan, cannot also be an agency or instrumentality of a non-state terrorist party like the Taliban. And in all events, a court cannot constitutionally hold that Afghanistan's central bank is an agency of the Taliban, as doing so would effectively recognize the Taliban as the government of Afghanistan, contrary to the President's constitutional prerogative and recognition policy. Even putting aside those dispositive legal points, Plaintiffs have failed to establish that the assets in question were ever blocked or belong to Afghanistan's central bank, much less to the Taliban.

At bottom, Plaintiffs' suit seeks to attach donated funds that the Bank intends to use for the benefit of the Afghan people and redirect them to satisfy the Taliban's U.S. judgment debts.  Before the Taliban takeover, the funds—which are held by the Bank on behalf of donor governments—were used to finance development activities in Afghanistan through the government, but upon that takeover, the Bank changed its disbursement posture.  The Bank currently finances projects in Afghanistan only through United Nations agencies, outside the Taliban's control.  The Bank's immunities exist precisely to protect the Bank's ability to use sovereign-donated funds in this manner, without interference by U.S. courts or private claimants.  Nothing in TRIA suggests Congress intended otherwise.  This Court should affirm the district court's dismissal for lack of jurisdiction.

## JURISDICTIONAL STATEMENT

The district court lacked subject matter jurisdiction over the Bank pursuant to 22 U.S.C. § 288a and 28 U.S.C. § 1604.  This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the final order of the district court granting the motions to quash the writs of attachment and denying Plaintiffs' motion for entry of judgment.  Plaintiffs timely filed a notice of appeal.

## STATEMENT OF THE ISSUE

Whether the Terrorism Risk Insurance Act of 2002 provides a basis for subject matter jurisdiction over this suit.

3

## STATUTES AND REGULATIONS

Except for the statutory provisions reproduced in the Addendum to this brief, all applicable authorities are contained in the Brief for Plaintiffs-Appellants.

## STATEMENT OF THE CASE

### A.    The World Bank's immunity as an international organization

1.    "In the wake of World War II, the United States and many of its allies joined together to establish a host of new international organizations" that were "designed to allow member countries to collectively pursue goals such as stabilizing the international economy, rebuilding war-torn nations, and maintaining international peace and security." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 765 (2019). In 1944, at the Bretton Woods Conference, the International Monetary Fund (IMF) and the International Bank for Reconstruction and Development (IBRD)—commonly known as the World Bank[1]—were established, becoming the world's first multilateral development institutions.

The World Bank is established and governed by its Articles of Agreement, a treaty signed by its 189 member countries, including the United States. *See* Articles of Agreement of the International Bank for Reconstruction and Development, Dec. 27, 1945, 60 Stat. 1440, T.I.A.S. No. 1502, 2 U.N.T.S. 134 (hereinafter, "Ar-

---

[1] The entity colloquially called the World Bank is, in fact, two separate public international organizations: the IBRD and the International Development

4

ticles"). The Articles list among the Bank's purposes assisting "in the reconstruc-tion and development" of its member countries. Articles art. I(i). The Bank focus-es on promoting long-term economic development, alleviating poverty, and help-ing member nations respond to a range of crises and conflicts, including the global COVID-19 pandemic, the war in Ukraine, and global food insecurity. World Bank, *Annual Report 2022*, at 4-5.[2] In service of these objectives, the Bank offers low- or no-interest loans to middle- and low-income countries. *Mendaro v. World Bank*, 717 F.2d 610, 611-12 (D.C. Cir. 1983). The Bank funds its lending activi-ties primarily through mandatory and voluntary contributions by member countries and borrowing in the financial markets. *See* Articles art. II; World Bank, *Getting to Know the World Bank*.[3]

2.    When the Bank and IMF were established, the United States and other nations understood that international organizations would require immunity from suit to function effectively. The Secretary of State explained that because an inter-national organization would be governed by, and receive contributions from, "all of the member states," the organization should "clearly not [be] subject to the ju-risdiction or control of any one of them." U.S. Dep't of State, *Charter of the Unit-*

---

Association (IDA). The IDA is not party to this case. For ease of reference, this brief refers to the IBRD as "the World Bank" or simply "the Bank."

[2] https://www.worldbank.org/en/about/annual-report#anchor-annual.

5

*ed Nations: Report to the President on the Results of the San Francisco Confer-ence by the Chairman of the United States Delegation, The Secretary of State* 136, Pub. 2349, Conference Series 71 (June 26, 1945).  Accordingly, these organizations' founding treaties committed member states to guarantee the organizations certain immunities.  *See infra* pp. 8-9.

In 1945, Congress enacted the International Organizations Immunities Act of 1945, Pub. L. No. 79-291, 59 Stat. 669 (codified at 22 U.S.C. § 288 *et seq*.), to establish a comprehensive domestic-law rule of privileges and immunities for international organizations designated by the President.  As particularly relevant here, the IOIA provides that "[i]nternational organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."  22 U.S.C. § 288a(b).

In *Jam*, the Supreme Court construed Section 288a(b) "to make international organization immunity and foreign sovereign immunity continuously equivalent." 139 S. Ct. at 768.  Because foreign sovereign immunity is now governed by the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602 *et seq*., the

---

[3] https://www.worldbank.org/en/news/feature/2012/07/26/getting_to_know_theworldbank.

scope of international organizations' immunity from suit under the IOIA is also governed by the FSIA. *Jam*, 139 S. Ct. at 772.

As relevant here, the FSIA provides foreign states—and, by virtue of the IOIA, international organizations—with two types of immunity. The first is jurisdictional immunity, which renders foreign states and international organizations presumptively immune from suit in the United States. 28 U.S.C. § 1604 (foreign states "shall be immune from the jurisdiction of the courts of the United States and of the States"). That presumptive jurisdictional immunity "is subject to several statutory exceptions" set forth in Sections 1605-1607 of the FSIA, which "constitute the *sole basis* to obtain subject matter jurisdiction" over a foreign state or international organization. *Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 861 (D.C. Cir. 2022) (emphasis added).

The second type of immunity is immunity from execution, which further protects foreign sovereigns and international organizations by ensuring that, in the event of an adverse judgment in a suit from which the state or organization was not jurisdictionally immune, "the sovereign's property in the United States 'shall be immune from attachment[,] arrest[,] and execution.'" *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 781 (D.C. Cir. 2020) (quoting 28 U.S.C. § 1609); *see Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 481 (7th Cir. 2016) (Iran's property was immune from execution even though Iran was not immune from suit).

Section 1609 provides that foreign-state property is presumptively immune, and Section 1610 sets forth certain exceptions to that immunity.  28 U.S.C. §§ 1609, 1610.

Section 1611(a) establishes even broader immunity from execution specifically for international organizations by providing that "[n]otwithstanding the provisions of section 1610," the "property of" international organizations "shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States."  *Id.* § 1611(a).  Section 1611 was intended to permit international organizations "to carry out their functions from their offices located in the United States without hindrance by private claimants seeking to attach the payment of funds to a foreign state," as "such attachments would also violate the immunities accorded to such international institutions."  H.R. Rep. No. 94-1487, at 30-31 (1976).

3.    The Bank, as an international organization designated by the President, *see* Exec. Order No. 9751, 11 Fed. Reg. 7713, 7713 (1946), is entitled to the immunities set forth in the IOIA—and thus to the presumptive immunity from jurisdiction and execution conferred by the FSIA.  The Bank's Articles also provide the Bank with additional immunities separate from those conferred by the IOIA, including immunity from suit and of its property from all forms of seizure.  Arti-

8

cles art. VII, §§ 3-4; *see generally Mendaro*, 717 F.2d 610 (construing immunity provisions of Bank's Articles).

**B.    Plaintiffs' judgment against the Taliban, and the statutes relevant to enforcement of that judgment**

In this case, seven John Doe plaintiffs ("Plaintiffs") seek to enforce a $138 million default judgment against the Taliban, al-Qaeda, and the Haqqani Network (collectively, "Defendants") by attaching assets of the Bank that were contributed by the Bank's sovereign member nations in order to support development in Afghanistan.  Plaintiffs also seek to attach funds of the IMF.  Because Plaintiffs' judgment is against terrorist parties for damages arising out of a bombing in Afghanistan, JA195, several statutory provisions governing suits by U.S. plaintiffs against terrorist actors—and enforcement of resulting judgments against terrorist assets—are relevant here.

Plaintiffs' efforts to enforce their judgment take place against the backdrop of Executive Branch sanctions programs concerning terrorist property in the United States.  *See, e.g.*, International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, tit. II, 91 Stat. 1625 (1977) (codified at 50 U.S.C. § 1701 *et seq.*). Generally speaking, the President (through the Department of the Treasury's Office of Foreign Assets Control (OFAC)) may "block" particular assets, including terrorist-party and foreign-state assets, that are subject to the United States' jurisdiction, by prohibiting transactions concerning those assets.  OFAC also may pro-

9

hibit transactions with blocked individuals or organizations.  Once property or entities are blocked, an OFAC license is necessary to authorize transactions concerning the property or entities.  *See generally* 31 C.F.R. § 501.801.  Since the late 1990s, the Taliban has been subject to a variety of OFAC sanctions.  *See, e.g.*, Exec. Order Nos. 13129, 64 Fed. Reg. 36,759 (1999); 13224, 66 Fed. Reg. 49,079 (2001); 13268, 67 Fed. Reg. 44,751 (2002).

In 2002, Congress enacted the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322, to aid plaintiffs who hold certain terrorism-related judgments in executing against terrorist parties' blocked property.  As relevant here, Section 201 of TRIA provides that, "notwithstanding any other provision of law," plaintiffs who have "obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A," may execute against "the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." § 201(a), (d)(4).[4]  Assets "of" a terrorist party are assets *owned* by that party. *Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 937-38 (D.C. Cir. 2013) ("of" denotes ownership).  TRIA's definition of "terrorist party" includes non-state actors like the Taliban, as well as "a foreign state designated as a state sponsor of ter-

---

[4] This brief cites the text of TRIA as amended by the Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, § 502(e)(2), 126 Stat. 1214, 1260.

rorism" (a designation that presently applies only to Cuba, Iran, North Korea, and Syria).  § 201(d)(4).  "Blocked" assets are those blocked pursuant to enumerated statutory authorities, including IEEPA.  TRIA, § 201(d)(2).

