**ORAL ARGUMENT NOT YET SCHEDULED**
_____

**No. 22-7134**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

JOHN DOES 1-7,
Plaintiffs-Appellants,

v.

TALIBAN; AL-QAEDA; HAQQANI NETWORK,
Defendants,

INTERNATIONAL MONETARY FUND; INTERNATIONAL BANK FOR RECONSTRUCTION
AND DEVELOPMENT,
Garnishees-Appellees.

_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-MC-00110-DLF
_____

**BRIEF OF GARNISHEE-APPELLEE**
**INTERNATIONAL MONETARY FUND**
_____

James R. Newland, Jr.
jnewland@seyfarth.com
Kiran Aftab Seldon
kseldon@seyfarth.com
Owen R. Wolfe
owolfe@seyfarth.com
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC  20004-1454
Telephone:    (202) 463-2400
Facsimile:    (202) 828-5393
*Counsel for International Monetary*
*Fund, Specially Appearing*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties And Amici.

The parties in this Court are:

> *Plaintiffs-Appellants*: John Does 1 through 7 ("Plaintiffs").

> *Garnishee-Appellee:* International Monetary Fund (the "Fund"), specially appearing.

> *Garnishee-Appellee*: International Bank for Reconstruction and Development (the "World Bank"), specially appearing.

> *Amici*: There were no amici in the district court and none has entered an appearance in this case.

The following were named parties in the district court, but have not appeared in the district court or in this Court:

> *Defendants*: The Taliban; Al-Qaeda; and The Haqqani Network.

### B.     Rulings Under Review.

This is an appeal from the district court's Order (A-194) and accompanying Memorandum Opinion (A-195), entered in Case No. 1:21-mc-00110-DLF on September 8, 2022, by the Honorable Dabney L. Friedrich, granting the Fund's motion to quash Plaintiffs' writ of attachment (A-47), granting the World Bank's motion to quash (A-89), and denying Plaintiffs' motion for entry of final judgment (A-15). The district court granted the Fund's and the World Bank's motions, and denied Plaintiffs' motion, because the district court determined that it lacked

subject matter jurisdiction due to the fact that Section 201 of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610, note, did not apply.  A-199-201.  The district court's opinion has not yet been published in the Federal Supplement but is available at 2022 WL 4103853 and 2022 U.S. Dist. LEXIS 161729.

### C.    Related Cases.

The case on review was not previously before this Court or any other court.

Plaintiffs previously obtained a default judgment against the Taliban, Al-Qaeda, and the Haqqani Network in the U.S. District Court for the Northern District of Texas, *John Does 1 through 7 v. Taliban*, No. 20-cv-00605.  In the case on review, Plaintiffs sought to attach assets to satisfy that default judgment, but as described above, the district court granted the Fund and World Bank's motions to quash.  A-194.

## CORPORATE DISCLOSURE STATEMENT

Subject to and without waiving its absolute immunities from suit and judicial process under United States and international law, appellee International Monetary Fund, specially appearing, respectfully states that it is an international organization granted absolute immunity from judicial process under the Articles of Agreement of the International Monetary Fund, Art. IX § 3, Dec. 27, 1945, 60 Stat. 1413, T. I. A. S. No. 1501 (implemented through the Bretton Woods Agreements Act, 22 U.S.C. § 286h).

Without waiving its immunities, the International Monetary Fund states that it is not a corporation, association, joint venture, partnership, syndicate, or other similar entity for which a disclosure statement would be required under either Federal Rule of Appellate Procedure 26.1 or D.C. Circuit Rule 26.1.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS .................................................... iv

TABLE OF AUTHORITIES ................................................. vi

GLOSSARY ............................................................. xv

INTRODUCTION ......................................................... 1

JURISDICTIONAL STATEMENT ............................................. 3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ............................. 4

PERTINENT STATUTORY PROVISIONS ...................................... 5

STATEMENT OF THE CASE ............................................... 5

I.      Relevant Background ......................................... 5

        A.      Sovereign and International Organization Immunity ... 5

        B.      The Fund's Absolute Immunity From Judicial Process ... 9

        C.      Plaintiffs' Judgment and Execution Efforts under the TRIA ... 11

II.     Procedural Summary .......................................... 14

        A.      Plaintiffs' Attempts at Service and Motion for Entry of
                Judgment ............................................ 14

        B.      The Motions to Quash ................................ 15

        C.      The Order Quashing the Writs ........................ 16

SUMMARY OF THE ARGUMENT ............................................. 17

STANDARD OF REVIEW .................................................. 19

ARGUMENT ............................................................ 19

I.      The District Court Lacked Subject Matter Jurisdiction Over The Fund
        Because of the Fund's Absolute Immunity. .................... 19

II.     The TRIA Does Not Override the Fund's Jurisdictional Immunities ... 21

        A.      Jurisdictional Immunity and Execution Immunity are Distinct. ... 21

        B.      The TRIA Targets the Execution Immunity of "Blocked"
                Sovereign Assets In Specified Circumstances. ........ 23

                1.      Section 201's plain text is limited to execution immunity ... 23

2.    Section 201's "notwithstanding" clause does not override jurisdictional immunity ............................................................29

3.    The legislative history confirms that the TRIA is an execution statute that does not abrogate the Fund's jurisdictional immunities ...........................................................33

4.    Section 201 contains no "clear statement" by Congress to abrogate the international agreements enshrining the Fund's immunity ....................................................................36

III.    The District Court Correctly Determined that Plaintiffs Have Not Met the Requirements of the TRIA to Execute on the Assets They Seek............40

A.    The District Court Properly Refused to Usurp the President's Exclusive Right to Recognize Foreign Governments ........................41

B.    The Fund's Special Drawing Rights are not Assets "of" the Taliban and Cannot be Held or Used by the Taliban and its Creditors ....................................................................................46

IV.    The District Court Also Lacked Jurisdiction Because Plaintiffs Did Not (And Could Not) Effect Service on the Fund ........................................50

V.    The District Court Properly Declined to Enter Judgment or Compel Interrogatory Responses. ................................................................53

CONCLUSION ....................................................................................57

PERTINENT STATUTORY PROVISIONS ...................................................ADD1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to*
*   United Nations*,
   988 F.2d 295 (2d Cir. 1993) ...............................................................40

*Agudas Chasidei Chabad v. Russian Fed'n*,
   128 F. Supp. 3d 242 (D.D.C. 2015)....................................................22

*Arch Trading Corp. v. Republic of Ecuador*,
   839 F.3d 193 (2d Cir. 2016) ...............................................................56

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989)............................................................................40

*AT&T v. Compagnie Bruxelles Lambert*,
   94 F.3d 586 (9th Cir. 1996) ................................................................50

*In re Baan Co. Secs. Litig.*,
   245 F. Supp. 2d 117 (D.D.C. 2003).....................................................51

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016)........................................................................12

*Bennett v. Islamic Republic*,
   825 F.3d 949 (9th Cir. 2016), *abrogated on other grounds by*
   *Rubin*, *v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ...........49, 50

*Bennett v. Islamic Republic of Iran*,
   618 F.3d 19 (D.C. Cir. 2010)...............................................25, 30, 50

*Bouchard v. U.S. Airways*,
   2012 U.S. Dist. LEXIS 1025 (E.D. Pa. Jan. 5, 2012).........................53

*Broadbent v. Org. of Am. States*,
   628 F.2d 27 (D.C. Cir. 1980)................................................................8

*Bulin v. Stein*,
   668 A.2d 810 (D.C. 1995) ...................................................................52

*City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ...............................................................50

*Conn. Bank of Commerce v. Republic of Congo*,
  309 F.3d 240 (5th Cir. 2002) .................................................................6

*Cook v. United States*,
  288 U.S. 102 (1933)..............................................................................37

*de Csepel v. Republic of Hungary*,
  714 F.3d 591 (D.C. Cir. 2013)..............................................................40

*De Letelier v. Republic of Chile*,
  748 F.2d 790 (2d Cir. 1984) ...................................................................6

*Doe v. JPMorgan Chase Bank, N.A.*,
  899 F.3d 152 (2d Cir. 2018) ...........................................................46, 47

*Doe v. Mattis*,
  889 F.3d 745 (D.C. Cir. 2018)..............................................................45

*Doe v. State of Israel*,
  400 F. Supp. 2d 86 (D.D.C. 2005).........................................................43

*El-Shifa Pharm. Indus. Co. v. U.S.*,
  607 F.3d 836 (D.C. Cir. 2010)..............................................................42

*Elgin v. Dep't of the Treasury*,
  567 U.S. 1 (2012)..................................................................................25

*EM Ltd. v. Republic of Argentina*,
  473 F.3d 463 (2d Cir. 2007) ...........................................................10, 47

*Errion v. Connell*,
  236 F.2d 447 (9th Cir. 1956) ................................................................53

*Est. of Levin v. Wells Fargo Bank*,
  45 F.4th 416 (D.C. Cir. 2022)........................................................49, 50

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990)..............................................................56

*Garcia v. Sebelius*,
   919 F. Supp. 2d 43 (D.D.C. 2013)......................................................51

*Goudreau v. Standard Fed. Sav. & Loan Ass'n*,
   511 A.2d 386 (D.C. Ct. App. 1986)...................................................55

*Guar. Tr. Co. of N.Y. v. United States*,
   304 U.S. 126 (1938)...........................................................................42

*Heiser v. Islamic Republic of Iran*,
   735 F.3d 934 (D.C. Cir. 2013)...................................... 16, 33, 34, 46, 48, 49, 50

*Heritage House Frame & Moulding Co. v. Boyce Highlands
   Furniture Co.*,
   88 F.R.D. 172 (E.D.N.Y. 1980).........................................................53

*Hill v. Republic of Iraq*,
   2003 U.S. Dist. LEIS 3725 (D.D.C. Mar. 11, 2003) .........................32

*Jam v. Int'l Fin. Corp.*,
   139 S. Ct. 759 (2019)...........................5, 6, 7, 9, 11, 17, 19, 20, 39, 51

*Jones v. Auto. Club of S. Cal.*,
   26 F. App'x 740 (9th Cir. 2002) ........................................................53

*Kappus v. Comm'r of IRS*,
   337 F.3d 1053 (D.C. Cir. 2003).........................................................37

*Kucana v. Holder*,
   558 U.S. 233 (2010)...........................................................................29

*Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*,
   142 S. Ct. 1968 (2022).......................................................................25

*McLaughlin v. Fidelity Sec. Life Ins.*,
   667 A.2d 105 (D.C. 1995) ..................................................................52

*Meredith v. Federal Mine Safety and Health Rev. Com'n*,
   177 F.3d 1042 (D.C. 1999) .................................................................23

*Ministry of Def. & Support for the Armed Forces of the Islamic
   Republic of Iran v. Elahi*,
   556 U.S. 366 (2009)...........................................................................34

*Moore v. United Kingdom*,
  384 F.3d 1079 (9th Cir. 2004) ...........................................................40

*Morton v. Mancari*,
  417 U.S. 535 (1974)..........................................................................36

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
  526 U.S. 344 (1999)..........................................................................52

*Muthana v. Pompeo*,
  985 F.3d 893 (D.C. Cir. 2021)...................................................42, 44

*N.L.R.B. v. SW Gen., Inc.*,
  580 U.S. 288 (2017)..........................................................................23

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007)..........................................................................38

*Novak v. World Bank*,
  703 F.2d 1305 (D.C. Cir. 1983)...................................................53, 57

*Nyambal v. IMF*,
  772 F.3d 277 (D.C. Cir. 2014)...................................... 17, 19, 20, 51, 54, 55, 56

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
  724 F.3d 230 (D.C. Cir. 2013)..............................................36, 37, 39

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  389 F.3d 192 (D.C. Cir. 2004)..........................................................19

*Republic of Arg. v. NML Cap., Ltd.*,
  573 U.S. 134 (2014).......................................................................5, 6