### C.     The Bank's Afghanistan Reconstruction Trust Fund

The property that Plaintiffs seek to attach represents funds that were donated to the Bank by its member nations to facilitate the Bank's development mission in Afghanistan.  In particular, Plaintiffs have focused on the Bank's Afghanistan Reconstruction Trust Fund (ARTF).  JA199.  The record below does not contain information about the ARTF.  Plaintiffs did not seek discovery, and the district court correctly concluded that it did not need to make findings about the assets in order to determine that it lacked jurisdiction over this suit.  Similarly, this Court may affirm without addressing any facts concerning the assets.  Nonetheless, the Bank provides this information for background purposes, based on publicly available sources.

The ARTF is one of many "trust funds" established by the Bank as a means of pooling and managing voluntary contributions to the Bank from member countries.  World Bank, *Trust Funds and Programs: About* (last accessed Mar. 16, 2022);[5] *see also* World Bank Group, *A Guide for Development Partners* 3-4 (Oct.

---

[5] https://www.worldbank.org/en/programs/trust-funds-and-programs.

2022) (hereinafter, "Donor Guide").[6]  Although the term "trust fund" has particular connotations in domestic state trust law, the Bank's trust funds are not creations of state law, but instead are Bank programs established and governed exclusively by "administration agreements" between and among the Bank and the donor nations that contribute to a particular fund.  *See id*. at 6.  Administration agreements generally provide that the Bank has a "fiduciary responsibility" to donor nations to ensure that the funds are used in accordance with the administration agreement.  *Id.* at 13; *see also id.* at 2, 5.  But the agreements do not create any fiduciary relationship between the Bank and the intended recipients of funding, and they do not entitle those intended recipients to any disbursements.  The Bank holds trust fund assets in an account in its own name, in its capacity as administrator of the trust funds.  World Bank Group, *2006 Trust Funds Annual Report*, at 82.[7]

While the Bank sometimes uses trust funds to pay for projects that it implements itself, it also disburses trust fund money to outside recipients, i.e., "sovereign governments or their agencies, as well as UN agencies or nongovernmental organizations (NGOs)."  World Bank Group, *2021 Trust Fund Annual Report: To-*

---

[6] https://thedocs.worldbank.org/en/doc/691a0080958ba14595adce208d27a19c-0060072022/related/Donor-Guide-Main-text.pdf.

[7] https://documents1.worldbank.org/curated/fr/115331468161643763/pdf/38883.pdf.

*ward Greater Resilience*, at 3 (Nov. 30, 2021).[8]  When the Bank disburses funds to such recipients, it does so pursuant to financing agreements with those recipients. *See* Donor Guide, at 14.  The Bank's Standard Conditions for grant agreements provide that the Bank may "suspend" and later "terminate" a grant recipient's ability "to make withdrawals from the Grant Account" under certain circumstances, including if "an extraordinary situation has arisen which makes it improbable that the Project can be carried out or that the Recipient will be able to perform its obligations under the Grant Agreement."  Standard Conditions for Grants Made by the World Bank Out of Various Funds §§ 4.02-.03 (Feb. 15, 2012).[9]

Before the Taliban takeover, the ARTF, among its other initiatives, supported the Government of Afghanistan's civilian operating costs and development projects by disbursing payments to the government and its ministries.  *See* ARTF Administrator, *ARTF Scorecard 2020*, at 4-5.[10]  Like other trust fund administration agreements, the ARTF Administration Agreement between the Bank and donor nations sets forth the Bank's obligations to the donors, defines the purposes for which the member nations' donated funds may be used, establishes the trust's governance

---

[8] https://thedocs.worldbank.org/en/doc/44c24bb3d216f1efb43801d870aa0eb4-0060072021/trust-fund-annual-report-2021.

[9] http://web.worldbank.org/archive/website01535/WEB/IMAGES/STDGC_EN.PDF.

[10] https://www.wb-artf.org/sites/default/files/ARTF/ARTF%20Scorecard%202020%20s_Redacted1_Redacted2.pdf.

13

structure, and provides that either the Bank or the donors may terminate the admin-
istration agreement if either determines the purposes of the trust can no longer be
carried out.  In that event, "any remaining Grant Funds will be returned to the Do-
nors on a pro-rata basis."  ARTF Administration Agreement: Standard Terms and
Conditions Governing Contributions to the Afghanistan Reconstruction Trust Fund
§ 12.[11]  Separate grant agreements between the Bank and the Islamic Republic of
Afghanistan governed disbursement of ARTF funds for particular projects.[12]

When Afghanistan fell to the Taliban in August 2021, the Bank paused
ARTF's portfolio in accordance with the Administration Agreement and the
Bank's own internal policies.  *See* World Bank, *'Through the Looking Glass': Les-
sons from the World Bank Afghanistan Portfolio for FCV Engagement*, at 1
(2022).[13]  Since that time, no funds have been disbursed to the Government of Af-
ghanistan or its agencies or ministries, including Afghanistan's central bank, Da
Afghanistan Bank (DAB).  Although Afghanistan is a member country of the
Bank, following the Taliban takeover, the Bank has not recognized any authority

---

[11] https://documents1.worldbank.org/curated/en/320361601479783918/pdf/
Official-Documents-Administration-Agreement-with-the-United-States-Agency-
for-International-Development-for-TF050576.pdf.

[12] *See, e.g.,* Afghanistan Reconstruction Trust Fund Grant Agreement (Feb. 15,
2012),       https://documents1.worldbank.org/curated/en/976661516114752161/
pdf/ARTF-Grant-Agreement-TF011825.pdf.

[13] https://documents1.worldbank.org/curated/en/099915101032321436/pdf/P1786
1103275970d50957302bfb0c71a607.pdf.

of the Taliban to represent the State of Afghanistan, and no representatives of Afghanistan sit on the Bank's Board of Governors.

In March 2022, the Bank adopted a new approach to the ARTF in order to aid the people of Afghanistan in addressing the large-scale humanitarian crisis that has unfolded since the government's collapse. *See* Press Release, *World Bank Announces Expanded Approach to Supporting the People of Afghanistan* (Mar. 1, 2022).[14]  All ARTF projects are now "being implemented . . . out of the interim Taliban administration's control, through United Nations agencies and [NGOs]" such as the United Nations Development Programme and the United Nations Children's Fund.  World Bank, *Emergency Support for the People of Afghanistan* (Sept. 9, 2022).[15]  Plaintiffs' repeated assertion (*e.g.*, Br. 41) that Bank assets "are being delivered, directly, into the hands of the Taliban and its instrumentalities" therefore could not be further from the truth.

### D.    Procedural history

1.    In November 2020, Plaintiffs obtained a default judgment against the Taliban and other terrorist networks.  JA195-96.  In mid-August 2021, the Taliban asserted control over Afghanistan's government, including DAB.  JA196.  On Au-

---

[14] https://www.worldbank.org/en/news/press-release/2022/03/01/world-bank-announces-expanded-approach-to-supporting-the-people-of-afghanistan.

[15] https://www.worldbank.org/en/country/afghanistan/brief/afghanistan-emergency-support.

gust 20, 2021, Plaintiffs registered their judgment in the U.S. District Court for the District of Columbia and secured writs of attachment applicable to the Bank and IMF, seeking to attach "any money, property or credits" belonging to the Taliban or an "agency or instrumentality of the [Taliban] . . . including but not limited to Da Afghanistan Bank."  JA33, JA35.

On September 20, 2021, a process server delivered a writ of attachment to the Bank's headquarters.  JA14, JA35.  The writ purported to direct the Bank to "hold" property belonging to the Taliban and its agencies or instrumentalities, JA35, and to answer two interrogatories asking whether the Bank was "indebted to the defendant(s)" and whether the Bank had "any goods, chattels, or credits of the defendant(s) in [its] possession or charge."  JA35-36 (footnote omitted).  Plaintiffs delivered a similar writ and interrogatories to the IMF.[16]  JA11, JA33.

Plaintiffs asserted that funds the Bank intended to disburse as aid to Afghanistan, including ARTF funds, were subject to execution under TRIA.  Plaintiffs alleged that the funds were owned by DAB (even though they were donated by member countries and, by definition, had not been disbursed to DAB), and that DAB was an "agency or instrumentality" of the Taliban.  JA123-25, JA129, JA134-35.  Plaintiffs further alleged that the Bank's funds were "blocked" within the meaning of TRIA because on August 15, 2021, the President had "froze[n] Af-

---

[16] The Bank does not concede that Plaintiffs properly served the Bank.

ghan government reserves held in U.S. bank accounts." JA124. Plaintiffs contended that TRIA "overrides all" immunities possessed by the Bank, including the Bank's jurisdictional immunity from suit. JA126.

2.     In response to the writ, the Bank wrote to Plaintiffs' counsel explaining that the Bank's assets are immune from attachment and the Bank itself is "immune from judicial proceedings." JA37. Plaintiffs then moved for entry of judgment *against the Bank and the IMF* for the full value of their underlying award against the Taliban and its co-defendants. JA15. The district court subsequently granted the Bank leave to file a motion to quash the writ, warning the parties that it would "not resolve or order further briefing on the plaintiffs' Motion for Entry of Final Judgment until it [had] resolve[d] the [IMF's] Motion to Quash and the Bank's forthcoming motion, and thereby determine[d] whether it ha[d] subject-matter and personal jurisdiction." JA87.