*Republic of Panama v. Republic Nat'l Bank*,
  681 F. Supp. 1066 (S.D.N.Y. 1988) ...............................................42, 44

*Roeder v. Islamic Republic of Iran ("Roeder I")*,
  333 F.3d 228 (D.C. Cir. 2003)..........................................................37

*Roeder v. Islamic Republic of Iran ("Roeder II")*,
  646 F.3d 56 (D.C. Cir. 2011)............................................................37

*Rubin v. Islamic Republic of Iran*,
  138 S. Ct. 816 (2018) ..................................................................25, 30

*Rubin v. Islamic Republic of Iran*,
  709 F.3d 49 (1st Cir. 2013) ...............................................................26

*Rubin v. Islamic Republic of Iran*,
  830 F.3d 470 (7th Cir. 2016) ...............................................................6

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999) ...........................................................................54

*Sacks v. IMF*,
  26 F.4th 470 (D.C. Cir. 2022) .........................................17, 20, 39, 57

*Schermerhorn v. State of Israel*,
  876 F.3d 351 (D.C. Cir. 2017) ......................................................7, 23

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
  549 U.S. 422 ......................................................................................54

*Smith v. FRB*,
  280 F. Supp. 2d 314 (S.D.N.Y. 2003),
  *aff'd*, 346 F.3d 264 (2d Cir. 2003) ..............................................29, 30

*Sossamon v. Texas*,
  563 U.S. 277 (2011) ...........................................................................24

*SouthAfrican Airways v. Dole*,
  817 F.2d 119 (D.C. Cir. 1987) ...........................................................37

*Stansell v. Revolutionary Armed Forces of Colombia*,
  45 F.4th 1340 (11th Cir. 2022) ..........................................................49

*Steel Co. v. Citizens for Better Env't*,
  523 U.S. 83 (1998) .............................................................................54

*SW Gen., Inc. v. N.L.R.B.*,
  796 F.3d 67 (D.C. Cir. 2015) .............................................................29

*Swinomish Indian Tribal Community v. BNSF Ry. Co.*,
  951 F.3d 1142 (9th Cir. 2020) ...........................................................38

*In re Terrorist Attacks*,
   2023 U.S. Dist. LEXIS 28773 (S.D.N.Y. Feb. 21, 2023) ... 26, 27, 28, 29, 32, 45

*TIG Ins. Co. v. Republic of Arg.*,
   967 F.3d 778 (D.C. Cir. 2020).............................................................21

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
   30 F.3d 148 (D.C. Cir. 1994)..............................................................43

*Tuck v. Pan Am. Health Org.*,
   668 F.2d 547 (D.C. Cir. 1981).............................................................20

*United States v. Ballestas*,
   795 F.3d 138 (D.C. Cir. 2015).............................................................38

*United States v. Holy Land Found. For Relief & Dev.*,
   445 F.3d 771 (5th Cir. 2006) .....................................26, 30, 31, 32, 38

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
   946 F.3d 120 (2d Cir. 2019) .........................................22, 27, 28, 32

*Villoldo v. Castro Ruz*,
   113 F. Supp. 3d 435 (D. Mass. 2015),
   *aff'd*, 821 F.3d 196 (1st Cir. 2016) ....................................................46

*Walters v. Indus. & Com. Bank of China, Ltd.*,
   651 F.3d 280 (2d Cir. 2011) ......................................................7, 22, 30

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*,
   443 U.S. 658 (1979)............................................................................37

*Weinberger v. Rossi*,
   456 U.S. 25 (1982)......................................................................28, 37

*Weininger v. Castro*,
   462 F. Supp. 2d 457 (S.D.N.Y. 2006) ..........................21, 27, 31, 32

*Weinstein v. Islamic Republic of Iran*,
   609 F.3d 43 (2d Cir. 2010) ................................................................32

*World Wide Minerals, LTD v. Republic of Kaz.*,
   296 F.3d 1154 (D.C. Cir. 2002).........................................................23

*Wrecking Corp. of Am., Virginia, Inc. v. Jersey Welding Supply, Inc.*,
    463 A.2d 678 (D.C. 1983) ...............................................................52

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)..............................................................41, 42, 44

*Zuza v. Office of the High Representative*,
    857 F.3d 935 (D.C. Cir. 2017)....................................................55, 56

**Statutes**

21 U.S.C. § 853 ...............................................................................31

22 U.S.C. § 286 .................................................................................1

22 U.S.C. § 286h.................................. 1, 3, 4, 11, 17, 19, 21, 22, 28, 36, 38, 39, 51

22 U.S.C. § 288a .........................................................5, 7, 16, 17, 20, 56

28 U.S.C. § 1291 ................................................................................4

28 U.S.C. § 1330 ..............................................................................51

28 U.S.C. §§ 1602, et seq............................... 6, 7, 12, 13, 26, 30, 32, 35, 40, 51, 56

28 U.S.C. § 1604 .........................................................................6, 24, 40

28 U.S.C. §§ 1605-07 ........................................................................51

28 U.S.C. § 1605(a) ...........................................................................24

28 U.S.C. § 1605A .........................................................7, 12, 13, 24, 27

28 U.S.C. § 1605B ...........................................................................7, 24

28 U.S.C. § 1607 ..............................................................................51

28 U.S.C. § 1608 ..............................................................................51

28 U.S.C. § 1609 ............................................................................6, 25

28 U.S.C. § 1610................................. 2, 3, 12, 18, 24, 25, 27, 33, 34, 35, 36, 40, 46

28 U.S.C. § 1610(f)...................................................................33, 34, 36

28 U.S.C. § 1611 ...............................................................................25

60 Stat. 1401 ....................................................................................10

116 Stat. 2322 ..................................................................................38

116 Stat. 2337, § 201(a) ..............................................................12, 13

116 Stat. 2337, § 201(d)(4) ..............................................................12

**Other Authorities**

148 Cong. Rec. 23,121 (Nov. 19, 2002) (statement of Sen. Harkin) .....................34

148 Cong. Rec. S11524 (daily ed. Nov. 19, 2002) ..................................35

Black's Law Dictionary (11th ed. 2019) ...............................................46

Edward Chukwuemeke Okeke, *Jurisdictional Immunities of States and International Organizations* (Oxford Univ. Press 2018) ............................7

Fed. R. Civ. P. 4(h) ...........................................................................52

Fund's Articles of Agreement...............................................................10

H. McKinnon Wood, *Legal Relations Between Individuals and a World Organization of States* ...............................................................8

H. Rept. 107-300 and H. Rept. 107-779 (Conference Report) - TERRORISM RISK PROTECTION ACT, 107th Congress (2001-2002) ........33, 34, 35

International Monetary Fund, *Questions and Answers on Special Drawing Rights*, available at https://www.imf.org/en/About/FAQ/special-drawing-right#Q1.%20What%20is%20an%20SDR? (Aug. 23, 2021) .....................47, 48

International Monetary Fund, *Special Drawings Rights (SDR) Factsheet*, available at https://www.imf.org/en/About/Factsheets/Sheets/2016/08/01/14/51/Special-Drawing-Right-SDR (Aug. 5, 2021) ...........................47, 48

Restatement (Third) of Foreign Relations Law of the United States ....22, 41, 43, 44

State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/...........................................................13

# GLOSSARY

| | |
|---|---|
| A- | Appendix |
| Br. | Brief for Plaintiffs-Appellants |
| The Fund | International Monetary Fund (Appellee) |
| Plaintiffs | Does 1 through 7 (Appellants) |
| The World Bank | International Bank for Reconstruction and Development (Appellee) |
| FSIA | Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, et seq. |
| IOIA | International Organization Immunities Act, 22 U.S.C. § 288, et seq. |
| TRIA | Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610, note |

## INTRODUCTION

In July 1944, while World War II raged in the European and the Pacific theaters, representatives of 44 countries met in Bretton Woods, New Hampshire to convene the United Nations Monetary and Financial Conference.  U.S. Treasury Secretary Henry Morgenthau Jr. presided as conference president.  On July 22, 1944, the representatives reached an agreement memorialized as the Articles of Agreement of the International Monetary Fund.  Today, the Fund is comprised of 190 member countries committed to achieving economic and financial stability around the globe—work which remains as important today as it was when the Articles of Agreement entered in force on December 27, 1945.

The Articles of Agreement reflect each member's commitment to advance the Fund's mandate through shared governance, without unilateral control or interference by a member acting through its national courts, legislature, or executive agencies.  In 1945, Congress authorized the President to accept membership in the Fund and took the additional step of incorporating into U.S. law the Fund's absolute immunity as envisaged by the members in the Articles of Agreement.  22 U.S.C. §§ 286, 286h.  Accordingly, the Articles of Agreement, known also as the Fund's charter, and the Bretton Woods Agreements Act grant the Fund absolute immunity absent its own express waiver.

Notwithstanding the Fund's absolute immunity, Plaintiffs sought to bring the Fund before the district court to satisfy a default judgment they obtained against the Taliban and other entities. Plaintiffs argue that the Fund was holding assets that they asserted should be used to pay the Taliban's judgment debt. The district court granted the Fund's motion to quash Plaintiffs' writ of execution, properly concluding that it lacked jurisdiction over the Fund.

Plaintiffs' claims of error all depend on a single premise: that the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 (note) ("TRIA"), overrides the Fund's absolute jurisdictional immunity. Enactment of the TRIA followed the 9/11 terrorist attacks. Congress passed the TRIA to address terrorist victims' efforts to execute upon the "blocked assets" of terrorist parties and their instrumentalities, while at the same time remaining vigilant over the need to continue protecting the immunity from execution granted to foreign sovereigns. As the legislative history makes clear, a key reason to enact the TRIA was to eliminate the Presidential waivers that previously had thwarted such execution efforts.

The TRIA thus removed *execution* immunity from certain terrorist assets. But nowhere in TRIA's text, structure, or legislative history did Congress give any hint that it was eliminating the independent *jurisdictional* immunities of sovereigns and international organizations whenever a creditor obtained a judgment against an

2

unrelated terrorist group.  Absent a clear statement to that effect, this Court cannot assume that Congress intended via an execution statute to abrogate the entire system of jurisdictional immunities embodied in international agreements and domestic law.

Because the TRIA does not override jurisdictional immunities, the district court lacked jurisdiction over the Fund and its order must be affirmed.  But even if the TRIA could override jurisdictional immunities, it did not do so here.  That is because the assets Plaintiffs sought to attach—"special drawing rights"—do not fall within the TRIA's scope.  As the district court correctly found, special drawing rights are not assets "of" the Taliban, and Afghanistan's central bank cannot be judicially declared an "agency or instrumentality" of the Taliban.  28 U.S.C. § 1610 (note).

Finally, because the Fund's absolute immunity prevented Plaintiffs from effecting proper service on the Fund and obtaining a judgment in their favor, the district court properly denied their motion for entry of judgment.

## JURISDICTIONAL STATEMENT

1.     The District Court did not have subject matter jurisdiction over the Fund due to its absolute immunity from judicial process, which is enshrined in its Articles of Agreement and codified into law in the Bretton Woods Agreements Act, 22 U.S.C. § 286h.

3

2.    This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  This appeal is from a final order, entered on September 8, 2022, granting the motions of the Fund and World Bank to quash writs of attachment and denying Plaintiffs' motion for entry of judgment.  A-194.  Plaintiffs timely appealed the order on October 6, 2021.  A-202.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the district court lacked subject matter jurisdiction over the Fund when the Fund did not expressly waive its absolute immunity from judicial process under its Articles of Agreement and the Bretton Woods Agreements Act.

2.    Whether the TRIA, a statute governing execution against certain assets, can override the Fund's absolute jurisdictional immunity and provide a basis for subject matter jurisdiction.