3.     The district court held that it lacked jurisdiction and quashed the writs of attachment. JA195. The court explained that in light of the "broad immunity" from suit enjoyed by Bank and IMF under the IOIA and FSIA, the court "lacks subject matter jurisdiction" "unless an exception or waiver to immunity applies." JA 198-99. The court held that it did not need to decide whether TRIA provides an exception to international organizations' jurisdictional immunity, because even if it did, TRIA "does not cover the assets in dispute here." JA199.

17

The court first expressed "doubt" that the funds in question "belong to Afghanistan," as Plaintiffs had asserted.  JA200.  The court explained that the ARTF—the only account identified by Plaintiffs as potentially attachable—"is not comprised of Afghanistan's own money, but member donor money administered by the Bank to support Afghanistan."  JA200 (internal quotation marks omitted).  And the court noted that "even if the funds were destined for Afghanistan," such aid money would not be "of" a terrorist organization for purposes of TRIA before the funds were transferred.  *Id*. (citing *Heiser*, 735 F.3d at 938, 940-41).

The district court then stated that "even accepting arguendo the plaintiffs' position that Afghanistan has an ownership interest in future aid to be disbursed to it," the court could not constitutionally "recognize an ownership claim by the Taliban" by holding that the assets were owned by the Taliban or its instrumentalities. JA200.  The court explained that the United States had "not recognized the Taliban as the legitimate government of Afghanistan," and that U.S. courts therefore "will not" hold that the Taliban has an interest in funds destined for Afghanistan.  *Id*. The court granted the Bank's and IMF's motions to quash the writs of attachment and denied Plaintiffs' motion for entry of judgment.  JA194, JA201.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's legal determination regarding the scope of an immunity exception." *Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338, 1341 (D.C. Cir. 2021).

## SUMMARY OF ARGUMENT

The district court correctly held that it lacked jurisdiction over this action because the Bank is entitled to immunity from suit under the IOIA and FSIA. Plaintiffs' primary contention on appeal (Br. 13-14, 32-33) is that the district court should have entered judgment against the Bank and IMF for the full amount of Plaintiffs' judgment against the Taliban because the Bank, citing its immunity, declined to answer Plaintiffs' attachment interrogatories. But the court was obligated first to inquire into its subject matter jurisdiction, and it correctly rejected Plaintiffs' argument that TRIA abrogates the Bank's immunity from suit and permits execution against its assets. TRIA does not provide subject matter jurisdiction over this suit for multiple independent reasons.

I.     TRIA does not abrogate the Bank's presumptive immunity from the jurisdiction of U.S. courts under the IOIA and FSIA. Although TRIA supersedes the *execution* immunity of certain terrorist-party assets, TRIA's text and structure, as well as background principles of jurisdictional and execution immunity, establish that the statute does not abrogate the *jurisdictional* immunity of a foreign sov-

19

ereign—or, as here, an international organization.  And although TRIA applies "notwithstanding any other provision of law," that clause merely establishes that TRIA supersedes statutes providing *execution* immunity.  No court has accepted Plaintiffs' contrary reading, which would have far-reaching negative consequences.  International organizations like the Bank would be exposed to attachment actions like Plaintiffs'—precisely the result that Congress sought to prevent in enacting the IOIA.

II.    Even if TRIA could theoretically provide a basis for subject matter jurisdiction over the Bank in some circumstances, it would not do so here.  TRIA applies only to "the blocked assets of" either "[a] terrorist party" or "any agency or instrumentality of that terrorist party."  § 201(a).  To avail themselves of TRIA, Plaintiffs must establish (among other things) that Afghanistan's central bank, DAB, is an "agency or instrumentality" of the Taliban.  As a matter of law, Plaintiffs cannot do so.  Both TRIA itself and the President's exclusive constitutional authority to recognize foreign governments preclude courts from deeming DAB to be an "agency or instrumentality" of the Taliban.

First, TRIA's structure forecloses the possibility that an entity could be both an agency of a foreign state, as DAB unquestionably is, and an agency of a non-state terrorist actor, as DAB would need to be for Plaintiffs to invoke TRIA.  TRIA creates two mutually exclusive avenues for executing against assets of a "terrorist

party"—one for non-state actors like the Taliban, and another for foreign states that have been designated by the Executive Branch as state sponsors of terrorism (a category that does not include Afghanistan). TRIA thus permits execution against foreign *state* assets only if the state has been designated a state sponsor of terrorism. Plaintiffs' reading of TRIA would allow plaintiffs to evade that limitation. That is why the United States has taken the considered position that, under TRIA, agencies of a foreign state that has not been designated as a state sponsor of terrorism cannot also be deemed agencies of a non-state terrorist party.

Second, the district court correctly determined that it lacked constitutional authority to treat DAB as an instrumentality of the Taliban. To do so would effectively recognize the Taliban as the government of Afghanistan. But only the President may recognize the legitimate government of a foreign state—and he has declined to recognize the Taliban.

Because DAB is not, as a matter of law, an agency or instrumentality of the Taliban, the Court need not address Plaintiffs' contentions that the Bank's funds are "blocked assets" "of" DAB—which they are not—and that the district court should have ordered discovery on those questions. Plaintiffs waived their discovery arguments by declining to request discovery or answers to the attachment interrogatories in connection with the motions to quash, and by representing that they had "prove[d]" their entitlement to execution under TRIA on the existing record.

21

JA129 n.4.  And Plaintiffs' unsupported and implausible assertions cannot suffice to satisfy their burden of demonstrating that the Bank's funds are blocked assets of DAB.

III.    Plaintiffs' argument that the district court should have entered judgment against the Bank is meritless.  Because international organization immunity deprives a court of subject matter jurisdiction, the district court was obligated first to consider the Bank's immunity.  Contrary to Plaintiffs' assertions, District of Columbia execution statutes do not supersede the IOIA and FSIA, and the Bank timely raised its jurisdictional objections.

## ARGUMENT

## I.    The District Court Lacked Subject Matter Jurisdiction Over the Bank Because TRIA Does Not Provide an Exception to Jurisdictional Immunity.

Plaintiffs contend that TRIA overrides the Bank's jurisdictional immunity from suit under the IOIA.  That is incorrect.  As the United States has explained in a similar execution action, "TRIA does not provide an independent grant of subject-matter jurisdiction" with respect to an otherwise jurisdictionally immune entity like the Bank.  *See* Statement of Interest of the United States of America, at 11, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-mc-40 (W.D.N.Y. Sept. 20, 2022) (hereinafter, "Caballero SOI").  The district court therefore lacked subject matter jurisdiction over this suit.

A.    **Under the IOIA and the FSIA, the Bank is immune from all forms of judicial process, and Plaintiffs therefore must establish an exception to jurisdictional immunity.**

Under the IOIA and FSIA, the Bank is entitled to immunity from the jurisdiction of U.S. courts unless Plaintiffs' suit falls within a statutorily specified exception to that immunity.  22 U.S.C. § 288a(b) (international organizations are entitled to the "same" immunity as foreign states); 28 U.S.C. § 1604 (foreign states are presumptively immune unless an FSIA exception to immunity applies); *see Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Plaintiffs do not contend that this suit falls within any of the exceptions to jurisdictional immunity set forth in Section 1605 of the FSIA, nor do they contend that the Bank has in any way waived its immunity.  Instead, Plaintiffs argue only that TRIA overrides the Bank's immunity from suit.

As an initial matter, Plaintiffs are wrong to suggest that they need only establish that TRIA overcomes the immunity from *execution* that the Bank's property enjoys under the IOIA and FSIA.  Br. 24 (asserting that TRIA "preempts" Section 1611 of the FSIA, which establishes that international organizations' property is immune from *execution*).  Because the IOIA and FSIA provide two distinct forms of immunity—jurisdictional immunity from suit and immunity from execution—a court cannot entertain an execution action against a foreign sovereign or international organization without first determining that it has subject matter

23

jurisdiction over the state or organization itself.  *See, e.g.*, *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 479 n.15 (D.C. Cir. 2016); *In re: Terrorist Attacks on September 11, 2011*, No. 03-MDL-1570, 2023 WL 2138691, at *9-10 (S.D.N.Y. Feb. 21, 2023) (holding that before judgment against Taliban could be enforced against DAB, plaintiffs would have to establish an exception to "DAB's jurisdictional immunity under 28 U.S.C. § 1604," and concluding that TRIA did not provide one).  As this Court has explained, "[t]o enforce an award against a foreign state in the United States, a party must . . . establish *both* that the foreign state is not immune from suit and that the property to be attached or executed against is not immune."  *TIG Ins. Co.*, 967 F.3d at 781 (emphasis added); *see also* H.R. Rep. 94-1487, at 26 (explaining that "neither section 1610 nor 1611 would permit an attachment for the purpose of obtaining jurisdiction over a foreign state or its property").

Because Plaintiffs hold a judgment against the Taliban—not the Bank—they have not previously established that the Bank is subject to jurisdiction, and they must do so now.  By contrast, when a plaintiff files an execution action against the *same* foreign state against whom it obtained a judgment of liability, the plaintiff has already established that the state is subject to jurisdiction (i.e., not immune from suit) in the course of obtaining that judgment, and that jurisdiction carries through to an execution suit to enforce the judgment against the state's assets.  *See*

*First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 53 (2d Cir. 2002). But where, as here, a plaintiff obtains a judgment against one party, and then seeks to enforce that judgment by filing suit against a *third-party* state or international organization, the plaintiff must first establish that the state or international organization lacks jurisdictional immunity before the plaintiff may maintain the execution action. *TIG Ins. Co.*, 967 F.3d at 781; *In re: Terrorist Attacks*, 2023 WL 2138691, at *9.