3.    Whether Plaintiffs satisfied the prerequisites for enforcing their judgment under the TRIA, including that the assets they sought to attach were blocked assets "of" an "agency or instrumentality of" the Taliban.

4.    Whether the district court lacked personal jurisdiction over the Fund due to Plaintiffs' failure to properly serve the Fund.

5.    Whether the district court should have compelled the Fund to answer interrogatories and entered judgment against the Fund, despite its lack of subject matter and personal jurisdiction over the Fund.

4

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

## I.    Relevant Background

### A.    Sovereign and International Organization Immunity.

For much of U.S. history, the State Department and courts "adhered to the classical theory of foreign sovereign immunity," so that "foreign governments [were] entitled to 'virtually absolute' immunity as a matter of international grace and comity." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 765-66 (2019).

In that era, Congress passed the International Organization Immunities Act of 1945 ("IOIA"), which provides international organizations with "a set of privileges and immunities" that were defined "by reference to comparable privileges and immunities enjoyed by foreign governments." *Id.*; 22 U.S.C. § 288a(b) ("International organizations … shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."). International organizations could, however, "expand[] or restrict[]" those default IOIA immunities in their "founding charter." *Jam*, 139 S. Ct. at 766.

Seven years after IOIA's passage, the State Department adopted a "newer 'restrictive' theory of foreign sovereign immunity," granting foreign governments immunity "only with respect to their sovereign acts, not with respect to commercial acts." *Jam*, 139 S. Ct. at 766; *Republic of Arg. v. NML Cap., Ltd.*, 573 U.S. 134,

140 (2014).  "Even under this theory, however, foreign sovereign property remained absolutely immune from execution."  *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 477 (7th Cir. 2016).  The State Department's new approach "thr[ew] [sovereign] immunity determinations into disarray, since political considerations sometimes led the [State] Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory."  *NML Capital*, 573 U.S. at 141 (internal quotations omitted).

Congress stepped in, enacting the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., in 1976.  *Id.*  The FSIA "codified the restrictive theory of foreign sovereign immunity but transferred 'primary responsibility for immunity determinations from the Executive to the Judicial Branch.'"  *Jam*, 139 S. Ct. at 766.  The FSIA grants foreign states immunity from suit in the United States (jurisdictional immunity), 28 U.S.C. § 1604, and grants their property immunity from attachment and execution (execution immunity), *id.*, § 1609—subject to specified exceptions.  *Id.*, §§ 1605-07, 1610-11.

The FSIA's exceptions to execution immunity remained "narrower than [those for] jurisdictional immunity."  *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002) (citing *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984)).  That aspect follows the prevailing view under customary international law that execution immunity, being "a greater

affront to [a state's] sovereignty," should be very rare. *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011). For similar reasons, terrorism exceptions to foreign state immunity are even less common.[1] 28 U.S.C. §§ 1605A, 1605B; *see, e.g.*, *Schermerhorn v. State of Israel*, 876 F.3d 351, 358 (D.C. Cir. 2017) (FSIA "terrorism exception … represents a 'delicate legislative compromise'").

In 2019, the Supreme Court interpreted the IOIA so as "to make international organization immunity and foreign sovereign immunity continuously equivalent." *Jam*, 139 S. Ct. at 768. As a result, and not to the exclusion of other immunities conveyed by their charters, international organizations subject to default rules of the IOIA now enjoy privileges and immunities equal to those enjoyed by foreign sovereigns today under the FSIA. *Id.* at 767-70. As in 1945, however, international organizations may expand or restrict those default levels of immunity through their charters. *Id.* at 771-72 (identifying the Fund as having broader immunities by charter than those forth in the FSIA).

Such immunity is essential. Shortly after the Bretton Woods Conference concluded in 1944, the former counsel and legal advisor to the League of Nations explained why:

---

[1] Edward Chukwuemeke Okeke, *Jurisdictional Immunities of States and International Organizations,* pp. 143-44, (Oxford Univ. Press 2018).

> Jurisdictional immunity is for several reasons essential for an organization like the League. . . . The third [reason] is the undesirability of allowing the courts of particular members to determine, quite possibly in different senses, the legal effects of acts performed in the exercise of the organization's functions.[2]

Thirty-five years later, in *Broadbent v. Org. of Am. States*, 628 F.2d 27 (D.C. Cir. 1980), this Court reached the same conclusion:

> Denial of immunity opens the door to divided decisions of the courts of different member states passing judgment on the rules, regulations, and decisions of the international bodies.  Undercutting uniformity in the application of staff rules or regulations would undermine the ability of the organizations to function effectively.

*Id.* at 34-35.

Thus, states have ceded a portion of their sovereignty over international organizations operating within their borders so that the organizations can fulfill their mandate without member state interference.  Immunity and reciprocity concerns are paramount when terrorism exceptions to immunity are concerned.  One states' terrorist organization may be another states' freedom fighter, which could result in inconsistent treatment of foreign states and international organizations among member states with different views.

---

[2] H. McKinnon Wood, *Legal Relations Between Individuals and a World Organization of States*, 30 Transactions of the Grotius Society for 1944, pp. 143-44 (1945).

These serious concerns over immunity and reciprocal treatment were recently expressed in the United States' Statement of Interest in *Caballero v. Fuerzas Armadas Revolucionarias de Columbia, et al.*, 1:20-mc-00040, ECF 125 (W.D.N.Y. Sept. 20, 2022).  There, the Executive branch made clear its understanding that the TRIA is a distinct exception to *execution* immunity for certain terrorist assets, but that "TRIA does not provide an independent grant of subject-matter jurisdiction over foreign states where jurisdiction has not already been established under the FSIA's exception to immunity for state sponsors of terrorism."  *Caballero* SOI, p. 11.  The plaintiffs' contrary position, the United States warned, "would strip foreign states of their immunities in unpredictable ways and in a manner that could have significant negative reciprocal consequences for the United States."  *Id.*, pp. 2-3.

## B.    The Fund's Absolute Immunity From Judicial Process.

The Fund is one of the main international organizations established in the wake of World War II to help its member countries pursue their collective goal of rebuilding the international economy.  *Jam*, 139 S. Ct. at 765.  The Fund's purposes include promoting international monetary cooperation, facilitating the expansion and balanced growth of international trade, promoting exchange stability among its 190 member countries, and providing temporary financial

9

assistance to its member countries experiencing balance of payments difficulties.

*See* Articles of Agreement ("Articles"), Art. I.[3]

Unlike many international organizations, the Fund's programs are non-commercial and used exclusively in connection with sovereign states. The Fund's programs are also tied to a larger regulatory enterprise. *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 482-84 & n. 21 (2d Cir. 2007) ("[t]he IMF is a unique cooperative international institution" whose "larger regulatory enterprise [is] intended to preserve stability in the international monetary system and foster orderly economic growth," and plays a "unique role" in "regulating the international monetary system by intervening in the economies of its members.").

Given the Fund's unique function and its need to avoid unilateral control by any single member country, the Fund's Articles—a treaty executed by the United States, *see* 60 Stat. 1401; 2 UNTS 39—grant the Fund absolute immunity from judicial process in its member countries:

> *Immunity from judicial process.* The Fund, its property and its assets, wherever located and by whomsoever held, shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract.

---

[3] The current version of the Fund's Articles of Agreement is available at http://www.imf.org/external/pubs/ft/aa/index.htm (last accessed March 16, 2023).

Articles, Art. IX § 3.

The need for absolute immunity is foundational to the Fund's charter.  The Articles specifically obligate "[e]ach member [to] take such action as is necessary in its own territories for the purpose of making effective in terms of its own law the principles set forth in [Article IX] and [to] inform the Fund of the detailed action which it has taken."  Articles, Art. IX § 10.  The United States, an original member country, codified Article IX, Sections 2 to 9 in the Bretton Woods Agreements Act in 1945.  *See* 22 U.S.C. § 286h (giving the immunity provision, and several others, "full force and effect in the United States.").

The Bretton Woods Agreements Act thus reflects the United States' longstanding commitment to the Fund as a member country to "provid[e] it with immunity (absent waiver) *in all cases*."  *Jam*, 139 S. Ct. at 777 (Breyer, J. dissenting) (emphasis added).

## C.    Plaintiffs' Judgment and Execution Efforts under the TRIA.

In November 2020, John Does 1 through 7 ("Plaintiffs") secured a default judgment totaling $138,418,741 against the Taliban, Al-Qaeda, and the Haqqani Network in the United States District Court for the Northern District of Texas, arising out of a bombing that occurred in Kabul, Afghanistan.  A-33.

Plaintiffs then obtained writs of attachment, requiring the Fund and World Bank "to hold and not to pay or surrender" assets purportedly belonging to the

defendants or of "the agency or instrumentality of the Defendant as defined by Section 201(a) of the [TRIA], 28 U.S.C. § 1610 note, including but not limited to Da Afghanistan Bank." A-33, 139.

The TRIA, codified as a note within the FSIA, authorizes plaintiffs who obtain judgments against a terrorist party to execute against certain terrorist assets. Pub. L. No. 107-297, 116 Stat. 2337, 28 U.S.C. § 1610 note. The provision referenced in Plaintiffs' writ—Section 201(a)—provides that, "notwithstanding any other provision of law," plaintiffs who have "obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C.] section 1605A," may "execut[e] or attach[]" the "blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." 116 Stat. 2337, § 201(a); *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317–18 (2016).

The TRIA defines a "terrorist party" as (i) "a terrorist," (ii) "a terrorist organization [as defined in the Immigration and Nationality Act]," or (iii) "a foreign state designated as a state sponsor of terrorism." 116 Stat. 2337, § 201(d)(4). The TRIA thus covers judgments against foreign sovereigns who are

state sponsors of terrorism (a category that does *not* include Afghanistan[4]) *and* non-state "terrorist organizations" like the Taliban.

For state sponsors of terrorism, however, the judgments must be of the kind for which the state "is not immune under [28 U.S.C.] section 1605A." 116 Stat. 2337, § 201(a); *see also* 28 U.S.C. section 1605A (exception to FSIA jurisdiction immunity for claims against "state sponsors of terrorism" for damages relating to acts of terror). In other words, the TRIA will permit execution on a judgment against a foreign sovereign only if the sovereign's immunity has already been abrogated under section 1605A.

The TRIA authorizes execution only against the "blocked assets" "of" the terrorist party, "including the blocked assets of any agency or instrumentality of that terrorist party." 116 Stat. 2337, § 201(a). Through the TRIA, Plaintiffs sought to attach the "blocked assets" of Da Afghanistan Bank—Afghanistan's central bank—to satisfy their judgment against the Taliban, on the theory that, after Afghanistan fell to the Taliban, the bank was now an "the agency or instrumentality of" the Taliban. A-29, 33, 139. Plaintiffs maintained that the Fund held such assets, in the form of "international reserve assets ('SDRs') belonging to

---

[4] U.S. Department of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last accessed March 16, 2023).

the Islamic Republic of Afghanistan and payable to Da Afghanistan Bank… ."  A-29.

## II.  Procedural Summary

### A.  Plaintiffs' Attempts at Service and Motion for Entry of Judgment

In August 2021, after the Taliban took control of Afghanistan and Da Afghanistan Bank, the Executive branch blocked certain Afghanistan assets in the United States to preserve them for the Afghan people.  A-109; *see also* Executive Order 14064 (Feb 11, 2022).  That same month, Plaintiffs registered their $138 million default judgment with the district court.  A-6, 195.  The court clerk then issued writs of execution applicable to both the Fund and the World Bank, seeking property "belonging to: The Taliban or the blocked assets of its agencies or instrumentalities as defined in Section 201(a) of the [the TRIA]."  A-10.

Plaintiffs subsequently obtained writs of attachment against the Fund and the World Bank.  *See* pgs. 11-12, *supra*; A-33; A-10, 139.  Attached to the writs were interrogatories asking whether the Fund and the World Bank were indebted to or held property belonging to the defendants.  A-34, 140.