### B.  TRIA does not abrogate the Bank's jurisdictional immunity from suit.

1.     TRIA does not override the *jurisdictional* immunity conferred upon the Bank by the IOIA and FSIA because TRIA is concerned exclusively with *execution* immunity.[17]  TRIA's text establishes that the effect of the provision is to create an exception to execution immunity: it renders the "blocked assets" of a terrorist party "subject to *execution or attachment in aid of execution*" in order to satisfy certain existing "judgment[s]" against that terrorist party.  § 201(a) (emphasis added).  TRIA does not mention jurisdictional immunity or purport to subject otherwise immune entities unrelated to a terrorist party—like the Bank here—to suit.

---

[17] Before the district court, the Bank argued generally that "the Bank and its assets are specifically immune from this type of suit, and [TRIA] does not override that immunity."  JA141; *see also* JA94.  Because sovereign immunity "goes to the subject matter jurisdiction of the court," *Delta Foods Inc. v. Republic of Ghana*, 265 F.3d 1068, 1071 (D.C. Cir. 2001), the Court must consider whether the Bank enjoys jurisdictional immunity under the IOIA and FSIA notwithstanding TRIA.

By contrast, when Congress *has* defined circumstances in which an entity pre-
sumptively immune from suit may nevertheless be sued, it has used express juris-
dictional language. For instance, Section 1605 of the FSIA provides that "[a] for-
eign state shall not be immune from the jurisdiction of courts of the United States
or of the States" in certain circumstances. 28 U.S.C. § 1605. TRIA contains no
comparable language. *See* Caballero SOI, at 12 ("TRIA's text exclusively pertains
to *post-judgment* attachment proceedings.").

TRIA's treatment of a "terrorist party" that is a foreign state reinforces the
conclusion that TRIA provides no freestanding exception to jurisdictional immuni-
ty. TRIA provides that a plaintiff may execute against the blocked assets of a for-
eign state only when the plaintiff has "obtained a judgment . . . for which a terrorist
party is not immune under section 1605A."[18] § 201(a). Section 1605A is the FSIA
exception to jurisdictional immunity that authorizes certain terrorism-related suits
against foreign states that have been designated by the Executive Branch as state
sponsors of terrorism. TRIA thus requires that before a plaintiff may avail itself of
TRIA to execute against a foreign state's assets, that state's jurisdictional immuni-
ty must already have been overcome and a valid judgment must *already have been*

---

[18] TRIA also provides for execution to enforce a "judgment against a terrorist party
on a claim based upon an act of terrorism," § 201(a), but that avenue pertains only
to terrorist parties that are *non*-state actors. *See* pp. 38, *infra*; *cf. Weininger v.
Castro*, 462 F. Supp. 2d 457, 480 (S.D.N.Y. 2006).

entered against the foreign state. *See Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019) (TRIA "provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA" (internal quotation marks and citation omitted)).  If TRIA itself somehow abrogated a foreign state's jurisdictional immunity, Congress would have had no reason to specify in the very same statute that the foreign state must already have been held non-immune under Section 1605A.

Some courts of appeals have held that TRIA "confers an independent basis for subject matter jurisdiction" over a party not named in the judgment in one narrow circumstance inapplicable here: when the third party against whose assets execution is sought is an "agency or instrumentality" of a designated foreign state sponsor of terrorism.  *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 132 (2d Cir. 2016); *see also Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010); *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 958 (9th Cir. 2016).  That construction, however, serves only to reinforce the conclusion that TRIA does not abrogate the jurisdictional immunity of unrelated third parties like the Bank.  TRIA provides that a plaintiff may execute against the blocked assets of an "agency or instrumentality of [a] terrorist party," including a designated state sponsor of terrorism, in order to satisfy a judgment against the state itself.  That language has the purpose and effect of declining to "recognize

any juridical distinction between a designated terrorist state and its agencies or instrumentalities" for purposes of TRIA, thus treating an agency or instrumentality of the terrorist state as though it were the alter ego of that state. *Weinstein*, 609 F.3d at 50 (quoting 148 Cong. Rec. S11,524, at S11,528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)); *see First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626-28 (1983) (ordinarily an instrumentality's assets may not be attached to satisfy a claim against the foreign state, unless the former is an alter ego of the latter).

The consequence of that alter-ego treatment is that, under general FSIA principles, a plaintiff may execute against the assets of the state agency or instrumentality in order to enforce a judgment against the *foreign state itself*, even without establishing an independent basis of subject matter jurisdiction over the agency or instrumentality. *See Crystallex International Corp. v. Bolivarian Rep. of Venezuela*, 932 F.3d 126, 136-38 (3d Cir. 2019) (under the FSIA, when an agency or instrumentality is an alter ego of the foreign-state judgment debtor, jurisdiction over state carries over to enforcement action against the alter ego agency or instrumentality). TRIA's narrow abrogation of juridical separateness for agencies and instrumentalities of designated state sponsors of terrorism, and the consequences of that abrogation for jurisdiction over those agencies, does not suggest that TRIA abrogates the jurisdictional immunity of third parties that, like the Bank,

28

are *entirely unrelated* to the terrorist party whose assets are sought.  To the contrary, TRIA's treatment of foreign-state agencies and instrumentalities confirms that had Congress intended to abrogate the jurisdictional immunity of unrelated parties like international organizations, it would have done so expressly.  *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825 (2018) (declining to "read into" Section 1610(g) a "blanket abrogation" of immunity absent an express provision to that effect, "[o]ut of respect for the delicate balance that Congress struck").

2.    Plaintiffs are incorrect in contending (Br. 24) that TRIA's provision that the statute applies "notwithstanding any other provision of law" establishes that TRIA overrides jurisdictional immunity.  "The introductory clause '[n]otwithstanding any other provision of law' does not define the scope of [a] statute."  *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 75 (D.C. Cir. 2015) (brackets omitted; quoting *Kucana v. Holder*, 558 U.S. 233, 238-39 & n.1 (2010)).  Instead, it merely "set[s] out an order of operations" to follow when, after having determined TRIA's proper scope, a court concludes that another statute irreconcilably conflicts with TRIA.  *Id.*; Scalia & Garner, Reading Law 126 (2012) ("superordinating language (signaled by *notwithstanding* or *despite*) merely shows which provision prevails in the event of clash—but does not necessarily denote a clash of provisions").

29

For the reasons explained above, TRIA's scope is limited to rendering assets available for execution. *Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003). TRIA's notwithstanding clause therefore establishes that the blocked assets of a terrorist party shall be subject to execution regardless of any conflicting legal provisions that would otherwise make those assets immune *from execution*. But TRIA does not purport to address, much less abrogate, jurisdictional immunity.

As a result, statutes that confer jurisdictional immunity, such as the IOIA and Section 1604 of the FSIA, do not conflict with TRIA. Jurisdictional immunity and execution immunity "operate independently" of each other. *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011); *see* Caballero SOI, at 5 n.3 ("[J]urisdictional immunity and attachment immunity are distinct and independent requirements."). Under the FSIA itself, a foreign state might have property that falls within one of Section 1610's exceptions to execution immunity, but nonetheless be immune from suit if none of Section 1605's exceptions to jurisdictional immunity apply. For instance, a "waiver of immunity from attachment of property does not imply a waiver of immunity from suit." *Walters*, 651 F.3d at 288 (quoting *Restatement (Third) of Foreign Relations Law of the United States* § 456(1)(b) (1987)). TRIA's notwithstanding clause therefore does not override the jurisdictional immunity provided by the IOIA and FSIA.

TRIA's statutory history confirms that conclusion. In 1998, Congress enacted Section 1610(f)(1) of the FSIA, which abrogated execution immunity for certain blocked assets so that they would be available to satisfy Section 1605A judgments against foreign states. The President, however, had authority to waive that provision "in the interest of national security," 28 U.S.C. § 1610(f)(3), which he repeatedly did, preventing the execution provision from ever taking effect. *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1002 (2d Cir. 2014). Congress therefore enacted TRIA. The reason that "Congress placed the 'notwithstanding' clause in [TRIA] § 201(a)" was "to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009); *accord* H.R. Rep. No. 107-779, at 27 (2002) (Conf. Rep.). Congress thus intended to narrow execution immunity for certain blocked assets; but there is no indication whatsoever that Congress intended silently to expand federal courts' jurisdiction over all foreign states and international organizations that are alleged to hold such assets.

Plaintiffs' remaining arguments also lack merit. The decisions on which Plaintiffs rely (Br. 24) confirm that TRIA's "notwithstanding" clause overrides only other statutes that provide *execution* immunity—not jurisdictional immunity. *See Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010) (TRIA

overrides the execution immunity of diplomatic property under Sections 1609 and 1610 of the FSIA); *Weininger v. Castro*, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) (TRIA overrides the execution immunity of foreign central bank property under Section 1611 of the FSIA). And courts have repeatedly rejected Plaintiffs' argument (Br. 24) that TRIA overrides any statute that would have the practical effect of preventing plaintiffs from obtaining the assets they seek, regardless of the statute's subject matter. *See United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 688 (5th Cir. 2013) (rejecting contention that "the 'notwithstanding' clause trumps any other law that has the incidental effect of removing funds from the reach of judgment creditors"); *id.* (holding that TRIA did not conflict with, and did not supersede, criminal forfeiture statute even though that statute would "prevent[] [the plaintiffs] from executing against those assets"); *Smith*, 346 F.3d at 271 (President's statutory authority to confiscate assets under IEEPA did not conflict with TRIA and was not superseded, even though that authority prevented plaintiffs from executing against assets in question).