In September 2021, Plaintiffs tried to serve the Fund with the writ, eventually leaving the documents at the feet of security guards, who advised the process server that they could not accept service for the Fund.  A-11-13, 196.  Plaintiffs made similar efforts to serve the World Bank.  A-14.

14

On October 12, 2021, Plaintiffs moved for entry of judgment against the Fund and the World Bank for the full amount of the judgment ($138,418,741), plus interest and costs. A-18. In response to the motion, the Fund's counsel asked Plaintiffs to withdraw their writ and motion, advising that the Fund "is absolutely immune from this garnishment proceeding and has not been (and cannot be) served with the Writ or the Motion." A-27-28; A-24. Plaintiffs refused, maintaining that the TRIA overrode the Fund's absolute immunity. A-28-31.

### B.    The Motions to Quash

On November 1, 2021, the Fund, specially appearing, moved to quash the writ, arguing that its absolute immunity deprived the district court of subject matter jurisdiction, and that the TRIA did not override its jurisdictional immunity. A-47-67. The Fund also explained that Plaintiffs had not carried out proper service, nor could they because of the Fund's immunity from all forms of process. *Id.* The World Bank subsequently filed its own motion to quash. A-89.

Plaintiffs opposed both motions, arguing that the TRIA provided the requisite jurisdiction and that they had satisfied the TRIA's requirements for attachment of assets held by the Fund and the World Bank. A-103, 119. Plaintiffs also disclaimed any need for discovery, noting they "already" had "'prove[d]' their claim" based in part on party "admissions." A-129, n. 4.

15

### C.    The Order Quashing the Writs

The district court granted the Fund and the World Bank's motions, holding that it "lack[ed] jurisdiction to attach the funds" that were the subject of the writs. A-195.  The court first recognized that the Fund and the World Bank had "broad immunity" from suit, such that it "lacks subject matter jurisdiction over them unless an exception or waiver to immunity applies."  A-198-99.  But the court held that it did not need to decide whether the TRIA—the only alleged immunity "exception" Plaintiffs identified—applied to international organizations, or "how the TRIA interacts with the IOIA and the Bretton Woods Agreement."  A-199.

Instead, the district court held that, even if the TRIA applied, "it does not cover the assets in dispute here" because they "are not terrorist assets."  *Id.* "[T]here is serious reason to doubt," the court began, that special drawing rights "belong to Afghanistan."  A-200.  But "even if the funds were destined for Afghanistan," the court continued, "funds payable, but not yet transferred, to a terrorist organization are not assets 'of' the organization."  *Id.* (citing *Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 938, 940-41 (D.C. Cir. 2013)).

The court also held that plaintiffs' theory "fell short" because "[t]he United States has not recognized the Taliban as the legitimate government of Afghanistan."  A-200.  Since courts "defer[] to the 'political department of the

government'" on recognition matters, the court held that it "will not recognize an ownership claim by the Taliban" in any aid earmarked for Afghanistan. *Id.*

Summarizing, the district court held that "the plaintiffs have not shown that the assets at issue fall under the TRIA" and "have not shown that an exception to the Fund and the World Bank's immunity applies," such that it "d[id] not have subject matter jurisdiction…." A-201. The court thus granted the motions to quash and denied Plaintiffs' motion for entry of judgment. A-194.

## SUMMARY OF THE ARGUMENT

The Fund's absolute immunity from "every form of judicial process" is enshrined in its Articles, which have the force of law in the United States under the Bretton Woods Agreements Act. Those immunity provisions, as authoritatively interpreted by this Court and the Supreme Court, may be abrogated only by the Fund's express waiver. *Sacks v. IMF*, 26 F.4th 470, 473-74 (D.C. Cir. 2022); *Nyambal v. IMF*, 772 F.3d 277, 280 (D.C. Cir. 2014); *Jam*, *supra*, 139 S. Ct. at 771-72. No such express waiver occurred here, and Plaintiffs do not contend otherwise. The district court's order concluding that it lacked jurisdiction over the Fund may be affirmed on this basis alone. *See* Section I, below.

Plaintiffs' contrary arguments all depend on one proposition: that the TRIA overrides the Fund's immunity, thereby permitting Plaintiffs to execute on certain assets ("special drawing rights") held by the Fund. But the TRIA's text, structure,

17

and legislative history establish that it simply authorizes *execution* against certain terrorist assets.  Nowhere does the statute purport to abrogate the Fund's independent *jurisdictional* immunity.  Congress did not silently intend to strip the Fund, other international organizations, and foreign sovereigns of their longstanding immunities whenever a judgment is obtained against a terrorist actor.  *See* Section II.

The order also may be affirmed on the independent ground that Plaintiffs did not satisfy TRIA's requirements.  Plaintiffs' theory of execution is that the Fund's special drawing rights are blocked assets "of" Da Afghanistan Bank, and the Bank has been an "agency or instrumentality" of the Taliban since its takeover of the country.  28 U.S.C. § 1610 (note).  The district court correctly held, however, that it could not deem Afghanistan's central bank to be an instrumentality of the Taliban because that would be tantamount to recognizing the Taliban as the government of Afghanistan—a power only the Executive branch possesses.  The court also found that special drawing rights are not blocked assets "'of' the [terrorist] organization," *i.e.*, the Taliban.  Any one of those rulings is sufficient to affirm the order.  *See* Section III.

Separately, the district court could not exercise personal jurisdiction over the Fund because Plaintiffs could not, and here did not, properly serve the Fund.  *See* Section IV.  Finally, given these jurisdictional deficiencies, the district court

18

properly declined to enter judgment for Plaintiffs or compel interrogatory responses. Nor did the district court err by failing to order jurisdictional discovery, when Plaintiffs disclaimed any need for discovery, and discovery would, in any event, have been futile. *See* Section V.

Any one of these independent grounds compels affirmance.

## STANDARD OF REVIEW

"[A]n international organization's claim of immunity" raises "questions of law reviewable de novo." *Nyambal*, 772 F.3d at 280. This Court reviews a district court's "'findings of fact—including facts that bear upon immunity and therefore upon jurisdiction—for clear error; hence, . . . once the facts have been settled, [the Court] decide[s] de novo whether those facts are sufficient to divest the foreign sovereign of its immunity.'" *Id.* (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004)).

## ARGUMENT

## I.    The District Court Lacked Subject Matter Jurisdiction Over The Fund Because of the Fund's Absolute Immunity.

The Fund's Articles immunize it from "every form of judicial process" except when the Fund "expressly waives" its immunity. Articles, Art. IX, § 3; 22 U.S.C. § 286h. In accordance with that plain language, the Supreme Court and this Court have consistently recognized the Fund's absolute immunity from suit absent its express waiver, which deprives courts of subject matter jurisdiction. *Jam,* 139

19

S. Ct. at 771–72 ("[the Fund] enjoys 'immunity from every form of judicial process except to the extent that it expressly waives its immunity'"); *id.* at 777 (Breyer, J. dissenting) (recognizing Fund's "immunity (absent waiver) in all cases"); *Nyambal*, 772 F.3d at 281 ("the Fund is immune absent express waiver under its Articles"); *Sacks*, 26 F.4th at 474 (same).

"The sweep of the Fund's immunity is broader than the protection afforded" by the IOIA, 22 U.S.C. § 288a(b). *Nyambal*, 772 F.3d 277 at 281; *Sacks*, 26 F.4th at 474 (Fund's immunity "more protective"); *Jam*, 139 S. Ct. at 771-72 ("the [international] organization's charter can always specify a different level of immunity" and the Fund's charter "*do[es] just that*" (emphasis added)). The Fund's "'immunity, where justly invoked, shields [it] not only from the consequences of litigation's results but also from the burden of defending'" an action. *Nyambal*, 772 F.3d 277 at 280-81 (quoting *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981)).

The Fund's broad immunity thus reduces the jurisdictional inquiry to a simple question: has the Fund expressly waived its immunity for this proceeding? If the Fund has not done so, then under *Jam*, *Nyambal*, and *Sacks*, it is immune and the Order quashing the writ must be affirmed. Plaintiffs do not argue that the Fund has expressly waived its immunity. That should end the analysis.

## II.    The TRIA Does Not Override the Fund's Jurisdictional Immunities.

Plaintiffs insist (Br. at 24-25, 48) that, even without the Fund's express waiver, Section 201 of the TRIA abrogates the Fund's absolute immunity.  But Plaintiffs simply conflate *execution* immunity with *jurisdictional* immunity.  While Section 201 expands the class of *assets* potentially available to victims of terrorism (execution immunity), it does not expand the class of *persons* that may be drawn into court (jurisdictional immunity).  Plaintiffs still must establish subject matter and personal jurisdiction over the target of their execution efforts—here, the Fund.  Plaintiffs cannot do so because the Bretton Woods Agreements Act is an independent, absolute bar to the exercise of jurisdiction over the Fund.  The Order may be affirmed on this independent basis.

### A.    Jurisdictional Immunity and Execution Immunity are Distinct.

There are "two different aspects of foreign sovereign immunity: *jurisdictional* immunity … and immunity from *attachment or execution* of the foreign sovereign's property."  *Weininger v. Castro*, 462 F. Supp. 2d 457, 481 (S.D.N.Y. 2006) (cited in Br. at 24) (emphasis added).  Recognizing these "two kinds of immunity," this Court has held that "[t]o enforce an award against a foreign state in the United States, a party must therefore establish *both* that the foreign state is not immune from suit *and* that the property to be attached or executed against is not immune."  *TIG Ins. Co. v. Republic of Arg.*, 967 F.3d 778,

781 (D.C. Cir. 2020) (emphasis added); *accord Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019) ("[w]hether the District Court … had jurisdiction under the TRIA to attach and execute on [an immune entity's] assets … turns on whether Petitioners held judgments that were based on *an exception to immunity from jurisdiction*…." (emphasis added)); *Walters*, 651 F.3d at 288 ("provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently"); *Agudas Chasidei Chabad v. Russian Fed'n*, 128 F. Supp. 3d 242, 245 (D.D.C. 2015) (same).

Because they are distinct, "waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit." Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 456(1)(b).

It follows, then, that for the TRIA to confer jurisdiction over this suit, Section 201 would have to override *both* (1) the Fund's jurisdictional immunity *and* (2) execution immunity over the assets that Plaintiffs target.  The TRIA does neither.  Section 201, because it concerns *only* execution immunities, does not abrogate the Fund's absolute jurisdictional immunities under the Bretton Woods Agreements Act.  *See* Section II(B) below.  Nor does Section 201 pierce execution

immunity because the assets Plaintiffs target do not fall within the TRIA's scope.
*See* Section III.

### B. The TRIA Targets the Execution Immunity of "Blocked" Sovereign Assets In Specified Circumstances.

The TRIA, by its plain language, abrogates only *execution* immunity in
some cases.  *See* sub-part (1).  Because it is an execution statute, the TRIA
(including its "notwithstanding" clause) does not affect the Fund's independent
*jurisdictional* immunity.  *See* sub-part (2).  The TRIA's legislative history confirms
this plain reading of the statutory text.  *See* sub-part (3).  As a result, one can
discern no clear statement that Congress intended for the TRIA to touch—let alone
override—the Fund's jurisdictional immunity.  *See* sub-part (4).

### 1. Section 201's plain text is limited to execution immunity.

When interpreting Section 201 of the TRIA, the Court must "begin[] with its
text," looking to the "ordinary meaning" of the words.  *N.L.R.B. v. SW Gen., Inc.*,
580 U.S. 288, 299-302 (2017); *Meredith v. Federal Mine Safety and Health Rev.
Com'n*, 177 F.3d 1042, 1054 (D.C. 1999) ("a statute is to be read as a whole"
because "the meaning of statutory language, plain or not, depends on context"
(internal quotations omitted)).  Exceptions to jurisdictional immunity "should be
narrowly construed."  *Schermerhorn*, 876 F.3d at 354; *World Wide Minerals, LTD
v. Republic of Kaz.*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) ("waivers of sovereign

immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language requires'"); *Sossamon v. Texas*, 563 U.S. 277, 285 (2011) (same); 3 Sutherland Statutory Construction § 62:1 (8th ed. 2022) (same).