3. Accepting Plaintiffs' argument that TRIA abrogates the jurisdictional immunity of international organizations and foreign states would have sweeping adverse consequences. Under Plaintiffs' view, TRIA would automatically render all international organizations and foreign states subject to suits seeking execution against assets they hold, so long as plaintiffs alleged that those assets were "of" a

terrorist party (or its agency or instrumentality).  Without jurisdictional immunity, organizations like the Bank could be subject to a cascade of suits like Plaintiffs'. The Bank's core function is disbursing loans and grants to governmental entities to promote stability, often in regions prone to conflict.  Those activities help stem the rise of terrorist groups—and the Bank has rigorous procedures designed to ensure that its funds are not disbursed to terrorist parties.  But as this suit demonstrates, the Bank's very mission and its possession of substantial funds could make the Bank an attractive target for plaintiffs seeking to execute on judgments against terrorist parties.  The Bank's jurisdictional immunity would mean little if plaintiffs could readily file writs of execution merely *asserting* that the Bank holds terrorist-party funds, thereby forcing the Bank to respond—and perhaps submit to burdensome discovery—within the expedited framework of state-law execution and attachment procedures.  *See Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 280 (D.C. Cir. 2014).  Such suits could chill donor governments' contributions to the Bank and hinder the Bank's efforts to support regions of the world at risk of instability and terrorist activity—the antithesis of TRIA's objectives.

Congress could not have intended TRIA silently to strip international organizations of their immunity from suit and subject them to burdensome execution proceedings seeking to attach their assets.  Concerns about just such suits animated Congress's grant of immunity to international organizations in the first place: Con-

33

gress recognized that international organizations headquartered in the United States would possess substantial assets here—assets donated by sovereign member states—and that attempts by private claimants in the United States to attach those funds would interfere with organizations' functions and cause significant foreign relations concerns.  S. Rep. No. 79-861, at 2-3 (1945); H.R. Rep. 94-1487, at 30. Similarly, construing TRIA to abrogate the jurisdictional immunity of foreign states (thereby subjecting even states that are not sponsors of terrorism to execution suits under TRIA) would, as the United States has explained, cause international friction and raise reciprocity concerns.  Caballero SOI, at 20-22.  In light of the significant adverse consequences that Plaintiffs' construction entails, TRIA "should not be interpreted to create subject-matter jurisdiction absent a clear indication of Congressional intent, which is not present here."  *Id.* at 23.

## II.    TRIA's Requirements Are Not Satisfied Because The Assets Plaintiffs Seek To Attach Are Not "of Any Agency or Instrumentality of" the Taliban.

Even if TRIA provided an exception to an international organization's jurisdictional immunity, *but see supra* Section I.B, TRIA would not support jurisdiction over the Bank in this case (or permit execution against the assets in question) because the assets Plaintiffs seek to attach do not fall within TRIA's ambit.  TRIA applies only to assets that are (1) "the blocked assets" (2) "of [a] terrorist party" or "of any agency or instrumentality of that terrorist party."  TRIA, § 201(a).  The as-

34

sets that Plaintiffs seek to attach therefore must be "seized or frozen" by the Executive Branch pursuant to certain authorities, *id.* § 201(d)(2), and they must be owned by the Taliban or its agency or instrumentality, *Heiser*, 735 F.3d at 937-38 ("of" denotes ownership).  Plaintiffs theorize (Br. 43-47) that assets in the Bank's possession are blocked assets owned by Afghanistan's central bank, DAB, and that DAB is an agency or instrumentality of the Taliban.  The Court does not need to decide whether the funds in question are blocked assets that belong to DAB (they are not, *see supra* pp. 11-15 and *infra* Section II.C).  Even assuming for the sake of argument that the Bank does possess blocked assets belonging to DAB, as a matter of law TRIA's text and structure, as well as the Constitution's conferral of foreign affairs powers exclusively on the political branches, foreclose the conclusion that DAB can be treated as an "agency or instrumentality of" the Taliban.

### A.    DAB is an organ of the State of Afghanistan.

As an initial matter, DAB, as the central bank of Afghanistan, is unquestionably an organ of the State of Afghanistan.  That fact is critical to determining DAB's proper treatment under TRIA.

The FSIA defines a "foreign state" as including any "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  The latter phrase encompasses any entity that "is a separate legal person," "is an organ of a foreign state or political subdivision thereof," and is not "a citizen of a State of the United States" or "creat-

ed under the laws of any third country." *Id.* § 1603(b). "'[S]tate central banks' [are] the 'paradigm of a state agency or instrumentality,'" *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 732 (11th Cir. 2014), as a central bank is an organ of a foreign state that effectuates its parent state's monetary policy, including by controlling currency flows and paying the nation's debts, *see EM Ltd. v. Banco Cent. de la Republica Argentina*, 800 F.3d 78, 94 (2d Cir. 2015). Indeed, the FSIA expressly recognizes that central banks are particularly closely tied to foreign states themselves. Section 1611(b) provides that "the property *of a foreign state* shall be immune" if "the property is that *of a foreign central bank* or monetary authority held for its own account," 28 U.S.C. § 1611(b)(1) (emphasis added), thus presupposing that the property "of a foreign central bank" is often also the property "of a foreign state." *Accord NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 189 (2d Cir. 2011). In addition, Section 1611(b) further recognizes the close relationship between central banks and their "parent foreign government[s]" by providing that the parent government may waive the central bank's immunity. 28 U.S.C. § 1611(b)(1).

DAB, as Afghanistan's central bank, is thus unquestionably an agency or instrumentality of the State of Afghanistan and a part of the "foreign state" of Afghanistan for purposes of the FSIA. *See* 28 U.S.C. § 1603(b); *accord* Caballero SOI, at 21. Plaintiffs do not suggest otherwise; indeed, their theory rests on the

fact that DAB is the central bank of Afghanistan and that it was set to receive aid disbursement from a trust fund "for Afghanistan." Br. 29-30.

### B. DAB is not an "agency or instrumentality of a terrorist party" under TRIA, and therefore its alleged assets are not subject to TRIA.

The fact that DAB is an agency or instrumentality of the State of Afghanistan creates two insurmountable obstacles to Plaintiffs' attempt to demonstrate that, as TRIA requires, DAB is *also* an "agency or instrumentality" of the Taliban. First, because DAB is an organ of the *state* of Afghanistan, it cannot also be an "agency or instrumentality" of a *non-state* terrorist party within the meaning of TRIA. Second, and independently, the district court lacked constitutional authority to hold that DAB is an agency or instrumentality of the Taliban because doing so would amount to judicial recognition of the Taliban as the government of Afghanistan.

1. An "agency or instrumentality" of a foreign state that has not been designated a state sponsor of terrorism cannot also be an "agency or instrumentality" of a non-state terrorist party under TRIA.

a. In TRIA, Congress carefully limited the situations in which foreign-state assets would be subject to execution notwithstanding the execution immunity provided by the FSIA. TRIA permits execution, in certain circumstances, against "the blocked assets of" a "terrorist party." § 201(a). The term "terrorist party" is

defined to include non-state actors—"a terrorist [or] a terrorist organization"—as well as certain foreign state actors. *Id.* § 201(d)(4). As discussed above, *see supra* pp. 26-27, a foreign state may count as a "terrorist party" only if the foreign state has been "designated as a state sponsor of terrorism" by the Executive Branch pursuant to certain statutes, a designation that presently applies to only four states (none of which are Afghanistan).

TRIA then provides separate avenues through which to obtain execution against non-state and state terrorist parties: the plaintiff must have "obtained a judgment against a terrorist party on a claim based upon an act of terrorism," or "obtained a judgment . . . for which a terrorist party is not immune under section 1605A." § 201(a). The latter avenue pertains only to terrorist parties that are foreign states, as only states could be subject to a judgment for which they are not immune under Section 1605A. *See supra* pp. 26-27. Conversely, the former avenue of TRIA execution—for holders of a judgment "on a claim based upon an act of terrorism"—necessarily applies only to *non*-state actors. Otherwise, a plaintiff would be able to use TRIA to execute against the blocked assets of a *foreign state* any time the plaintiff possessed a judgment "on a claim based upon act of terrorism," whether or not the foreign state was immune from that claim under Section 1605A. In other words, the "based upon an act of terrorism" avenue would subsume (and render superfluous) the "not immune under section 1605A" avenue,

thereby expanding execution against foreign-state assets beyond what Congress contemplated. *Cf. Weininger*, 462 F. Supp. 2d at 480 ("[I]f a foreign sovereign was immune from judgment under [the predecessor to Section 1605A], reading 'a claim based on an act of terrorism' to include those foreign sovereigns would defeat that very immunity and create a whole new category of jurisdiction over otherwise immune sovereigns.").

In both its definitional and its execution provisions, then, TRIA reflects Congress's considered determination that the execution immunity of foreign states should be abrogated only when the Executive Branch has concluded that the state's support for terrorism warrants taking the significant step of designating the state a sponsor of terrorism. Caballero SOI, at 20-21. That makes sense: "[s]eizing a foreign state's property is a serious affront to its sovereignty," and, "[c]orrespondingly, judicial seizure of a foreign state's property carries potentially far-reaching implications for American property abroad." *Rubin*, 830 F.3d at 480. Conversely, Congress made a considered judgment that foreign states *not* designated as sponsors of terrorism should not have their assets made subject to execution to satisfy terrorism-related judgments.

b.    Plaintiffs' position, however, is that they may sidestep Congress's decision not to subject assets of non-terrorist states to execution by establishing that DAB—the central bank of the State of Afghanistan—is an "agency or instrumen-

tality" of the Taliban, a non-state terrorist party.  Although TRIA does not define the phrase "agency or instrumentality," this Court need not address the full scope of the phrase in order to conclude that TRIA forecloses Plaintiffs' argument.[19] Plaintiffs' construction would vitiate Congress's limitation of TRIA's execution provisions to foreign states that are state sponsors of terrorism.  A holder of a judgment against a non-state terrorist party could attach the assets of *any* foreign state—including states *not* designated state sponsors of terrorism—by arguing that the state is an instrumentality of the non-state terrorist party.  Plaintiffs' position would also give rise to a significant anomaly: while TRIA would render a non-terrorist foreign state's assets subject to execution to satisfy a judgment against a

---

[19] The term "agency or instrumentality" may connote a branch or subdivision of the larger terrorist-party entity that implements its terrorist objectives.  *Black's Law Dictionary* (agency; instrumentality).  Although the FSIA defines the phrase "agency or instrumentality" as an "organ of a foreign state," 28 U.S.C. § 1603(b), the phrase as used in TRIA is likely broader, as TRIA contemplates that an entity may be an "agency or instrumentality" of a *non-state* terrorist party. *Kirschenbaum*, 830 F.3d at 132-35.  In *Kirschenbaum*, the Second Circuit defined TRIA's reference to "agency or instrumentality" broadly, to include an entity that was "owned, controlled, or directed by the terrorist party."  *Id.* at 135.  There, however, the Second Circuit had no occasion to address "whether, and under what circumstances (if any), an agency or instrumentality of a foreign state can simultaneously be an agency or instrumentality of a non-state terrorist entity." Caballero SOI, at 32.  Moreover, the Second Circuit later cautioned that *Kirschenbaum*'s interpretation of "agency or instrumentality" might be overbroad and require further refinement.  *See Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 199 (2d Cir. 2019).  And as the United States has explained, Caballero SOI 31-34, *Kirschenbaum*'s definition must not be used to hold that a foreign state is an agency or instrumentality of a non-state terrorist party for the reasons stated above in text.