Section 201 provides in relevant part:

> "Notwithstanding any other provision of law… in every case in which a person has obtained a judgment against a terrorist party … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to *execution or attachment in aid of execution* in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable."

28 U.S.C. § 1610, note (emphasis added).

By its terms, the provision addresses only "execution or attachment in aid of execution" of "blocked assets." *Id.* Nothing in its text refers to subject matter or personal jurisdiction, much less waives jurisdictional immunities. Yet when Congress addresses jurisdictional immunities, the word "jurisdiction" generally appears in the statute. *See, e.g.*, 28 U.S.C. § 1604 ("a foreign state shall be immune from the *jurisdiction* of the courts of the United States…." (emphasis added)); 28 U.S.C. § 1605(a) ("[a] foreign state shall not be immune from the *jurisdiction* of courts" if certain exceptions apply (emphasis added)); 28 U.S.C. § 1605A(a) (same); 28 U.S.C. § 1605B(b) (same).

24

By contrast, when Congress addresses execution or attachment immunities, it does not refer to jurisdiction, but to "attachment" and "execution." *See*, *e.g.*, 28 U.S.C. § 1609 ("property in the United States of a foreign state shall be immune from *attachment*, arrest and *execution* except as provided in sections 1610 and 1611"); 28 U.S.C. § 1610(a) (certain sovereign property "shall not be immune from *attachment* in aid of *execution*, or from *execution*" under specified circumstances); 28 U.S.C. § 1611(b) ("the property of a foreign state shall be immune from *attachment* and from *execution*" in some cases) (emphasis added).

"Congress knew how to write … a law" overriding jurisdictional immunities, but "[i]t did not do so in this statute." *Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*, 142 S. Ct. 1968, 1974 (2022); *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 13 (2012) (other statutes "demonstrate[d] that Congress knew how to" enact certain provisions); *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018) ("Had Congress likewise intended … such an effect, it knew how to say so").

A more natural reading of Section 201—and one adopted by several courts and the Executive branch in *Caballero*—is that it operates as an exception to execution immunity for blocked assets of a state terrorist party (and its instrumentalities) where the plaintiff has a valid judgment against that state terrorist party. *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir.

2010) (cited in Br. at 24) ("[d]iplomatic properties are generally immune from attachment," but the TRIA "carves out an exception to this general rule, authorizing *the attachment* of 'blocked assets' …." (emphasis added)); *Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 58 (1st Cir. 2013) (same); *United States v. Holy Land Found. For Relief & Dev.*, 445 F.3d 771, 787 (5th Cir. 2006) (cited in Br. at 24) (Section 201 "appears to target statutory immunities *to execution*" (emphasis added)); *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *184-85 (S.D.N.Y. Feb. 21, 2023) ("the language in the TRIA resembles the other execution immunity language in the FSIA, distinguishing it from the FSIA's language abrogating jurisdictional immunity …. TRIA is thus rightfully categorized as an execution statute within the FSIA framework"); *Caballero* SOI, p. 6 ("TRIA § 201 exclusively pertains to making certain assets available for execution to satisfy terrorism-related judgments.").[5]

Because its sole focus is execution against blocked terrorist assets, "TRIA § 201(a) does not offer a freestanding mechanism for waiving a foreign sovereign instrumentality's immunity *to jurisdiction*." *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *190 (emphasis added) (holding that the TRIA did not pierce jurisdictional immunity of Da Afghanistan Bank in attachment proceeding

---

[5] Plaintiffs in the *In re Terrorist Attacks* case filed a notice of appeal to the Second Circuit on February 28, 2023.

brought to enforce judgment against the Taliban).  Instead, "section 201(a)

provides for federal court jurisdiction over execution and attachments" of

"blocked" sovereign assets only where a "valid" underlying judgment has already

established jurisdiction over the sovereign.  *Vera*, 946 F.3d at 133.  In that

circumstance, "the sovereign's loss of jurisdictional immunity in the underlying

judgment flows through to the [sovereign's] instrumentality in the attachment

proceedings…."  *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *190.

But when there is no such "valid" underlying judgment against the

sovereign, the TRIA cannot pierce the jurisdictional immunity of the sovereign (or

its instrumentality) in a later attachment proceeding.  *See*, *e.g.*, *Vera*, 946 F.3d at

142 (because underlying judgment against the sovereign (Cuba) was not "valid,"

*i.e.*, judgment violated Cuba's sovereign immunity, judgment was not "enforceable

under TRIA section 201(a)" as against Cuba's assets and the district court "lacked

jurisdiction over the enforcement proceeding.").

The "valid" judgment requirement follows the TRIA's structure.  As

explained, the TRIA permits execution on a judgment against a foreign sovereign

*only* when the state's sovereign immunity has already been abrogated in the action

under FSIA's "terrorism exception," section 1605A. 28 U.S.C. § 1610, note;

*Weininger*, 462 F. Supp. 2d at 488 (the TRIA does not "create a whole new

category of jurisdiction over otherwise immune sovereigns").  With a valid

27

judgment, jurisdiction over the terrorist sovereign "flows through to the [sovereign's] instrumentality in the attachment proceedings…." *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *190.

Plaintiffs do not hold a "valid" judgment against any sovereign—their judgment is against the Taliban. Br. at 3-4.[6] Absent a valid judgment against Afghanistan or Da Afghanistan Bank, their sovereign immunities remain intact, and their assets cannot be attached. *Vera,* 946 F.3d at 142; *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *190. More importantly, Plaintiffs' judgment against the Taliban cannot abrogate the jurisdictional immunity of *the Fund*—a third party over whom jurisdiction could not be established in the terrorism proceeding absent the Fund's own express waiver. *Id.* Thus, the Fund's own absolute immunity under the Bretton Woods Agreements Act remains intact and stands as an obstacle to subject matter jurisdiction.

In short, Section 201—a provision that by its plain language addresses only execution against terrorist assets—cannot reasonably be construed to pierce the Fund's independent jurisdictional immunity under the Bretton Woods Agreements Act. *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) ("some affirmative expression of

---

[6] The TRIA also cannot establish jurisdiction because, as explained below, the assets Plaintiffs sought to attach are not the property "of" the Taliban under Section 201.

congressional intent to abrogate the United States' international obligations is required....").

### 2.  Section 201's "notwithstanding" clause does not override jurisdictional immunity.

Plaintiffs argue (Br. at 24-25, 48) that Section 201's first clause, "notwithstanding any other provision of law," overrides the Fund's jurisdictional immunity.  They are incorrect.

An introductory "'[n]otwithstanding any other provision of law'" clause "does not define the scope of the statute.  It simply informs that once the scope of the statute is determined, it applies regardless of what any other provision or source of law might say."  *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 75 (D.C. Cir. 2015) (quoting *Kucana v. Holder*, 558 U.S. 233, 238–39 n. 1 (2010)).

For this reason, "TRIA's notwithstanding clause 'is not a bulldozer that clears every possible legal obstacle between a litigant and their goal.'"  *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *186.  The TRIA "necessarily has a scope and that scope depends on the substance of the provision to which it is attached."  *Smith v. FRB*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003), *aff'd*, 346 F.3d 264, 271 (2d Cir. 2003).

The TRIA's scope, as explained, is execution of assets.  "Because the TRIA is an *execution* statute, it does not conflict with … provisions … that deal with *jurisdictional immunity*."  *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at

*186 (italics in original).  Because there is no conflict between these two "independent" immunities, *Walters*, 651 F.3d at 288, the TRIA's "notwithstanding" clause is not triggered by the Fund's assertion of jurisdictional immunity.  *See e.g.*, *Rubin*, 138 S. Ct. at 824-25 (Section 201 "extend[s] to [FSIA] judgment holders' ability to *attach and execute* against property"; "notwithstanding" clause overrides "provisions otherwise granting immunity, *but only with respect to assets* associated with certain regulated and prohibited financial transactions" (emphasis added)); *Smith*, 346 F.3d at 271 (Second Circuit was "unconvinced" that the "notwithstanding …" clause "operates to abrogate the President's [International Emergency Economic Powers Act] confiscation authority as it pertains to blocked terrorist assets ….").

Plaintiffs' own authorities *confirm* that the "notwithstanding" clause operates only against execution immunity.  In *Bennett*, 618 F.3d at 23 (cited in Br. at 24), the court recognized that "TRIA § 201(a) … provid[es] a mechanism for the *attachment* of various assets [n]otwithstanding any other provision of law." (internal quotation marks omitted) (emphasis added).

Similarly, in *Holy Land* (cited in Br. at 24), the Fifth Circuit held that the TRIA's "'notwithstanding' language … appears to target statutory immunities *to*

*execution*." 445 F.3d at 787 (emphasis added).[7]  And a later decision in the same case held that the TRIA did not override a criminal forfeiture statute (21 U.S.C. § 853(e)) that placed certain assets out of the TRIA's reach.  *Holy Land*, 722 F.3d 677, 681 (5th Cir. 2013).  The Fifth Circuit faulted plaintiffs and the district court for "find[ing] conflict between two statutes where there is none and grant[ing] undue power to [the TRIA's] 'notwithstanding' clause."  *Id.* at 688 (criticizing plaintiffs' "sweeping assertion" that "the 'notwithstanding' clause trumps any other law that has the incidental effect of removing funds from the reach of judgment creditors.").

Another of Plaintiffs' authorities, *Weininger* (Br. at 24), also recognized that, "[o]n its face, TRIA would appear to provide the exception to immunity *from attachment* that Plaintiffs seek."  462 F. Supp. 2d at 483 (emphasis added); *id.* at 480 ("TRIA . . [is] an execution statute.").  But *Weininger* went on to broadly state that "TRIA operates as an exception to immunity from both jurisdiction and execution."  *Id.* at 488-89.  That approach is not correct, and it is not relevant here for two reasons.

First, the statement is dicta and finds no support in the cases *Weininger* relied on, which only recognized the TRIA's effect on *execution* immunity.  *See id.*

---

[7] Plaintiffs left out the emphasized language when quoting *Holy Land*.  *See* Br. at 24.

at 488-89 (citing *Holy Land*, *supra*, and *Hill v. Republic of Iraq*, 2003 U.S. Dist. LEIS 3725, at \*10 (D.D.C. Mar. 11, 2003) ("TRIA overrides any immunity *from execution* that blocked Iraqi property might otherwise enjoy" (emphasis added)). And just last month, having the benefit of 17 years of subsequent judicial and Executive branch analysis, a court in the same district rejected *Weininger*'s approach. *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at \*182-87.

Second, *Weininger* involved enforcement of a "valid" judgment against a sovereign whose FSIA jurisdictional immunity had already been overcome. 462 F. Supp. 2d at 488-89 ("the Florida state courts already determined that Cuba was not immune from judgment under § 1605(a)(7)"). *Weininger*'s statement about the TRIA overriding jurisdictional immunity was unnecessary to its holding because the judgment against Cuba had pierced jurisdictional immunity. (Here, as set forth above, pg. 28, Plaintiffs' judgment against the Taliban does not have the same effect). For similar reasons, *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010), which involved an underlying judgment against a foreign sovereign, is inapplicable, and the Second Circuit has since made clear that *Weinstein* is limited to situations "where 'a valid judgment has been entered' against the sovereign." *Vera*, 946 F.3d at 133.

In sum, Section 201's "notwithstanding" clause functions to override conflicting execution immunities, *not* jurisdictional immunities.