*non-state party*, TRIA would continue to authorize a plaintiff to recover assets to satisfy a judgment against *a foreign state itself* only if the state has been designated as a state sponsor of terrorism. Here, for instance, because Afghanistan is not a state sponsor of terrorism, Plaintiffs would not be able to use TRIA to attach assets of Afghanistan or DAB to satisfy a judgment against Afghanistan itself. But under Plaintiffs' reading of TRIA, assets purportedly belonging to DAB are subject to execution because DAB is an "agency or instrumentality" of the Taliban, a non-state terrorist party. For just those reasons, the United States has explained that TRIA's structure forecloses deeming a foreign state and its agencies to be agencies or instrumentalities of a non-state terrorist party. Caballero SOI, at 33.

Plaintiffs' construction also would raise foreign relations concerns. Execution would be available based not on the Executive Branch's foreign-relations and national-security judgment that the state in question should be designated a sponsor of terrorism, but instead based on a determination by a court—which lacks foreign relations expertise—that, on the facts of the case, the foreign state organ functioned as an "agency or instrumentality" of a terrorist party. Caballero SOI, at 33. As the United States has explained, that would cause "significant international friction" and raise concerns about reciprocal action against the United States. *Id.* In view of the sensitivity of executing against foreign sovereign assets, it is inconceivable that Congress would have permitted private claimants to attach the assets

of any and all foreign states (or their instrumentalities) to satisfy judgments against non-state terrorist parties.

2.    The district court correctly held that DAB is not an "agency or in-strumentality" of the Taliban for another, independent reason: so holding would amount to judicial recognition of the Taliban as the government of Afghanistan.

a.    As Plaintiffs concede (Br. 47 n.8), the Executive Branch does not rec-ognize the Taliban (or any entity) as the government of Afghanistan.  *Accord* Statement of Interest of the United States of America, at 26, *John Does 1 Through 7 v. The Taliban*, No. 20-mc-740 (S.D.N.Y. Feb. 11, 2022) (hereinafter, "Does SOI").  Because the President possesses the "exclusive recognition power . . . to acknowledge, in a formal sense, the legitimacy of other states and governments" (or to refuse to do so), *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 17 (2015), courts are precluded from issuing any holding that expressly or implicitly contra-dicts the President's recognition decision.  *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 137 (1938); *Nat'l City Bank of New York v. Republic of Chi-na*, 348 U.S. 356, 358 (1955).  In particular, courts may not give *legal effect* to ac-tions of an unrecognized government in a manner that acknowledges, for purposes of U.S. law, that the unrecognized regime exercises governmental authority over the state.  *See, e.g., Guar. Tr. Co.*, 304 U.S. at 137 (holding that "the Soviet Gov-ernment could not maintain a suit in our courts before its recognition by the politi-

42

cal department of the government"; permitting such a suit would recognize for domestic-law purposes that the Soviet government possessed authority to speak for the Soviet state); *National City Bank of N.Y.*, 348 U.S. at 358 (once the Executive Branch has recognized a foreign government, courts must accord foreign sovereign immunity to the government; contrary conclusion would suggest that the government is not actually legitimate government of the state).

Accepting Plaintiffs' argument that DAB is an "agency or instrumentality" of the Taliban would necessarily give legal effect in U.S. courts to the Taliban's apparent exercise of governmental authority over Afghanistan. Plaintiffs' theory is that the Taliban has asserted quintessentially *governmental* control over DAB by appointing Taliban personnel as DAB governors and directing DAB to effectuate Taliban monetary policy on behalf of the State of Afghanistan. Br. 27 (arguing that the Taliban "established itself as the government of Afghanistan" and "install[ed] a new governor" of DAB); JA134 (noting that the "newly installed Board of Directors for Da Afghanistan Bank has met" with "representatives of countries such as Pakistan, Turkey, Iran, Azerbaijan, and Kyrgyzstan at the behest of the Taliban"). Embracing Plaintiffs' theory would therefore formally acknowledge the Taliban's exercise of governmental authority and hold that it is sufficient to render DAB an agency or instrumentality of the Taliban.

Moreover, the ruling Plaintiffs seek would give the Taliban's apparent control domestic legal effect by rendering DAB's alleged assets available for execution to satisfy the Taliban's judgment debts in the United States. For purposes of protection from execution, U.S. law views property owned by a central bank as the property of the foreign state itself. *See NML*, 652 F.3d at 189 (FSIA's central-bank execution provision reflects "Congress's understanding" that "funds of [] foreign central banks" "are, in fact, 'the reserves of [the] foreign state[s]' themselves" (citation omitted)). Because DAB is the central bank of Afghanistan, therefore, its assets may be "viewed as the property of a foreign state," i.e., Afghanistan. *Id.*; *supra* pp. 35-36. Indeed, Plaintiffs have made that point themselves. JA29 (Plaintiffs assert that the funds in question "belong[] to the Islamic Republic of Afghanistan"). But the Taliban has no right to own or control Afghanistan's property: one legal consequence of nonrecognition is that "a regime not recognized as the government of a state"—here, the Taliban—"is not entitled to property belonging to that state located in the United States." Does SOI, at 26 (quoting *Restatement (Third) of Foreign Relations Law* § 205(2)). Holding that DAB's alleged property—that is, Afghan state property located in the United States—is available to satisfy a judgment against the Taliban therefore would necessarily imply that the Taliban *is* "recognized as the government of [the] state." *Restatement (Third) of Foreign Relations Law* § 205(2).

44

b.    Plaintiffs' contrary arguments lack merit.  Plaintiffs primarily argue (Br. 43-45) that only "formal" acts of recognition impinge on the President's exclusive recognition power, and that here, the court need only "acknowledg[e] . . . as a factual matter the Taliban *acts as* a government."  Plaintiffs are wrong on both counts.

First, although a judicial ruling cannot formally bestow recognition on a foreign government under domestic or international law, the Supreme Court and courts of appeals have long held that judicial actions short of a formal declaration of recognition impermissibly contradict the President's recognition policy if they necessarily imply that the entity in question is the authorized government of the state.  *See, e.g., United States v. Hutchings*, 26 F. Cas. 440, 442 (C.C.D. Va. 1817) (Marshall, C.J.) (sitting as circuit justice) (because Executive had not yet recognized independence of Buenos Aires, court could not give effect to commissions issued by that government); *Guar. Tr. Co. of New York*, 304 U.S. at 137 (permitting unrecognized entity to sue on behalf of foreign state contradicts recognition policy).

Plaintiffs read the Supreme Court's decision in *Zivotofsky* to suggest that "[j]udicial or legislative acts short of the formal act of recognition are not constitutionally problematic."  Br. 44-45.  That reading is misguided.  *Zivotofsky* explained that *Congress* may "express its disagreement with" the President's recognition de-

cision, including by "enact[ing] an embargo, declin[ing] to confirm an ambassador, or even declar[ing] war." 576 U.S. at 30. Critically, Congress enjoys its *own* constitutional authority over foreign affairs, and it may exercise that authority so long as it does not "alter" or "directly contradict[]" the President's recognition decision. *Id*. Unlike Congress, however, the Judiciary has no such authority, and it is therefore bound to accept as "conclusive" not only the President's recognition decisions, but also the precise recognition policy followed by the Executive Branch. *Id.* at 18, 19; *see also id.* at 22 ("The courts of the union must view a newly constituted government as it is viewed by the legislative and executive departments of the government of the United States." (alterations and internal quotation marks omitted; quoting *United States v. Palmer*, 16 U.S. 610, 643 (1818))). For that reason, *Zivotofsky* approvingly cited the decisions discussed above, which held that courts may not accord an entity treatment under U.S. law that is inconsistent with the President's recognition decision. *Id*. at 18-19.

Second, Plaintiffs are wrong to assert (Br. 45) that they merely seek "a judicial finding that the Taliban controls DAB" as a factual matter. Rather, they seek an order that *gives domestic legal effect to that alleged fact* by authorizing Plaintiffs to seize money allegedly belonging to the State of Afghanistan to pay the Taliban's U.S. judgment debts. That holding would necessarily acknowledge that the Taliban is exercising governmental authority over DAB and Afghan state assets, as

46

another court has already recognized.[20]  *See In re: Terrorist Attacks*, 2023 WL 2138691, at *13 ("The Constitution forbids this Court from determining what the Judgment Creditors require under TRIA: a finding that the Taliban regime is in control of DAB—an instrumentality of the government of Afghanistan—and that the Taliban thus acts as the government of Afghanistan.").