### 3.    The legislative history confirms that the TRIA is an execution statute that does not abrogate the Fund's jurisdictional immunities.

The purpose of the TRIA Section 201 was to eliminate specific execution immunities to enable terrorism victims to access "blocked" terrorist assets.  H. Rept. 107-300 and H. Rept. 107-779 (Conference Report) - TERRORISM RISK PROTECTION ACT, 107th Congress (2001-2002), p. 27 ("Section 201 … authorizes the enforcement of judgments against terrorist organizations and eliminates the effect of any Presidential waiver issued prior to the date of enactment purporting to bar or restrict enforcement of such judgments, thereby making clear that all such judgments are enforceable against any assets or property under any authorities referenced in Section 1610(f)(1).").[8]

FSIA § 1610(f)(1) (referenced in the Conference Report), "purportedly allowed creditors holding judgments under § 1605(a)(7) … to attach blocked property" even before the TRIA's passage.  *Heiser*, 735 F.3d at 939.  But "the President was authorized to 'waive any provision' of § 1610(f)(1) 'in the interest of national security.'  28 U.S.C. § 1610(f)(3)."  *Id.* at 939 (D.C. Cir. 2013).  Because "[t]he President waived § 1610(f)(1) in almost all cases after finding that

---

[8] House Report 107-300 is available at www.congress.gov/congressional-report/107thcongress/house-report/300 (last visited March 16, 2023) and House Report 107-779 is available at https://www.congress.gov/107/crpt/hrpt779/CRPT-107hrpt779.pdf (last visited March 16, 2023).

attachment of blocked property would 'impede the ability of the President to conduct foreign policy,'" Congress "responded to this perceived 'flaunting [flouting of?] the law,' 148 Cong. Rec. 23,121 (Nov. 19, 2002) (statement of Sen. Harkin), by passing § 201, which 'builds upon and extends the principles in section 1610(f)(1) ... and *eliminates the effects of any Presidential waiver* issued prior to the date of enactment.'" *Heiser*, 735 F.3d at 939 (quoting H.R. Rep. No. 107–779, at 27) (emphasis added).

As the Supreme Court summarized, the TRIA's "history suggests that Congress placed the 'notwithstanding' clause in § 201(a) … to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009).

In other words, the TRIA lifted execution immunity for "blocked assets" of terrorist states "notwithstanding" the Presidential waiver in section 1610(f)(3).

Plaintiffs rely (Br. at 23) on the statement of a sponsor of the TRIA, Senator Tom Harkin, that "[t]he purpose of [Section 201]" is to enable terrorism victims "to satisfy [their] judgments from the frozen assets of terrorist parties" and "establishes once and for all … that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly*

*provided in this act.*"  148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (emphasis added).

Senator Harkin's statement confirms that Section 201 was meant to override executive branch waiver—he said nothing about jurisdictional immunity.  In fact, consistent with the plain language of the statute, Senator Harkin noted that the TRIA "operates to strip a terrorist state of its *immunity from execution or attachment* in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities, *available for attachment and/or execution of a judgment issued against that terrorist state*."  148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (emphasis added).

Similarly, the committee report Plaintiffs cite (Br. at 23-24) confirms that "[t]he purpose of Section 201" is to enable terrorism victims to enforce their judgments "through the *attachment* of blocked assets of terrorist parties."  H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.) (emphasis added).  The report then notes that "Section 201 builds upon and extends the principles in section 1610(f)(1) of the [FSIA]."  *Id.*  Section 1610(f)(1), in turn, relates to "[e]xceptions to the immunity from attachment or execution," *not* jurisdiction.

In short, the TRIA's legislative history confirms that Section 201 eliminated execution immunity for certain "blocked" terrorist assets, "notwithstanding" any

preexisting Presidential waiver under 28 U.S.C. § 1610(f).  It did not purport to override independent jurisdictional immunities.

### 4.    Section 201 contains no "clear statement" by Congress to abrogate the international agreements enshrining the Fund's immunity.

Plaintiffs invoke the "later in time" canon, arguing that because the TRIA was enacted after the Bretton Woods Agreements Act, it necessarily trumps the Fund's immunities.  Br. at 24.  In *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 724 F.3d 230 (D.C. Cir. 2013) ("*OOIDA*"), this Court acknowledged the "last-in-time rule": if statutes and treaties clash, "the more recent legal pronouncement controls."  724 F.3d at 233.  "But though the last-in-time rule tells courts how to resolve clashes between statutes and treaties, *courts prefer to avoid such conflicts altogether*."  *Id.* at 233-34 (emphasis added); *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

To avoid needless conflict—particularly when international agreements are at issue—the Court follows a "clear statement" rule.  *See OOIDA*, 724 F.3d at 234-35.  Under this "clear statement rule," "absent some clear and overt indication from

36

Congress, we will not construe a statute to abrogate existing international agreements even when the statute's text is not itself ambiguous." *Id.* at 234.

"[R]equiring a clear statement rule with respect to implicit abrogation of international agreements" serves to "protect against unintended clashes" that "could result in international discord.'" *Id.* at 236.[9]  The rule "injects clarity into the policymaking process" and "permits Congress, the President, the courts, and the public alike to better comprehend the actual implications of legislation." *Id.* at 238 (as Congress did not mention abrogating "any existing international

---

[9] *See also, e.g.*, *Weinberger*, 456 U.S. at 32 ("some affirmative expression of congressional intent to abrogate the United States' international obligations is required...."); *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979) ("Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights."); *Cook v. United States*, 288 U.S. 102, 120 (1933) (same); *Roeder v. Islamic Republic of Iran ("Roeder I")*, 333 F.3d 228, 238 (D.C. Cir. 2003) ("Congress (or the President acting alone) may abrogate an executive agreement, but legislation must be clear to ensure that Congress—and the President—have considered the consequences."), *Roeder v. Islamic Republic of Iran ("Roeder II")*, 646 F.3d 56, 61 (D.C. Cir. 2011) (describing the "clear statement requirement"); *Kappus v. Comm'r of IRS*, 337 F.3d 1053, 1059 & n.6 (D.C. Cir. 2003) ("unless it is impossible to do so, treaty and law must stand together in harmony" (internal quotation marks omitted)); *South African Airways v. Dole*, 817 F.2d 119, 125-26 (D.C. Cir. 1987) ("statutes must be construed wherever possible in a manner that will not require to the United States 'to violate the law of nations'").

agreement" in the legislative history, court refused to "presume the Act repudiates the executive agreements with Mexico and Canada *sub silentio*.").[10]

Here, this Court may avoid a needless clash between the TRIA and the Fund's jurisdictional immunities under the Bretton Woods Agreement Act by recognizing—just like many other courts have done—that the TRIA is purely an execution statute. That construction, as explained above, reflects the TRIA's plain text and its legislative history. The TRIA, as an execution statute targeting "blocked" terrorist assets, can co-exist with the Fund's jurisdictional immunities under the Bretton Woods Agreement Act. Because these provisions can be so reconciled, the Court must give effect to both. *Holy Land*, 722 F.3d at 688 (addressing Section 201 and faulting lower court for finding "conflict between two statutes where there is none").

Congress simply did not mention, address, or consider the Articles or the Bretton Woods Agreement Act when passing the TRIA. *See* 116 Stat. 2322; *cf. Swinomish Indian Tribal Community v. BNSF Ry. Co.*, 951 F.3d 1142, 1160 (9th

---

[10] This idea follows the longstanding principle that "'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (alterations in original); *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.").

Cir. 2020) (no abrogation of treaty rights absent "clear evidence that Congress *actually considered* the conflict between its intended action on the one hand and … treaty rights on the other" (emphasis added)).  The TRIA's silence necessarily is not a "clear statement" of Congressional intent to dismantle the longstanding, jurisdictional immunities of the Fund.

There is good reason to require a clear statement here: abrogating the Articles (an international agreement in effect since World War II) would sow "international discord."  *OOIDA*, 724 F.3d at 236.  As detailed above, the Fund's broad immunity is necessary for the Fund to pursue its purposes and avoid unilateral interference by the courts of any one of its 190 member states.  *See* Articles, Art. IX § 1 (immunities necessary "[t]o enable the Fund to fulfill the functions with which it is entrusted"); *Jam*, 139 S. Ct. at 771.

Given the Fund's unique function and its need to avoid unilateral control by any single member country, each of its member countries conferred absolute immunity on the Fund and agreed to make this immunity effective in their domestic legal systems.  *See* Articles, Art. IX, §§ 3, 10; 22 U.S.C. § 268h.  This careful balance struck by 190 countries, under the "shared premise that the Fund is generally immune from suit," *Sacks*, 26 F.4th at 473-74, would be upended by a ruling that the United States, a founding member country, eviscerated the Fund's absolute immunities *sub silentio* in the TRIA.

Finally, even if there were a conflict between Section 201 and the Fund's immunities, the latter would control. The FSIA "is subject to such [previously executed] international agreements." *Moore v. United Kingdom*, 384 F.3d 1079, 1084 (9th Cir. 2004) (citing 28 U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act…")). Under this treaty exception, "[i]f there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *Moore*, 384 F.3d at 1084 (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989)); *see also de Csepel v. Republic of Hungary*, 714 F.3d 591, 601–03 (D.C. Cir. 2013)(same); *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 297 (2d Cir. 1993) (resolving direct conflict between FSIA and preexisting treaty in favor of enforcing treaty).

Section 201 is part of the FSIA. 28 U.S.C. § 1610, note. Section 201, being a later-in-time enactment, is subject to preexisting international agreements like the Articles, not the other way around. Thus, the Articles control over Section 201. *Moore*, 384 F.3d at 1084.

## III. The District Court Correctly Determined that Plaintiffs Have Not Met the Requirements of the TRIA to Execute on the Assets They Seek.

TRIA only applies to blocked assets "of" a "terrorist party" or "of" "any agency or instrumentality of that terrorist party." 28 U.S.C. § 1610, note. The

40

district court correctly held that the TRIA does not apply here, and that ruling must be affirmed for at least two independent reasons: first, courts cannot constitutionally declare Afghanistan's central bank an "agency or instrumentality" of the Taliban (A-197-201); and second, the special drawing rights Plaintiffs seek (Br. at 35-47) are not blocked assets "of" the Taliban.  A-197-201.

### A.    The District Court Properly Refused to Usurp the President's Exclusive Right to Recognize Foreign Governments.

To satisfy the TRIA's narrow execution exception, Plaintiffs must point to blocked assets "of" their judgment creditor, the Taliban.  Plaintiffs argued that property that assertedly was payable to Afghanistan's central bank, Da Afghanistan Bank, belonged to the Taliban.  But for that argument to succeed, the district court would have to recognize the Taliban as the government of Afghanistan and the owner of its assets, which according to United States law, the district court correctly refused to do.

Had the district court done so, it would have circumvented the President's exclusive authority to recognize foreign governments.  A-200-01.  "Recognition is a 'formal acknowledgement' that a particular 'entity possesses the qualifications for statehood' or 'that a particular regime is the effective government of a state.'" *Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) (citing Restatement § 203, Comment a (1986)).  "Recognition is a topic on which the Nation must speak ... with one voice."  *Zivotofsky*, 576 U.S. at 14 (internal quotations omitted).  Based on

41

constitutional structure, Supreme Court precedent, and Congressional practice, "the power to recognize or decline to recognize a foreign state and its territorial bounds resides in the President alone." *Id.* at 28.

To infringe on the President's exclusive power, an action by one of the other branches of government need "not itself constitute a formal act of recognition." *Id.* at 30. Rather, if the action by the other branch would, by implication, "contradict [the President's] prior recognition determination," it sidesteps the President's exclusive recognition power. *See id.* (statute requiring passports to list "Israel" as place of birth for Jerusalem-born individuals infringed on recognition power).