Finally, Plaintiffs contend (Br. 47) that their position is "fully aligned" with the Executive Branch, which they characterize as having "acknowledged the fact of the Taliban's control over Afghanistan."  But although the Executive has indeed acknowledged the Taliban's de facto control of Afghanistan, the Executive has in no way recognized any de jure entitlement of the Taliban to direct DAB as Afghanistan's central bank or to dispose of Afghanistan's central bank property.  Until the Executive Branch recognizes a government of Afghanistan, the Judiciary is

---

[20] *M. Salimoff & Co. v. Standard Oil Co. of New York*, 262 N.Y. 220 (1933), on which Plaintiffs rely (Br. 44), is not to the contrary.  There, the court dismissed a conversion claim by Russian nationals whose property had been confiscated in Russia by the unrecognized Soviet government.  The court's holding merely acknowledged the effect *within the Soviet Union* of the Soviet government's actions with respect to private rights—which, as the court explained, does not implicate recognition.  *Id*. at 225; *see also Restatement (Third) of Foreign Relations Law* § 205, Reporters' Note 3.  The court distinguished that holding from a decision according an unrecognized government's actions "extraterritorial effect" on the legal status of property or companies located in the United States—which *would* implicate recognition.  262 N.Y. at 225-26.  Here, Plaintiffs seek the latter, as they assert that the Taliban's control of DAB should render Afghan assets in the United States available to satisfy the Taliban's U.S. judgment debts.

precluded from treating the Taliban as exercising governmental authority for pur-
poses of U.S. law. *See* Does SOI, at 27.

*    *    *

Because DAB may not be deemed an agency or instrumentality of the Tali-
ban, Plaintiffs cannot demonstrate that TRIA's requirements are satisfied. The
consequence of TRIA's inapplicability is twofold. First, even if TRIA could pro-
vide a freestanding exception to the Bank's jurisdictional immunity under the IOIA
and FSIA, *but see supra* Section I.B, TRIA does not apply here and so the district
court lacked subject matter jurisdiction over the Bank. Second, even accepting
Plaintiffs' assertion that the Bank holds assets of DAB, Plaintiffs have not estab-
lished that TRIA provides an exception to the *execution* immunity of DAB assets
under the FSIA, *see* 28 U.S.C. §§ 1609, 1611. The property Plaintiffs seek is
therefore not subject to attachment or execution.

**C.   The Court need not address whether ARTF funds are owned by DAB and are "blocked assets," but in any event, Plaintiffs have failed to satisfy their burden on those issues.**

For the reasons stated above, this Court should hold that, as a matter of law,
TRIA does not permit the district court to exercise jurisdiction over the Bank. That
is true regardless of whether, as TRIA requires, ARTF funds are both "blocked as-
sets" and assets "of" DAB (that is, owned by DAB, *see Heiser*, 735 F.3d at 940).
This Court therefore need not address those questions in order to affirm. But in

48

any event, Plaintiffs have not satisfied their burden on either question. *See Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1356 (11th Cir. 2022) (judgment creditors bear burden of establishing that TRIA's requirements are satisfied); *Vera*, 946 F.3d at 142 (same).

1.    Perhaps recognizing as much, Plaintiffs initially contend (Br. 35-38) that the district court improperly found that the assets did not belong to Afghanistan without first ordering discovery. But Plaintiffs have waived that complaint. Before the district court, Plaintiffs asserted that they had "prove[d]" that TRIA applied based on the existing record, and they did not attempt to obtain jurisdictional discovery or even request answers to the attachment interrogatories before the court decided whether to quash the writ for lack of jurisdiction.[21] JA129 n.4 (arguing only that Plaintiffs "*would* be allowed to conduct discovery to 'prove' their claim" if they survived the motion to quash, and arguing that Plaintiffs had "al-

---

[21] Plaintiffs' attachment interrogatories were not a request for jurisdictional discovery, and Plaintiffs never suggested the district court should treat them as such. In any event, the two interrogatories and any discovery requests would not have elicited responses that could support Plaintiffs' TRIA claim. As noted above, *see supra* pp. 11-15, the Bank is not "indebted to the defendant(s)*" (question 1), nor does it have "any goods, chattels, or credits of the defendant(s)* in [its] possession or charge" (question 2). JA36. Nor would Plaintiffs have been entitled to discovery had they sought it. Among other reasons, discovery was unnecessary, as the district court lacked jurisdiction for the legal reasons discussed in text. JA200; *see Nyambal*, 772 F.3d at 281 (holding that jurisdictional "[d]iscovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination" (citation omitted)).

ready" "prove[d]" that TRIA applied even without answers to the interrogatories (emphasis added)); *see Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009) (it is plaintiffs' burden to provide the court with a "specific indication . . . regarding 'what facts additional discovery could produce that would affect [the court's] jurisdictional analysis'" (citation omitted)). But in all events, having represented that the existing record compelled a ruling in their favor, Plaintiffs may not now argue that the district court erred in failing to order *sua sponte* discovery Plaintiffs did not seek.

2.    In fact, the record below does not permit the conclusion that ARTF funds are blocked assets of DAB.

With respect to whether ARTF funds are assets "of" DAB, Plaintiffs have argued that DAB owned the funds merely because they were allegedly "to be delivered to" DAB "in due course." Br. 41. But, as the district court found, JA200, Plaintiffs have wholly failed to substantiate their apparent assumption—either as a matter of fact or of law—that the mere intention to deliver aid creates a property interest on the part of the contemplated recipient. Plaintiffs' theory not only misunderstands how international organizations operate, *see supra* pp. 4-6, 11-15, but it would require U.S. courts to contradict Bank policies and agreements and interfere with the Bank's functions by declaring intended aid recipients the owners of funds in the Bank's possession from the Bank's member countries.

*Estate of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416 (D.C. Cir. 2022), does not support Plaintiffs. *Contra* Br. 40-41. That decision reaffirmed that the terrorist party must have an ownership interest in the assets before they can be attached under TRIA, 45 F.4th at 420, and it held only that where funds originated with Iran and were blocked on that basis, applying technical U.C.C. funds-transfer rules to hold that the funds were not Iran's property would be inconsistent with TRIA and the federal sanctions framework, *id.* at 421. Here, relying on nothing more than Plaintiffs' unsupported say-so to hold that Bank assets are DAB property would be inconsistent with Congress's careful limitation of TRIA's exception to terrorist property, not to mention the federal policy of enabling international organizations to maintain assets in the United States without interference from private claimants or U.S. courts. Nor does *Levin* suggest, as Plaintiffs argue (Br. 40), that property is "of" an entity any time that entity would be "out of pocket" as a result of attachment. *Levin* stated that "blocked funds can be attached only if no intermediary or upstream bank asserts an interest as an innocent third party." 45 F.4th at 423. Here, of course, the Bank asserts an interest in the funds in question—which it received from its member nations and disburses as aid to recipients other than DAB to undertake projects of its choosing in Afghanistan. *See, e.g.*, Articles art. III, § 1 (conditions for Bank's use of "resources . . . *of the Bank*" (emphasis added); art. IV, § 1.

Similarly, Plaintiffs have not demonstrated that ARTF funds are "blocked" assets, most notably because Plaintiffs have not shown that they are DAB assets in the first place.  In addition, the Bank is not subject to blocking orders, because the Bank's Articles render the Bank's property immune from executive seizure and the Bank immune from suit by the United States.  Articles art. VII, §§ 3-4.  Even putting those points aside, Plaintiffs have not pointed to any Executive Branch action blocking assets in the Bank's possession.  Plaintiffs cite newspaper accounts reporting that in August 2021, the Executive Branch "froze Afghan government reserves held in U.S. bank accounts," Br. 28, but the Bank does not hold reserves on behalf of member states in the manner of an ordinary bank.[22]  *See, e.g.*, Articles arts. III, IV.  And although Plaintiffs assert (Br. 29-30) that the Bank's August 2021 suspension of the ARTF portfolio was compelled by the Executive Branch's blocking order, they cite no evidence for that assertion (and, again, never sought any).  In fact, the suspension reflected the Bank's own policies and its concerns about the Taliban's takeover.

Plaintiffs are also incorrect in asserting (Br. 10 & n.2) that General License No. 14, issued by the Executive Branch pursuant to the Afghanistan sanctions

---

[22] At a more basic level, Plaintiffs offer no support for their inference that Afghanistan's reserves were "frozen" pursuant to a blocking order, as TRIA requires, § 201(d)(2), rather than simply rendered non-withdrawable pursuant to Section 25B of the Federal Reserve Act.  *See* 12 U.S.C. § 632.

framework, suggests that the Bank held blocked assets. Plaintiffs contend that the license unblocked Taliban assets in the Bank's possession, but in fact, as the Bank explained in its reply brief below, JA146, that license did not address blocked *assets* at all. Instead, it stated that the U.S. government, NGOs, and various international organizations (including the Bank) could engage in certain transactions with blocked *entities*, *i.e.*, the Taliban, in the course of providing humanitarian assistance to Afghanistan. *See* U.S. Dep't of Treasury, OFAC, General License No. 14, Authorizing Humanitarian Activities in Afghanistan (Sept. 24, 2021).[23] And because the license purported to authorize transactions by entities, including the U.S. government, that would not actually need the authorization of a license, the license suggests no position on the part of the United States regarding the extent to which any international organization may be subject to the U.S. sanctions framework.

In sum, although the Court need not address these elements of TRIA's requirements, Plaintiffs have failed to satisfy their burden of demonstrating that they are satisfied.

## III.   The District Court Correctly Denied Plaintiffs' Motion for Entry of Judgment.

The conclusion that the district court lacked jurisdiction over this action disposes of Plaintiffs' contention (Br. 32-35) that under D.C. Code § 16-526(b), the district court should have entered judgment against the Bank as a penalty for de-

---

[23] https://home.treasury.gov/system/files/126/ct_gl14.pdf.

clining to answer Plaintiffs' interrogatories. Federal Rule of Civil Procedure 69 provides that state-law procedures on execution do not supersede applicable federal statutes. Fed. R. Civ. P. 69(a)(1) ("The procedure on execution . . . must accord with the procedure of the state where the court is located, *but a federal statute governs to the extent it applies*" (emphasis added)). The IOIA and FSIA unquestionably "appl[y]" here, *id.*, and they required the district court to assure itself, as it did, of its jurisdiction before issuing any orders against the Bank. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983); *see, e.g.*, *Zuza v. Off. of the High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017) (explaining that "IOIA immunity . . . compels prompt dismissal even when it attaches mid-litigation"); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). Once the district court concluded that it lacked subject matter jurisdiction over the Bank, therefore, it lacked authority to permit execution against the Bank's assets or enter judgment against the Bank.