While *Zivotofsky* involved unauthorized Congressional action, the President's exercise of his foreign policy powers "is conclusive on all domestic courts." *Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) (quoting *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938)). These types of foreign relations questions are for the political branches, not the courts. *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. U.S.*, 607 F.3d 836, 841-42 (D.C. Cir. 2010) ("Disputes involving foreign relations, … are 'quintessential sources of political questions'…. [C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security"); *Republic of Panama v. Republic Nat'l Bank*, 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988) ("it is not a proper function of a domestic court of the United States to

42

attempt to judge which government best represents the interests of" the foreign

nation (internal quotation marks omitted)).

Plaintiffs contend that the Fund holds "assets … *belonging to the Islamic*

*Republic of Afghanistan* and payable to Da Afghanistan Bank," which Plaintiffs

concede is "the Central Bank of Afghanistan." A-29 (emphasis added); A-76.

Plaintiffs also concede that the President has not recognized the Taliban as the

government of the Islamic Republic of Afghanistan. *See, e.g.*, A-135-36. Yet

Plaintiffs urge a different test. They allege the Taliban now exercise de facto

control over Afghanistan and its central bank, such that assets that "belong[] to the

Islamic Republic of Afghanistan" are now assets of the Taliban or its agencies and

instrumentalities. *See, e.g.*, Br. at 46-47; A-29; A-76-77; A-107-108.

Plaintiffs are effectively asking for a finding that the Taliban is the

government of Afghanistan. "[F]oreign sovereigns are legal fictions to the extent

that they can only act through their individual officers," who are "act[ing] on

behalf of that nation." *Doe v. State of Israel*, 400 F. Supp. 2d 86, 104 (D.D.C.

2005) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153

(D.C. Cir. 1994)). Moreover, to the extent they seek assets of the Taliban that they

assert are held in the United States (which they must for present purposes), "a

regime not recognized as the government of a state is not entitled to property

belonging to that state located in the United States." Restatement § 205(2); *see*

43

*also Republic of Panama*, 681 F. Supp. at 1070 (rejecting claim to funds in U.S. bank account by regime not recognized by the United States).

Accordingly, a finding by the district court that assets "belonging to … Afghanistan" are "assets of [a] terrorist party" or an "agency or instrumentality of that terrorist party" for purposes of the TRIA would require a finding that the Taliban is the government of Afghanistan and thus rightfully controls Da Afghanistan Bank.  Otherwise, the Taliban, whether directly or through Da Afghanistan Bank, would not be "entitled to property belonging to" Afghanistan in the United States.  Restatement § 205(2).  *De facto* control by the Taliban is not sufficient because Plaintiffs seek to attach property in the United States, rather than property in "territory under the control of that regime."  *Id.* § 205(3).

It is also irrelevant that a ruling for Plaintiffs would "not itself constitute a formal act of recognition."  *Zivotofsky*, 576 U.S. at 30.  Federal courts cannot implicitly "contradict" the President's exercise of his exclusive recognition power. *Id.*; *see also id.* at 22 ("the Judiciary is not responsible for recognizing foreign nations"); *Muthana*, 985 F.3d at 907; *Republic of Panama*, 681 F. Supp. at 1071.

Another federal court reached the same conclusion in a case involving the same Plaintiffs.  On February 21, 2023, District Judge George Daniels held that Plaintiffs' request to attach Da Afghanistan Bank's funds held by the Federal Reserve Bank of New York would violate the President's exclusive right to

44

recognize foreign governments: "a finding that the Taliban regime is in control of [Da Afghanistan Bank]" would be to find that "the Taliban thus acts as the government of Afghanistan." *In re Terrorist Attacks*, 2023 U.S. Dist. LEXIS 28773, at *195-203.

Adopting Plaintiffs' position also could upset the Executive branch's foreign policy calculus, since allowing the judicial branch to effectively brand a foreign sovereign as a "terrorist state" offends its dignity and thus undermines the Executive branch's ability to make those determinations as part of its foreign policy. Put simply, Plaintiffs would have the Court wade into a foreign policy "thicket" where federal courts should not operate. *See Doe v. Mattis*, 889 F.3d 745, 769 (D.C. Cir. 2018) (Henderson, J., dissenting) ("in the 'thicket' of international politics … 'our lack of competence is marked,' 'our democratic unaccountability glaring' and 'the ramifications of our actions unpredictable'").

The district court properly declined to contradict the President's decision not to recognize the Taliban as the government of Afghanistan, or to wade into foreign relations questions most properly addressed by the political branches. The decision should be affirmed.

45

**B.**    **The Fund's Special Drawing Rights are not Assets "of" the Taliban and Cannot be Held or Used by the Taliban and its Creditors.**

Section 201 addresses attachment of "the blocked assets *of* th[e] terrorist party (including the blocked assets *of* any agency or instrumentality of that terrorist party)."  28 U.S.C. § 1610, note (emphasis added).  The word "of" in Section 201 denotes "ownership," to prevent attachment of property belonging to "innocent parties."  *Heiser*, 735 F.3d at 939-41; *Villoldo v. Castro Ruz*, 113 F. Supp. 3d 435, 442 (D. Mass. 2015), *aff'd*, 821 F.3d 196 (1st Cir. 2016) (same).  Ownership is the right "to use, manage, and enjoy property," including the "implie[d] … right to possess a thing, regardless of any actual or constructive control."  Black's Law Dictionary (11th ed. 2019).

Requiring "ownership" by the terrorist party and judgment debtor (or its agencies and instrumentalities) aligns with the principle that "a judgment creditor cannot acquire more property rights in a property than those already held by the judgment debtor."  *Heiser*, 735 F.3d at 938; *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 157 (2d Cir. 2018) (under Section 201, "[i]t is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property is only the same as the defendant's own interest in it").

Here, Plaintiffs assert the right to execute on "special drawing rights" *of a Fund member* (Afghanistan).  The district court concluded that these special

46

drawing rights "are not assets 'of' the [terrorist] organization," (*i.e.,* the Taliban)

under the TRIA.  A-200.  That conclusion is indisputably correct because special

drawing rights are assets allocated to Fund members (the Taliban is not one), and

are not commercial assets the Taliban or its creditors may hold.  As a result, the

Taliban (and, by extension, creditors like Plaintiffs) have no right to own or hold

special drawing rights.

Special drawing rights are an interest-bearing international reserve asset

created by the Fund to supplement the reserves of its member countries, in

accordance with its Articles.  *See* Articles, Art. XV § 1 ("[t]o meet the need, as and

when it arises, for a supplement to existing reserve assets, the Fund is authorized to

allocate special drawing rights in accordance with the provisions of Article XVIII

to members that are participants in the Special Drawing Rights Department.").[11]

Special drawing rights are not currency but, rather, represent one *Fund*

*member*'s right to exchange for the currency of another *Fund member.  Id.*; s*ee*

*also EM Ltd.*, 473 F.3d at 484 (special drawing rights "are not available in the

---

[11] *See also* International Monetary Fund, *Questions and Answers on Special Drawing Rights*, available at  https://www.imf.org/en/About/FAQ/special-drawing-right#Q1.%20What%20is%20an%20SDR? (Aug. 23, 2021) (last visited March 16, 2023); *see also* International Monetary Fund, *Special Drawings Rights (SDR) Factsheet*, available at https://www.imf.org/en/About/Factsheets/Sheets/2016/08/01/14/51/Special-Drawing-Right-SDR (Aug. 5, 2021) (last visited March 16, 2023).

commercial market"). Their status "as a reserve asset derives from the commitments of [Fund] members to hold and exchange [special drawing rights] and to accept the value of [special drawing rights] as determined by the Fund."[12]

Special drawing rights are only allocated to Fund members that elect to participate in the Special Drawing Rights Department of the Fund. Articles, Art. XVII § 1. Currently, all members of the Fund participate in the Special Drawing Rights Department.[13] Special drawing rights can be held and used by member countries, the Fund, and certain designated official entities called "prescribed holders"—but they cannot be held by private entities or individuals. *See* Articles, Art. XVII (describing who may hold special drawing rights); *see also* n. 13, supra.

Based on the above, special drawing rights cannot be transferred to or held by the Taliban (the judgment debtor) or the Plaintiffs (the judgment creditors). As a result, special drawing rights are not assets "of" the Taliban and are not subject to execution under the TRIA. *Heiser*, 735 F.3d at 939-41. To allow Plaintiffs to

---

[12] *See* International Monetary Fund, *Questions and Answers on Special Drawing Rights*, available at https://www.imf.org/en/About/FAQ/special-drawing-right#Q1.%20What%20is%20an%20SDR? (Aug. 23, 2021) (last visited March 16, 2023).

[13] *See* International Monetary Fund, *Special Drawings Rights (SDR) Factsheet*, available at https://www.imf.org/en/About/Factsheets/Sheets/2016/08/01/14/51/Special-Drawing-Right-SDR (Aug. 5, 2021) (last visited March 16, 2023).

execute on special drawing rights would impermissibly allow them to "acquire *more* property rights in a property than those already held by the judgment debtor." *Heiser*, 735 F.3d at 938 (emphasis added).

Plaintiffs fault the district court for ruling without first ordering discovery. But they never asked for discovery, and insisted on a resolution based on the existing record. A-129, n. 4 (arguing they "already" had "'prove[d]' their claim"). Plaintiffs have therefore waived that contention, and also have failed to meet their burden to prove TRIA's elements on the existing record. *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1356 (11th Cir. 2022) (burden of establishing TRIA's requirements is on judgment creditors). The record, including the newspaper articles on which Plaintiffs rely, does not support that the Fund held assets belonging to the Taliban. Nor does the record support that the Fund prevented the Taliban from accessing special drawing rights because of an executive branch "blocking" order.

Plaintiffs also fault (Br. at 38-43) the district court's reliance on *Heiser* because *Heiser's* application of the U.C.C. to determine ownership of electronic funds was rejected in other contexts in *Est. of Levin v. Wells Fargo Bank*, 45 F.4th 416 (D.C. Cir. 2022) and *Bennett v. Islamic Republic*, 825 F.3d 949 (9th Cir. 2016), *abrogated on other grounds by Rubin*, *supra*. But the district court did not cite, let alone rely on, the U.C.C. to determine ownership here. A-200. Rather, the

district court cited *Heiser* for the basic proposition that the judgment debtor must own the assets sought by the judgment creditor.  *See id.*

*Levin* and *Bennett* both *agreed* with that principle.  In *Levin*, this Court held that the creditor could attach funds if the judgment debtor had "[a] 'sufficient property interest'" in those funds.  45 F.4th at 420, 423.  In *Bennett*, the Ninth Circuit agreed that the assets at issue were within Section 201 because the judgment debtor had "a contractual right to obtain [the] payments" in question.  825 F.3d at 964.  Far from undermining the district court's conclusion, *Levin* and *Bennett* confirm it was correct.

In sum, special drawing rights are not assets "of" the Taliban, are not the type of asset subject to execution and transfer to the Taliban and its creditors, and are not subject to the "block" that is required by the TRIA.

## IV.    The District Court Also Lacked Jurisdiction Because Plaintiffs Did Not (And Could Not) Effect Service on the Fund.

Even if Plaintiffs could overcome the Fund's immunity and satisfy the requirements of the TRIA (and they cannot), their failure to effect service on the Fund is an independent bar to jurisdiction.

"Personal jurisdiction has constitutional dimensions and regardless of policy goals, Congress cannot override the due process clause, the source of protection for non-resident defendants"  *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (internal citations omitted); *City of Monroe Emples. Ret. Sys. v.*

*Bridgestone Corp.*, 399 F.3d 651, 667 (6th Cir. 2005) ("[a] claim of statutory liability … is no substitute for establishing personal jurisdiction" and "Congress cannot override the due process clause" (internal quotation marks omitted)); *In re Baan Co. Secs. Litig.*, 245 F. Supp. 2d 117, 129 (D.D.C. 2003) (plaintiffs cannot "impermissibly conflate[] statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair").