The Court should reject Plaintiffs' suggestion (Br. 32) that the Bank failed to timely assert its immunity and therefore is not entitled to immunity. The Bank first asserted its immunity to Plaintiffs by letter. *See Inversora Murten, S.A. v. Energoprojekt-Niskogradnja Co.*, 264 F. App'x 13, 15 (D.C. Cir. 2008) (per curiam) (rejecting judgment creditor's "claim that the World Bank waived its immunity by asserting it in a letter"). And when Plaintiffs refused to withdraw the writ of at-

54

tachment, the Bank filed a motion to quash with leave of court, in which it raised its jurisdictional objections.  JA87.

In any event, Plaintiffs cite no authority suggesting that a court could exercise jurisdiction over an otherwise immune organization simply because (as Plaintiffs assert) the organization failed to "timely fil[e] a motion to quash."  Br. 32. *Novak v. World Bank*, 703 F.2d 1305 (D.C. Cir. 1983), on which Plaintiffs rely, stated only that *if* the Marshal had served the Bank as he should have, the Bank then should have "asserted that it was not amenable to suit in the district court." *Id.* at 1310.  That is exactly what the Bank did here.  And *Novak* does not suggest that—contrary to black-letter law—a court may ignore an immune entity's objection to the court's subject matter jurisdiction.  Whenever a jurisdictional objection is raised, the court must address it.  *Delta Foods Inc.*, 265 F.3d at 1071.  That is what the district court did here—and it correctly concluded that it lacked jurisdiction.

## CONCLUSION

The district court's order granting the Bank's motion to quash the writ of attachment and denying Plaintiffs' motion for entry of judgment should be affirmed.


Dated March 20, 2023                    Respectfully submitted,

                                        */s/ Ginger D. Anders*
                                        Ginger D. Anders
                                        Sarah E. Weiner
                                        MUNGER, TOLLES & OLSON LLP
                                        601 Massachusetts Ave. NW,
                                          Suite 500E
                                        Washington, DC 20001-5369
                                        (202) 220-1100
                                        Ginger.Anders@mto.com

                                        *Counsel for Appellee International Bank*
                                        *For Reconstruction and Development*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g) of the Federal Rules of Appellant Procedure, the undersigned counsel hereby certifies that this brief complies with the type volume limitation of Rule 32(a)(7)(B). As measured by the word-processing system used to prepare this brief, there are 12,983 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

Dated:  March 20, 2023                    */s/ Ginger D. Anders*
                                          Ginger D. Anders

## CERTIFICATE OF SERVICE

I certify that on March 20, 2023, a true and correct copy of this Brief was filed via the Court's electronic filing system, which will forward a copy to all counsel of record. I certify that all participants in this case are registered CM/ECF users.

Dated: March 20, 2023                    */s/ Ginger D. Anders*
                                              Ginger D. Anders

# ADDENDUM

# TABLE OF CONTENTS

22 U.S.C. § 288a ........................................................................A1

28 U.S.C. § 1603(a), (b) [EXCERPT] ....................................A2

28 U.S.C. § 1604 ......................................................................A3

28 U.S.C. § 1605A(a) [EXCERPT] .........................................A3

28 U.S.C. § 1609 ......................................................................A5

28 U.S.C. § 1610 ......................................................................A6

28 U.S.C. § 1611 ....................................................................A13

Terrorism Risk Insurance Act of 2002,
    Pub. L. No. 107-297, 116 Stat. 2322 [EXCERPT]....................................A14

## 22 U.S.C. § 288a

## Privileges, exemptions, and immunities of international organizations

International organizations shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:

**(a)** International organizations shall, to the extent consistent with the instrument creating them, possess the capacity--

**(i)** to contract;

**(ii)** to acquire and dispose of real and personal property;

**(iii)** to institute legal proceedings.

**(b)** International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

**(c)** Property and assets of international organizations, wherever located and by whomsoever held, shall be immune from search, unless such immunity be expressly waived, and from confiscation. The archives of international organizations shall be inviolable.

**(d)** Insofar as concerns customs duties and internal-revenue taxes imposed upon or

A1

by reason of importation, and the procedures in connection therewith; the registration of foreign agents; and the treatment of official communications, the privileges, exemptions, and immunities to which international organizations shall be entitled shall be those accorded under similar circumstances to foreign governments.

## 28 U.S.C. § 1603

## Definitions

For purposes of this chapter--

**(a)** A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

**(b)** An "agency or instrumentality of a foreign state" means any entity--

> **(1)** which is a separate legal person, corporate or otherwise, and

> **(2)** which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> **(3)** which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

* * *

A2

## 28 U.S.C. § 1604

## Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

## 28 U.S.C. § 1605A

## Terrorism exception to the jurisdictional immunity of a foreign state

**(a) In general.**--

**(1) No immunity.**--A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

**(2) Claim heard.**--The court shall hear a claim under this section if--

A3

**(A)(i)(I)** the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

**(II)** in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;

**(ii)** the claimant or the victim was, at the time the act described in paragraph (1) occurred--

**(I)** a national of the United States;

**(II)** a member of the armed forces; or

A4

**(III)** otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

**(iii)** in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or

**(B)** the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

\* \* \*

## 28 U.S.C. § 1609

### Immunity from attachment and execution of property of a foreign state

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

**28 U.S.C. § 1610**

**Exceptions to the immunity from attachment or execution**

**(a)** The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

> **(1)** the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

> **(2)** the property is or was used for the commercial activity upon which the claim is based, or

> **(3)** the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

> **(4)** the execution relates to a judgment establishing rights in property--

>> **(A)** which is acquired by succession or gift, or

>> **(B)** which is immovable and situated in the United States: *Provided*,

A6

That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

**(5)** the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

**(6)** the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

**(7)** the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

**(b)** In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

**(1)** the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

**(2)** the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

**(3)** the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

**(c)** No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

**(d)** The property of a foreign state, as defined in section 1603(a) of this chapter,

used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

> **(1)** the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

> **(2)** the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

**(e)** The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

**(f)(1)(A)** Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of

A9

1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

> **(B)** Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

**(2)(A)** At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

> **(B)** In providing such assistance, the Secretaries—

**(i)** may provide such information to the court under seal; and

**(ii)** should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

**(3) Waiver.**--The President may waive any provision of paragraph (1) in the interest of national security.

**(g) Property in certain actions.**—

**(1) In general.**--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

**(A)** the level of economic control over the property by the government of the foreign state;

**(B)** whether the profits of the property go to that government;

**(C)** the degree to which officials of that government manage the property or otherwise control its daily affairs;

A11

**(D)** whether that government is the sole beneficiary in interest of the property; or

**(E)** whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

**(2) United States sovereign immunity inapplicable.**--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

**(3) Third-party joint property holders.**--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

## 28 U.S.C. § 1611

## Certain types of property immune from execution

**(a)** Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

**(b)** Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

> **(1)** the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

> **(2)** the property is, or is intended to be, used in connection with a military activity and

>> **(A)** is of a military character, or

**(B)** is under the control of a military authority or defense agency.

**(c)** Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

**TERRORISM RISK INSURANCE ACT OF 2002, PL 107–297, § 201, 116 Stat 2322, 2337, as amended by PL 112-158, § 502(e)(2), 126 Stat. 1214, 1260**[24]

\* \* \*

## SEC. 201. SATISFACTION OF JUDGMENTS FROM BLOCKED ASSETS OF TERRORISTS, TERRORIST ORGANIZATIONS, AND STATE SPONSORS OF TERRORISM.

**(a)** IN GENERAL.-Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the

---

[24] In 2008, Congress repealed 28 U.S.C. § 1605(a)(7) and replaced it with § 1605A. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-341. In 2012, Congress enacted a conforming amendment to TRIA § 201. *See* Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, § 502(e)(2), 126 Stat. 1214, 1260.

blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

**(b)** PRESIDENTIAL WAIVER.-

**(1)** IN GENERAL.-Subject to paragraph (2), upon determining on an asset-by-asset basis that a waiver is necessary in the national security interest, the President may waive the requirements of subsection (a) in connection with (and prior to the enforcement of) any judicial order directing attachment in aid of execution or execution against any property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

**(2)** EXCEPTION.-A waiver under this subsection shall not apply to--

**(A)** property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations that has been used by the United States for any nondiplomatic purpose (including use as rental property), or the proceeds of such use; or

**(B)** the proceeds of any sale or transfer for value to a third party of any asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

\* \* \*

**(d)** DEFINITIONS.-ln this section, the following definitions shall apply:

**(1)** ACT OF TERRORISM.-The term 'act of terrorism' means----

**(A)** any act or event certified under section 102(1) [Pub. L. 107-297, set out in a note under section 6701 of Title 15, Commerce and Trade]; or

**(B)** to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

**(2)** BLOCKED ASSET.-The term 'blocked asset' means----

**(A)** any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) [now 50 U.S.C. 4305(b)] or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

**(B)** does not include property that--

**(i)** is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

**(ii)** in the case of property subject to the Vienna Convention on Diplomatic

A16

Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

(3) CERTAIN PROPERTY.-The term 'property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' and the term 'asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' mean any property or asset, respectively, the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

(4) TERRORIST PARTY.-The term 'terrorist party' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under [former] section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) [former 50 U.S.C. 4605(j)] or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

* * *

A17