The district court had no jurisdiction over the Fund for many reasons.

First, the Fund is immune from every form of judicial process—including service of process. Articles, Art. IX, § 3; 22 U.S.C. § 286h; *Nyambal*, 772 F.3d 277 at 280-81. Without its own express waiver, the Fund cannot be served and subjected to personal jurisdiction. *Garcia v. Sebelius*, 919 F. Supp. 2d 43, 46 (D.D.C. 2013) (where international organization was absolutely immune from "suit and every form of judicial process," plaintiffs' attempts at service were ineffective).

Second, even an international organization subject to the default levels of FSIA immunity may only be drawn into court if the plaintiff establishes a waiver of jurisdictional immunity (28 U.S.C. §§ 1605-07) *and* that the international organization has been served pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(a)-(b). The Fund, which enjoys higher levels of immunity than provided under the FSIA due to its charter (*Jam*, 39 S. Ct. at 771-72), is entitled to—at the

51

very least—service that follows the FSIA's minimum standards when it has expressly waived its immunity.  Setting aside that the Fund has not waived its immunity here, Plaintiffs did not meet the FSIA's service standards: they simply dropped the papers at the foot of a security guard, who expressly stated to the process server that she was "not authorized to accept service."  A-11.

Third, parties with *no* immunities are still entitled to proper service under federal and state law before they are subject to a court's jurisdiction.  *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  Federal Rule of Civil Procedure 4 requires parties to be served in accordance with state law, or via "an officer, a managing or general agent, or any other agent authorized by appointment or law to receive service of process…."  Fed. R. Civ. P. 4(h).  In the District of Columbia, "a writ of attachment after judgment may be properly served on a corporate garnishee by delivering it to 'an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process ....'"  *Wrecking Corp. of Am., Virginia, Inc. v. Jersey Welding Supply, Inc.,* 463 A.2d 678, 679 (D.C. 1983) (citing Super. Ct. Civ. R. 4).  Merely receiving notice of a lawsuit is not sufficient.  *McLaughlin v. Fidelity Sec. Life Ins.,* 667 A.2d 105, 106 (D.C. 1995); *Bulin v. Stein,* 668 A.2d 810, 814 (D.C. 1995).

Under these standards, too, dropping process at the foot of a security guard who lacks the authority to accept service is not sufficient.  *See* A-11; *see, e.g.,*

*Jones v. Auto. Club of S. Cal.*, 26 F. App'x 740, 743 (9th Cir. 2002) (service on security guard not sufficient); *Bouchard v. U.S. Airways*, 2012 U.S. Dist. LEXIS 1025, at *2-5 (E.D. Pa. Jan. 5, 2012) (same; collecting cases).[14]  Accordingly, setting aside all immunity-related arguments, Plaintiffs' failure to effect valid service on the Fund is an independent ground for affirmance.

## V.  The District Court Properly Declined to Enter Judgment or Compel Interrogatory Responses.

Plaintiffs assert that the district court should have entered judgment against the Fund for failure to answer interrogatories (Br. at 32-34) or compelled interrogatory responses (*id.* at 35).  They put the merits cart before the jurisdictional horse.  The district court properly first addressed jurisdiction—a threshold question in every case.  Finding that it lacked jurisdiction, the district court properly dismissed the action.

---

[14] In *Novak v. World Bank*, 703 F.2d 1305 (D.C. Cir. 1983) (cited in Br. at 32), the Court stated in footnote dicta that, in some circumstances, service can be effected by leaving the papers near the person to be served.  *Id.* at 1310 n.14 (citing *Errion v. Connell*, 236 F.2d 447, 457 (9th Cir. 1956) (target of service was an individual) and *Heritage House Frame & Moulding Co. v. Boyce Highlands Furniture Co.*, 88 F.R.D. 172, 174 (E.D.N.Y. 1980) (target of service was corporation, and service effected on authorized agent)).  *Novak* did *not* endorse leaving papers with individuals *not authorized* to accept service (like the security guards in this case), much less when the entity to be served is absolutely immune from all forms of judicial process.

53

As discussed in Section I, above, the Fund's absolute immunity, which it did not waive, deprived the district court of subject matter jurisdiction, rendering the court powerless to order answers to interrogatories or to enter judgment against the Fund. *Nyambal*, 772 F.3d at 280-81.

Even outside the immunity context, "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 93-102 (1998)). In making the jurisdictional determination, "a federal court has leeway 'to choose among threshold grounds for denying audience to a cause on the merits.'" *Id.* at 431 (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).

Here, the district court did exactly that. Before proceeding with the action, it addressed jurisdiction. Choosing among the various threshold grounds, which included the Fund's absolute immunity, the district court ultimately determined that it lacked subject matter jurisdiction because the TRIA did not apply. A-197-201. Having determined that it lacked jurisdiction, the district court properly refused to enter judgment or compel interrogatory responses. *See id.*

By insisting that the district court had to enter judgment based on the Fund's failure to answer interrogatories, Plaintiffs are essentially contending that the D.C.

54

Code trumps federal law.  *See* Br. 32-35.  That is exactly backwards.  *See, e.g.*,

*Goudreau v. Standard Fed. Sav. & Loan Ass'n*, 511 A.2d 386, 388 (D.C. Ct. App.

1986) (D.C. Code "is preempted" where it "does indeed conflict with" federal

law).  The D.C. Code cannot change the fact that the district court lacked

jurisdiction under federal law, which prohibited the lower court from going further.

Plaintiffs also belatedly contend that the district court should have granted

jurisdictional discovery.  The contention is waived because Plaintiffs never asked

for this relief below.  A-103, 119.  On the contrary, they insisted that the district

court could resolve the motions to quash based on the existing record.  A-129, n. 4.

But even if the Court were to entertain the discovery argument, it fails.  The

Fund's immunity extends to "every form of judicial process."  Articles, Art. IX §

3.  "Process" does not just mean the initiating papers for a lawsuit; "[i]t refers

broadly to '[t]he proceedings in any action.'"  *Zuza v. Office of the High*

*Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017).  Thus, the Fund's immunity

"shields [its] … from the *burden of defending*" the suit.  *Nyambal*, 772 F.3d at 280-

81 (emphasis added).  As a result, the Fund's immunity necessarily protects against

the burdens of litigation, including answering interrogatories and being subjected

to discovery.

Because "[t]he Fund's entitlement … to immunity from suit" is "'a critical

preliminary determination,'" the plaintiff must "articulate[] a '*specific, well-*

*founded allegation* that [jurisdiction] exists'" before that plaintiff can obtain discovery. *Nyambal*, 772 F.3d at 281 (*quoting Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (emphasis added)).

Courts apply similar standards to international organizations with *lower levels* of immunity than the Fund, finding them exempt from discovery absent an exception to immunity or a "reasonable basis" to believe such an exception might exist. *See, e.g.*, *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) ("sovereign immunity [under the FSIA] protects a sovereign from the expense, intrusiveness, and hassle of litigation"; affirming dismissal of action and denial of discovery where plaintiff failed to "articulate a 'reasonable basis' for the court to assume jurisdiction"); *Zuza*, 857 F.3d at 938 (IOIA).

No amount of discovery can change the fact that the Fund is absolutely immune from all forms of judicial process, absent a waiver. *See* Section I. Discovery would also have been futile to rebut the district court's conclusion that the TRIA's requirements were not met. Special drawing rights are not blocked assets "of" the Taliban or its agencies and instrumentalities; and the district court was constitutionally prohibited from determining whether Da Afghanistan Bank was an "agent or instrumentality" of the Taliban. *See* Section III, *supra*. Thus, even if Plaintiffs could overcome every other hurdle posed by the Fund's immunities, they could never show that the TRIA applied.

Finally, Plaintiffs' reliance on *Novak*, 703 F.2d at 1310 (Br. at 32) is misplaced. There, the Court held it was improper for the district court to sua sponte dismiss an action against the World Bank based on "the United States Marshal's refusal to serve World Bank." *Id.* *Novak* held that dismissal for lack of jurisdiction is only inappropriate "where there exists a reasonable prospect that service can be obtained." *Id.* Here, there is no such "reasonable prospect" because "the Fund is generally immune from suit" and from "every form of judicial process." *Sacks*, 26 F.4th at 473-74; Articles, Art. IX § 3.

In short, the district court did exactly what it was supposed to do. Having first found that it lacked jurisdiction, the district court properly refused to compel interrogatory responses, to enter a judgment it lacked the authority to enter, or to order discovery that would have been futile. The decision should be affirmed.

## CONCLUSION

The order granting the Fund's motion to quash the writ of attachment and denying Plaintiffs' motion for entry of judgment should be affirmed.

DATED:  March 20, 2023                    Respectfully submitted,


By: */s/ James R. Newland*

James R. Newland, Jr.
JNewland@seyfarth.com
Kiran Aftab Seldon
kseldon@seyfarth.com
Owen R. Wolfe
owolfe@seyfarth.com

SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC  20004-1454
Telephone:    (202) 463-2400
Facsimile:    (202) 828-5393

*Counsel for International Monetary
Fund, Specially Appearing*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), and 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 12,946 words.

By: <u>*/s/ James R. Newland*</u>
James R. Newland, Jr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2023, I caused a copy of the above to be filed with the Clerk of the Court using the ECF system and thereby served on all counsel of record, including counsel for Appellant.

By: *<u>/s/ James R. Newland</u>*
James R. Newland, Jr.

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Articles of Agreement of the International Monetary Fund, Article IX ....... ADD1

22 U.S.C. § 286h ................................................................................... ADD1

22 U.S.C. § 288a ................................................................................... ADD1

28 U.S.C. § 1604 .................................................................................. ADD2

28 U.S.C. § 1609 .................................................................................. ADD2

28 U.S.C. § 1610, note ......................................................................... ADD2

28 U.S.C. § 1330 .................................................................................. ADD3

# PERTINENT STATUTORY PROVISIONS

**Articles of Agreement of the International Monetary Fund, Article IX:**

Section 3. Immunity from judicial process

The Fund, its property and its assets, wherever located and by whomsoever held, shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract.

## 22 U.S.C. § 286h

The provisions of article IX, sections 2 to 9, both inclusive, and the first sentence of article VIII, section 2(b), of the Articles of Agreement of the Fund, and the provisions of article VI, section 5(i), and article VII, sections 2 to 9, both inclusive, of the Articles of Agreement of the Bank, shall have full force and effect in the United States and its Territories and possessions upon acceptance of membership by the United States in, and the establishment of, the Fund and the Bank, respectively.

## 22 U.S.C. § 288a

International organizations shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:

(a)International organizations shall, to the extent consistent with the instrument creating them, possess the capacity—

(i)to contract;

(ii)to acquire and dispose of real and personal property;

(iii)to institute legal proceedings.

(b)International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

(c)Property and assets of international organizations, wherever located and by whomsoever held, shall be immune from search, unless such immunity be

expressly waived, and from confiscation. The archives of international organizations shall be inviolable.

(d)Insofar as concerns customs duties and internal-revenue taxes imposed upon or by reason of importation, and the procedures in connection therewith; the registration of foreign agents; and the treatment of official communications, the privileges, exemptions, and immunities to which international organizations shall be entitled shall be those accorded under similar circumstances to foreign governments.

## 28 U.S.C. § 1604

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

## 28 U.S.C. § 1609

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment [1] arrest [1] and execution except as provided in sections 1610 and 1611 of this chapter.

## 28 U.S.C. § 1610, note

Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

(2) Blocked asset. The term 'blocked asset' means—
(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b) [50 USCS § 4305(b)]) or under sections 202 and 203 of the International

Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

(B) does not include property that—

(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

## 28 U.S.C. § 1330

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

93194285v.2